**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PINKZEBRA MUSIC, LLC )
)
               Plaintiff, )
)
     v. )
) Case Number:
SHENZHEN WONDERSHARE )
INFORMATION TECHNOLOGY CO. LTD., )
WONDERSHARE SOFTWARE CO., )
ISKYSOFT STUDIO, and AIMERSOFT ) **1:16-cv-11099**
STUDIO, ) **Judge Joan B. Gottschall**
) **Magistrate Judge Sheila M. Finnegan**
             Defendants. )

**DECLARATION OF BRIAN T. NOACK IN SUPPORT OF PLAINTIFF'S *EX PARTE*
MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER, INCLUDING A
TEMPORARY INJUNCTION, A TEMPORARY ASSET RESTRAINT, EXPEDITED
DISCOVERY, AND SERVICE OF PROCESS BY E-MAIL**

    1.    I am an attorney with the law firm of Wolek & Noack and counsel for Plaintiff

PINKZEBRA MUSIC, LLC ("Pinkzebra") in this case. I make this declaration from my personal

knowledge and, if called upon to do so, could and would competently testify to the matters set

forth herein in a court of law.

    2.    A February 2011 report commissioned by Business Action to Stop Counterfeiting

and Piracy (BASCAP) entitled Estimating the Global Economic and Social Impacts of

Counterfeiting and Piracy" included findings that counterfeit and pirated products account for an

estimated $650 billion in losses in international trade, resulting in tens of thousands of lost jobs

for legitimate businesses and broader economic losses, including lost tax revenue, of more than

$125 billion every year. That figure is expected to increase each year. A true and correct copy of

this report is attached hereto as Exhibit A.

    3.    In my experience of working with and observing counterfeiters and music piracy,

counterfeiters use a variety of tactics to evade enforcement efforts, including registering online marketplace accounts under new aliases once they receive notice of a lawsuit.

4.     Once notice of a lawsuit is received, counterfeiters/music pirates frequently move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court.

5.     For these reasons, in the absence of an *ex parte* Order, Defendants could and likely would move any assets from accounts in U.S.-based financial institutions, including PayPal accounts, to offshore accounts.

6.     I have accessed the Internet Corporation for the Assigned Names and Numbers ("ICANN") website at www.icann.org in order to download the ICANN Registrar Accreditation Agreement. A true and correct copy of the ICANN Registrar Accreditation Agreement is attached hereto as Exhibit B. According to Section 3.7.7.1 of the Registrar Accreditation Agreement established by ICANN, an individual or entity that registers a domain name is required to provide "accurate and reliable contact details and promptly correct and update them during the term of the...registration, including...postal address."

7.     I have reviewed the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters ("Hague Convention"), to which China is a signatory. The Hague Convention does not preclude service by email, and the declarations to the Hague Convention filed by China do not appear to expressly prohibit email service. A true and correct copy of the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters, and a list of signatory members, are collectively attached hereto as Exhibit C.

8.     I have researched whether the issuance of an order to serve process upon the Defendants by electronic mail pursuant to Fed. R. Civ. P. 4(f)(3) is contrary to or likely to offend

2

the law of the People's Republic of China (the "PRC"). I located an English language version of the current Civil Procedure Law of the PRC, which was adopted on April 9, 1991. A true and correct copy of the Civil Procedure Law downloaded from Chinacourt.org, a website sponsored by the Supreme People's Court of the PRC, is attached hereto as Exhibit D. Chapter VII, Section 2, of the Civil Procedure Law governs service of process. I am informed and believe that the law does not preclude the service of process by email and allows for alternate service of process in certain circumstances.

9.    Exhibit E is a true and correct copy of a screenshot showing the number of downloads of the Summer Collection from WonderShare's Filmora software.

10.    Exhibit F is a true and correct copy of a screenshot showing the number of downloads of the Halloween Collection from WonderShare's Filmora software.

11.    Exhibit G is a true and correct copy of the unpublished decisions cited in Pinkzebra's Memorandum in Support of its Motion for TRO.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 5, 2016                    RESPECTFULLY SUBMITTED,


                                  By:    /s/ Brian T. Noack
                                  Brian Noack
                                  Adam Wolek
                                  WOLEK & NOACK
                                  333 S Wabash Ave., Suite 2700
                                  Chicago, IL 60604
                                  P 312.860.9006
                                  F 708.843.0509
                                  *Attorneys for Plaintiff PINKZEBRA MUSIC,
                                  LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on December 5 2016, he caused this document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.


Dated: December 5, 2016                              WOLEK & NOACK


                                                     By:___/s/ Brian T. Noack___
                                                     Brian T. Noack

# EXHIBIT A



An ICC initiative

**BASCAP**

Business Action to Stop
Counterfeiting and Piracy

# Estimating the global economic and social impacts of counterfeiting and piracy

A REPORT COMMISSIONED BY BUSINESS ACTION TO STOP
COUNTERFEITING AND PIRACY (BASCAP)

February 2011

© Frontier Economics Ltd, London.

# Estimating the global economic and social impacts of counterfeiting and piracy

**Table of Contents**

**Foreword**                                                                       **1**

**Executive Summary**                                                              **3**

*Building on the OECD's work* ................................................................ *3*

*Key findings* ........................................................................................... *5*

*Analytical approach* .............................................................................. *9*

*Agenda for future research* ................................................................... *9*

**1**    **Introduction**                                                           **11**

*1.1*   *Methodologies* .......................................................................... *12*

**2**    **Analysis and Findings**                                                  **15**

*2.1*   *Internationally traded counterfeit and pirated products* ............ *15*

*2.2*   *The domestic manufacture and consumption of counterfeit and pirated products* ....................................................................... *17*

*2.3*   *Digital piracy* ........................................................................... *23*

**3**    **The broader economy-wide effects of counterfeiting and piracy**        **39**

**4**    **Conclusions**                                                            **45**

*4.1*   *Estimates of total value of counterfeit and pirated products* ..... *45*

*4.2*   *Broader economy wide effects of counterfeiting and piracy* ..... *47*

*4.3*   *A growing problem – projections to 2015* ................................ *48*

*4.4*   *The complete picture* .............................................................. *50*

**Annexe 1: US Analysis and Findings**                                             **53**

# Foreword

Government efforts to stabilize the economy and stimulate economic growth, trade and employment must include the critical and pervasive role that intellectual property (IP) protection plays in driving, innovation, development and jobs.

The massive infiltration of counterfeit and pirated products, or *IP theft*, creates an enormous drain on the global economy – crowding out billions in legitimate economic activity and facilitating an "underground economy" that deprives governments of revenues for vital public services, forces higher burdens on tax payers, dislocates hundreds of thousands of legitimate jobs and exposes consumers to dangerous and ineffective products.

Reliable information on the scope, scale, costs and impacts of counterfeiting and piracy is critical for helping policymakers to better understand that the trade in fake goods is damaging their economies, threatening the health and safety of their citizens and stifling innovation and creativity.   Policymakers with better information on of how counterfeiting and piracy undermine IP, innovation, economic growth and employment are better able to make the fight against IP theft a higher  public policy priority and take the actions needed to prevent the damage inflicted by counterfeiting and piracy.

In this regard, government efforts to strengthen IP enforcement regimes can more appropriately be considered as investments that pay tangible dividends to economic development and society.

Because counterfeiters and pirates operate outside the law, estimating the extent of counterfeiting and piracy and the harm these activities cause is extremely challenging.  Illegal businesses do not report information on their activities to any government agency so measuring their size must be done using indirect methods.

For this reason, Business Action to Stop Counterfeiting and Piracy (BASCAP), an initiative of the International Chamber of Commerce, is commissioning experts (including Frontier for this report) to examine the issue and to develop methodologies for estimating the economic and social impacts of counterfeiting and piracy.  No one report or approach will yield a complete picture or provide all the answers, but BASCAP is committed to learning from as many sources of expertise as possible.

BASCAP is a business initiative, created, led and funded by the world business community, specifically brand owners, and organized by the International Chamber of Commerce, to raise public and political awareness about counterfeiting and piracy, encourage government action and promote respect for intellectual property.  For more information or to download a copy of this report, visit www.iccwbo.org/bascap

# Executive Summary

Counterfeiting and piracy has increased substantially over the last two decades. Today, counterfeit and pirated products can be found in almost every country in the world and in virtually all sectors of the global economy. As policymakers grapple with allocating resources across multiple public policy challenges, better information on the full scope, scale, costs and impacts of counterfeiting and piracy is necessary to ensure that the appropriate resources and prioritization are given to combating counterfeiting and piracy.

Estimates of the level of counterfeiting vary but all estimates agree that counterfeiting represents a multi-billion dollar underground economy with hundreds of billions of dollars of counterfeit product being produced every year.

## Building on the OECD's work

Most recently, the OECD endeavoured to address the lack of in-depth systematic evidence on counterfeiting and piracy and provide governments with a reliable, data-based assessment.

The OECD published an extensive report on the subject in 2008[1], and concluded that the value of counterfeited and pirated goods moving through international trade alone equalled $200 billion annually, a number they updated in 2009 to $250 billion[2].

In releasing their findings, the OECD stated,

*"This total does not include the value of domestically produced and consumed counterfeit and pirated products and the significant volume of pirated digital products being distributed via the Internet. If these items were added, the total magnitude of counterfeiting and piracy worldwide could well be several hundred billion dollars more."*

In addition the OECD explained that,

*Counterfeiting and piracy "can have broader economy-wide effects on trade, foreign investment, employment, innovation, criminality, environment [...] and with respect to governments, counterfeiting and piracy have direct effects on tax revenues and government expenditures."*

Taken together, the OECD report delineated four categories of impact, of which they provided quantitative estimates for only one: Counterfeit and pirated goods moving through international trade.

---

[1] OECD, The Economic Impact of Counterfeiting and Piracy, 2008 (hereinafter "OECD Report").

[2] OECD, Magnitude of Counterfeiting and Piracy of tangible products: An Update, November 2009.

This study seeks to build on the OECD's work, by updating their estimates and more importantly, introducing and examining categories of impacts identified and discussed but not quantified by the OECD report – the value of domestically produced and consumed counterfeit products, the value of digital piracy, and impacts on society, governments and consumers.

● **Category 1: Counterfeit and pirated goods moving through international trade.** We update the OECD's estimate of the value of counterfeit and pirated goods moving through international trade, drawing on new customs seizure data indicating that the incidence of counterfeiting and piracy has increased relative to the 2005-based customs data used in the OECD's 2008 study.

● **Category 2: Value of domestically produced and consumed counterfeit and pirated products.** We develop a methodology, derived from the OECD's modeling work, to generate an estimate of the value of domestic manufacture and consumption of counterfeit and pirate products – thereby capturing an estimated value of fake products that do not cross borders.

● **Category 3: Volume of pirated digital products being distributed via the Internet.** We describe, evaluate and contextualize industry reports and academic studies on the value of digital piracy of recorded music, movies and software. We then use these studies to produce an estimate of the total value of digital piracy that has been calculated using consistent assumptions and methodology across these industries.

● **Category 4: Broader economy-wide effects.** We provide a summary of previous analysis aimed at identifying the broader economy-wide effects of counterfeiting and piracy.

Before discussing our findings, it is important to be clear about the nature and context of the analysis presented in this report. Since counterfeiting operates outside the law, estimating the exact level of counterfeiting and the harm it brings is extremely challenging. The activities of illegal businesses cannot be measured using the same techniques used for legitimate business concerns.

We have therefore used a variety of analytical approaches to reach our estimates, drawing on a range of sources of information and making conservative assumptions. Our methodologies are described in detail, and we are explicit about the assumptions that have been required to reach the estimates we present and their limitations. While the methods used cannot yield precise estimates, the results do offer compelling evidence of the broad global magnitude of counterfeiting and piracy.

Executive Summary

# Key findings

The following Table 1 compiles the set of findings we refer to as *the complete picture*, drawing together estimates for the total value of counterfeit and pirated products in 2008, along with projections for 2015. Notably, our estimates of impacts on the broader economy only include estimated impacts on the twenty G20 economies and are presently limited to 2008.

**Table 1. The Complete Picture.** Estimate of the total value of counterfeit and pirated products in 2008 and 2015, and impacts on the broader economy and employment

| OECD Category | Estimate in $ billions (2008) | Estimate in $ billions (2015) |
|---|---|---|
| Internationally traded counterfeit and pirated products | $285 - $360 | $770 - $960 |
| Domestically produced and consumed counterfeit and pirated products | $140 - $215 | $370 - $570 |
| Digitally pirated products | $30 - $75 | $80 - $240 |
| *sub total* | **$455 - $650** | **$1,220 - $1,770** |
| Broader economy wide effects[†]* | $125 | *$125 +* |
| Employment losses* | 2.5 million | *2.5 million +* |

Source: Frontier Economics

[†] Effects on government tax revenues, welfare spending, costs of crime health services, FDI flows

* Estimate limited to G20 economies

## Global economic value

We estimate that, based on 2008 data, the total global economic value of counterfeit and pirated products is as much as $650 billion every year. Table 2 below provides a breakdown of our estimate. It shows that international trade accounts for more than half of counterfeiting and piracy (our updated estimate is $285 billion to $360 billion), domestic production and consumption accounts for between $140 billion and $215 billion and digitally pirated music, movies and software accounts for between $30 billion and $75 billion.

Executive Summary

**Table 2.** Estimate of the total value of counterfeit and pirated products (2008)

| OECD Category | Estimate (2008 data) |
|---|---|
| Internationally traded counterfeit and pirated products | $285 billion - $360 billion |
| Domestically produced and consumed counterfeit and pirated products | $140 billion - $215 billion |
| Digitally pirated products | $30 billion - $75 billion |
| **Total** | **$455 billion - $650 billion** |

Source: Frontier Economics

It is important to note that these estimates are likely to provide a conservative estimate of the impact of counterfeiting and piracy. The estimates of the value of counterfeiting are based on 2008 data (the last year for which complete data was available), and given the rapid increase in counterfeiting and piracy observed between 2005 and 2008, this is likely to under-estimate the level of counterfeiting and piracy beyond 2008. It is for this reason that we have provided estimates to 2015.

It is also important to note that this study, following in the footsteps of the OECD report, has not attempted to estimate business losses associated with counterfeiting and piracy. This is primarily because the likely variations and other difficulties associated with estimating substitution effects across substantially different countries and industries introduces an additional level/degree of variables which could undermine our aim to as accurately as possible characterize the magnitude of counterfeiting and piracy.

### Broader economy-wide effects

In addition to their work on economic impacts, the OECD examined – but did not provide quantitative estimates for a range of broader economy-wide effects: *"Counterfeiting and piracy can have broad economy-wide effects on trade, foreign investment, employment, innovation, criminality and the environment. Concerning the microeconomic effects, the sales volume, prices and costs of rights holders are impacted, as are investment, royalties and brand value. For consumers, counterfeit and pirated products may offer cheap alternatives to genuine goods but are usually of inferior quality. For certain types of infringing goods, the health and safety of consumers may be put at significant risk. With respect to governments, counterfeiting and piracy have effects on tax revenues, government expenditures, and, when corruption takes place, the effectiveness of public institutions. (p. 133)*

Executive Summary

These social costs are far from insignificant and merit treatment sufficient to ensure that they are not overlooked when considering the full range of negative impacts resulting from counterfeiting and piracy. In an associated study[3] (excerpted in Chapter 3 of this report), Frontier explored the value and impact of these broader economy-wide effects. Notably, this work did not capture all of the thirteen "broader economy wide effect" cost-categories identified by the OECD; we only tackled impact of counterfeiting and piracy on government tax revenues, legitimate employment, increased costs of crime, economic costs on consumer health and safety, and downward pressures on FDI flows. Moreover, the scope of this report was limited to only the 20 countries comprising the "group of 20", and so will be an under-estimate of the global impact of counterfeiting and piracy. The findings, however, are relevant to this report and serve to complete the picture of the total impacts to "economy and society".

We found counterfeiting and piracy are estimated to cost G20 governments and consumers over $125 billion every year:

□ of this, the G20 economies lose approximately $77.5 billion in tax revenues and higher welfare spending, $25 billion in increased costs of crime, $18.1 billion in the economic cost of deaths resulting from counterfeiting and another $125 million for the additional cost of health services to treat injuries caused by dangerous fake products; and

□ a number of G20 economies may be missing out on higher FDI as a result of concerns over IPR enforcement. That lost investment could give rise to additional tax losses of more than $6.25 billion across the G20.

## Employment

This report has not considered explicitly the impact of counterfeiting and piracy on employment. However, Frontier's previous study, which focused on the wider social and economic impacts of counterfeiting and piracy found that counterfeiting and piracy has significant negative impacts on employment across the G20 economies. Our previous analysis found that **approximately 2.5 million jobs have been destroyed by counterfeiting and piracy** – alternatively, if counterfeiting and piracy could be eradicated or seriously reduced, up to 2.5 million jobs could be created in the legitimate economies of the G20. It should also be noted that these estimates do not include secondary impacts on employment that may well be experienced by suppliers, retailers and other sectors in the supply chain.

---

[3] Frontier Economics, The Impact of Counterfeiting on Governments and Consumers, December 2009

While it is likely that many of those who lost their jobs have gone on to find reemployment, the personal and family trauma associated with even temporary unemployment should not be lightly discounted. For example, people may quickly get into arrears on mortgages or personal debts, have difficulty paying medical expenses (as benefits are often linked to employment) or be forced to relocate to find alternative employment.

Finally, it is important to note that our previous analysis focused only on the G20 economies and so are likely to under-estimate the negative global impacts of counterfeiting and piracy on employment.

A growing problem – projections to 2015

Based on the OECD's analysis, our work to update the OECD figures and a range of analysis by industry and academics, it would appear that the value and volume of counterfeiting and digital piracy is increasing rapidly. In order to understand the potential impact of this rapid increase, we have developed an estimate of the value of counterfeiting and piracy in 2015. Obviously, estimating what will happen to counterfeiting and piracy is a difficult exercise, and depends on many factors, including developments in the world economy, and action by business and governments to try to counter such activities. Nevertheless, it is helpful to understand what the total magnitude of counterfeiting and piracy would be in 2015, were current growth rates to continue.

The OECD's original report (based on 2005 data) estimates that the value of counterfeit and pirated products in trade equated to $200 billion. In 2009, the OECD increased this figure to $250 billion. Updating these trends using 2008 data to reflect increases in trade *and* seizures since 2005, we find that the value of counterfeit and pirated products in trade has increased by up to $160 billion (to $360 billion) over this period – this is an increase of around 22% per year. Were counterfeiting and piracy to continue to grow at even the much lower rate of 15% per year, it would imply that traded counterfeit and pirated products could be worth up to **$960 billion by 2015.** Similar increases for domestic counterfeit production and consumption imply estimates of up to **$570 billion by 2015.**

The findings also suggest that digital piracy has grown substantially over the last decade, to the point where it now accounts for between 6.5% and 12% of the total value of counterfeit and pirated products consumed. In some sectors, such as music, movies and software, digital piracy accounts for a substantially greater share of the total. It is also likely that digital piracy will continue to grow rapidly over the next decade as internet access grows and ever-faster broadband speeds facilitate illegal downloads and file sharing. Even using a highly conservative assumption, that digital piracy maintains its share of total counterfeiting and piracy, it could account for $210 billion by 2015. Alternative projections based on internet traffic growth suggest this figure could reach **$240 billion by 2015.**

Executive Summary

Together these estimates imply that the global value of counterfeit and pirated products could be up to **$1.77 trillion by 2015**.

## Analytical approach

In this report we have sought to build on the work of the OECD to provide up to date estimates of the impact of counterfeiting and piracy in the four categories identified in the OECD's work. In some cases this has involved updating the OECD's analysis with more recent data, whereas in others it has involved developing new analysis, much of which is based on the OECD's analytical approach. The analysis in relation to each of the four impact categories is based on a combination of publicly available data and assumptions.

The publicly available data is from reputable sources such as national governments and the OECD, and is supplemented where necessary with data and analysis from industry associations, businesses and academia. We have based the assumptions used in the analysis on existing data and analysis where possible and have in all cases made the assumptions used as conservative as possible. For instance, in projecting the value of counterfeiting and piracy to 2015, we have assumed growths rates considerably below those observed between 2005 and 2008. The main body of the report sets out in detail the assumptions used in the analysis, the basis of those assumptions, and the impact that they have on our analysis.

It is important to note that the model does not include any multipliers, nor does it attempt to estimate the wider effects that counterfeiting may give rise to in terms of impact on the wider supply chain, investment by firms to prevent counterfeiting and piracy or potentially reduced investment and R&D incentives.

The analysis has been developed so that it can be used by national governments, independent agencies, industry sector associations or any other bodies seeking to identify and examine the costs and impacts of counterfeiting. Over time, we hope that if this approach is implemented by policymakers and other stakeholders at a national level, the reliance on assumptions in developing estimates can be substantially reduced.

## Agenda for future research

Looking to the future research agenda, we believe that while it is important to have an understanding of global magnitudes in order to highlight the increasing threat to the global economy, more fine grained and detailed analysis is required on a country by country basis.

Only when the analysis is conducted on a country by country basis, can one identify in detail the negative impacts of counterfeiting and piracy, and the relative costs and benefits of significantly increasing enforcement activities.

Executive Summary

Moreover, analysis carried out at the country level is likely to provide better quality, more accurate estimates, due to greater and more robust data.    To demonstrate the extent to which the types of approach identified in this report can be applied at a country level, Annexe 1 provides an illustrative assessment of the magnitude of counterfeiting and piracy in the US economy.

Finally, we believe an important next step in the work to identify the impact of counterfeiting and piracy will be to develop a robust methodology for understanding the relationship between the magnitude of counterfeiting and piracy and business losses.

# 1 Introduction

The OECD published an extensive report on counterfeiting and piracy in 2008[4]. The report, based on 2005 data, found that the value of international trade in counterfeit and pirated goods was at least $200 billion. In 2009, the OECD updated this figure to $250 billion[5].

In releasing their findings, the OECD stated,

"This total [$250 billion] does not include the value of domestically produced and consumed counterfeit and pirated products and the significant volume of pirated digital products being distributed via the Internet. If these items were added, the total magnitude of counterfeiting and piracy worldwide could well be several hundred billion dollars more." In addition the OECD explained that counterfeiting and piracy "can have broader economy-wide effects on trade, foreign investment, employment, innovation, criminality, environment [...] and with respect to governments, counterfeiting and piracy have direct effects on tax revenues and government expenditures." (p.13)

Taken together, the OECD Report delineated four categories of impact, which serve as a roadmap for additional research and a blueprint for this report:

- **Category 1:** Counterfeit and pirated goods moving through international trade;

- **Category 2:** Value of domestically produced and consumed counterfeit and pirated products;

- **Category 3:** Volume of pirated digital products being distributed via the Internet; and

- **Category 4:** Broader economy-wide effects.

The OECD Report provided detailed estimates of only the first category of impact – international trade. The International Chamber of Commerce (ICC), through its BASCAP initiative, commissioned Frontier Economics to build on the OECD's work to develop estimates of the magnitude of categories 1-3 above. Frontier has previously carried out analysis to estimate the magnitude of category 4 effects, which we provide a summary of later in this report. Additionally, we were asked to develop estimates for the US' share of counterfeiting and piracy, which appear in Annexe 1 as a model for future worked needed at the national level.

---

[4] OECD, The Economic Impact of Counterfeiting and Piracy, 2008 (hereinafter "OECD Report").

[5] OECD, Magnitude of Counterfeiting and Piracy of tangible products: An Update, November 2009.

Clearly, making estimates for any of the categories of impact identified above is extremely challenging. The activities of illegal businesses cannot be measured using the same techniques used for legitimate business concerns. Legitimate businesses tend to provide the authorities with information about their revenues, unit sales, prices, employment, imports and exports amongst other things. Illegal businesses do not report any such information.

For this reason, we must use indirect methods to estimate the magnitude of counterfeiting and piracy. We have used a variety of methodological and analytical approaches to reach our estimates, drawing on a range of sources of information and making conservative assumptions to reach a total figure for the value of counterfeiting and piracy activity. While the estimates generated using these methods cannot yield the same detailed, high quality measures of activity as those provided for legitimate businesses, they offer an extremely useful approach for gauging the scale of these activities and their impact.

Building on the OECD work, we have focused on developing estimates of the *value* of counterfeiting and piracy for the three impact categories above. To translate these figures into estimates of business losses involves making assumptions about the degree of substitution between counterfeit and pirated products and their legitimate counterparts. This area is fraught with difficulties because robust estimates of substitution rates are difficult to generate and vary from sector to sector. In order to produce credible estimates, we have opted to continue down the path taken by the OECD and focus on estimating the *value* of counterfeiting and piracy rather than attempt to estimate the business losses associated with it. This approach also enables us to eliminate the additional level/degree of variables which could undermine our aim to as accurately as possible characterize the magnitude of the unfair competition for legitimate economic activity and the unchecked growth of an emerging "underground economy".

Below we provide a high-level overview of the techniques that we have used for our estimates. The findings section that follows provides extensive details for each.

## 1.1    Methodologies

This section sets out the methodology used to develop measures of value in relation to:

▫    internationally traded counterfeit and pirated products;

▫    domestically produced and consumed counterfeit and pirated products; and

▫    digitally pirated products.

Introduction

### 1.1.1 Updating the OECD's estimates of counterfeit and pirated products

Our estimate of the effect of changes in the incidence of counterfeiting and piracy on internationally traded goods is based on information on the ratio of customs seizures to real imports since 2005.

We examine how the ratio of seizures to imports has changed since 2005 and assess the possible drivers of the observed changes. Notably, the more recent data indicates an increase in border seizures. We assess the impact and appropriateness of attributing different proportions of the increase in seizures to increased counterfeiting and piracy activity. These different allocations are applied to the OECD's 2009 figure of $250 billion (which was based on updated trade values only) to give an updated estimate of the total commercial value of counterfeiting and piracy in international trade.

### 1.1.2 The domestic manufacture and consumption of counterfeit and pirated products

The approach we have taken to developing an estimate of the value of domestic counterfeiting draws from and builds on the methodology employed by the OECD to reach their estimate of the value of counterfeiting and piracy in world trade. We take the OECD's estimate of the *maximum* proportion of counterfeit products in world trade and make a number of assumptions to translate these estimates into an estimate of the value of domestic counterfeit production and consumption. Specifically, we have taken a three step approach.

● **Step 1:** Calculation of counterfeiting/piracy propensities for each product category in each source economy, drawing on the OECD's original estimates.

● **Step 2:** Identification of the relevant categories of GDP that are likely to be exposed to counterfeit products.

● **Step 3:** Estimation of the value of domestic counterfeiting production and consumption for each country by applying the trade related counterfeiting rates to the relevant components of GDP for each source economy.

Step 3 above makes the assumption that there is a strong relationship between the ratio of counterfeit products in a country's exports and the ratio of counterfeit products in its domestic production[6]. In recognition of the fact that there are likely to be some countries for which this assumption is inappropriate, we have drawn on a range of other sources to understand and vary the assumed

---

6    We are also implicitly assuming that there are no countries that produce counterfeits for domestic production only.

Introduction

relationship between counterfeiting and piracy in international trade and that of domestic counterfeiting and piracy production and consumption. The sources used include a study by the Japan Patent Office and a study by the State University Graduate School of Economics for the Brand Manufacturers Association in Russia. These studies are used to build an appropriate range for our estimates.

## 1.1.3    Digital piracy of recorded music, movies and software

Estimating the value of digital piracy in recorded music, movies and software is complex. This report draws on the most recent industry and academic studies to provide the first aggregated estimate of the value of digital piracy across these three critical "copyright-based" industries.    In so doing, it builds on the methodologies and findings of the most recent industry studies. Where available, we draw on more recent data to update the industry studies, and use consistent assumptions and methodologies (regardless that the specific industry dynamics are likely to differ) in order to produce digital piracy estimates that are more consistent across the three industries.   Estimated values for pirated recorded music, movies and software are considered in turn below and then aggregated.

Introduction

# 2    Analysis and Findings

This section sets out the findings from our analysis of the value of counterfeiting and piracy. Specifically, it sets out:

- □    an update of the OECD's estimate of the value of internationally traded counterfeit and pirated products;

- □    an estimate, derived from the OECD's methodology, of the value of domestically consumed counterfeit and pirated products; and

- □    an estimate, based on industry and academic analyses, of the value of digital piracy.

## 2.1    Internationally traded counterfeit and pirated products

As described in the Introduction, the OECD's original report, based on 2005 data, estimated that the value of counterfeiting and piracy in international trade was $200 billion.  In 2009, the OECD updated their estimate to $250 billion based on increases in the volume of world trade after 2005.

The research underpinning these estimates by the OECD was extremely thorough, based on survey data collected from custom authorities in 70 countries from 1999 to 2005 and information on world trade from 2005 to 2008. Accordingly, this section only seeks to update this estimate by factoring in more recent data, specifically that which indicates an increased incidence (seizures) of counterfeiting and piracy since 2005.

Data on customs seizures by the US and the EU since 2005 indicate that there has been a sharp increase in seizures relative to international trade volumes between 2005 and 2008.  Figure 1 shows an index of the ratio of the number of customs seizures against the real value of imports in the US and the EU for 2001, 2005 and 2008.  The index of the ratio is defined to equal 100 in 2005 for the US and the EU. In 2008, the US index equals 162, which indicates that seizures increased 62% relative to US real imports between 2005 and 2008. Similarly, for the EU, seizures increased 59% relative to real imports between 2005 and 2008.



**Figure 1**
**Indexed Ratio of Customs Seizures to Real Imports in the U.S. and the E.U.**
**(2005=100)**

Sources:
U.S.: U.N. ComTrade figures in U.S. dollars deflated by the GDP deflator.
E.U.: Eurostats

There are two potential reasons for the documented increase in seizures:

▫ an increase in the incidence of counterfeiting and piracy; and/or

▫ improved scrutiny and enforcement by the US and EU agencies.

Given the significant increase in seizures and the limited time frame for implementation of more rigorous enforcement policies, we believe that a significant proportion of the increase is likely to be due to an increase in the incidence of counterfeiting and piracy in international trade. Moreover, we are not aware of any significant policy shift or increase in resources in either the US or EU that would be likely to result in such an increase through improved detection of seizures.

If the full increase in seizures is assumed to be as a result of an increase in the incidence of counterfeiting and piracy, then a further $150 billion of counterfeit and pirated goods could be traded globally on an annual basis. A more conservative assumption is that between 25% and 75% of the increase in seizures relative to imports is due to counterfeiting and piracy. This would allow for the possibility that some of the increase is accounted for by operational improvements. On this basis an additional $37.5 billion to $112.5 billion of counterfeit and pirated goods could be traded globally on an annual basis.

Combining this with the OECD's updated estimate of $250 billion leads to an estimate of the value of counterfeiting and piracy in international trade of between **$287 billion and $362 billion**.

## Analysis and Findings

## 2.2   The domestic manufacture and consumption of counterfeit and pirated products

The OECD explicitly stated that an accounting of *domestically* manufactured and consumed counterfeit and pirated products could increase the total value of counterfeiting and piracy significantly. However, they did not attempt to develop an equivalent detailed estimate for this category either as part of their original 2008 study or their 2009 update.

As with estimating the value of internationally traded counterfeit and pirated products, estimating the value of domestically produced and consumed counterfeit products is challenging. It is also not clear from a conceptual perspective how large the domestic manufacture and consumption of counterfeit goods is expected to be relative to the international trade in those goods. Therefore, an analysis of this category begins with an investigation of the decision of whether to import a counterfeit good as opposed to producing it for consumption domestically. This decision lies in the balance of two key factors, profitability and risk:

- **Profitability:** Is it more profitable to produce the good within the country in which you wish to sell it or produce it outside of that country and import it?[7]

- **Risk:** Is there a greater risk (and hence cost) attached to importing the good and potentially having it seized by customs, or producing it within the consuming country and risking local detection (by law enforcement agencies)?

The balance of these two factors is likely to vary significantly depending on the characteristics of the product and also on the country of origin and country of destination for the good. For example, some goods may be relatively amenable to import through customs without detection, but their production might attract significant law enforcement attention in consuming countries. Furthermore, the existence of Free Trade Zones may mitigate some risk associated with export/import in some areas.

A useful approach for estimating domestic production and consumption of counterfeit and pirated products would involve a joint survey of customs agencies and domestic law enforcement agencies. Such an approach would parallel the approach taken by the OECD in estimating the value of counterfeit and pirated goods moving in international trade. However, the scale of work required for this type of exercise is extensive and therefore beyond the scope of this study.

---

[7]   An assessment of profitability would take into a range of factors including the cost base, manufacturing capability and capacity of different countries.

Analysis and Findings

Instead, to develop an indicative estimate, we have built on the methodology developed by the OECD and used evidence currently available in a range of forms to derive an estimate. In the rest of this section we describe the calculations we have undertaken to derive these estimates. In turn we describe:

▫ the methodology used to calculate the estimate, including the key assumptions;

▫ the data sources used to derive the estimate; and

▫ the results of our simulations.

## 2.2.1 Methodology

The approach we have taken to developing an estimate of the value of domestic counterfeiting and piracy builds upon the methodology used by the OECD to reach their estimate of the value of counterfeiting and piracy in world trade.

### The OECD methodology

The OECD estimate was built on survey evidence collected from custom authorities in 70 countries containing details about the number of interceptions and infringements they had recorded between 1999 and 2005. This information was used to build up a picture of the flows of counterfeit and pirated products originating from a wide range of different source countries. Using this information, the OECD developed two indices to capture flows of counterfeit products in world trade:

▫ the GTRIC-p index which captures the relative flows of different counterfeit products in world trade; and

▫ the GTRIC-e index which captures the relative flows of counterfeit products originating from different source economies.

These indices inform us about the relative frequencies with which different types of counterfeit products from different source countries appear in world trade. For example, they tell us that 1.5 times as many counterfeit headgear products (primarily baseball caps) originate from Hong Kong relative to Pakistan. These indices are clearly useful but, to reach an absolute estimate of the value of counterfeit production in world trade they must be combined with an estimate of the absolute value of counterfeits of one product type from one source economy.

As it is extremely difficult to generate an absolute value for any product category or economy, the OECD identified the product category and source economy where counterfeit production was thought to be most pronounced. It used an estimate of the *maximum* likely value of counterfeiting in this category to generate

Analysis and Findings

counterfeiting rates for all product and source country combinations[8]. Counterfeiting rates were then applied to the value of imports for each importing country to generate the $200 billion estimate[9] of the value of counterfeiting and piracy in world trade.

## Building on the OECD methodology

To calculate the value of domestic counterfeiting and piracy, we take the OECD's estimates of the proportion of counterfeit and pirated products in world trade as our starting point. We make a number of assumptions to translate these figures into an estimate of the value of domestic counterfeit and pirated production and consumption. Specifically, our methodology follows three steps:

- **Step 1:** Take the simulated counterfeiting propensities for each product category in each source economy estimated and applied by the OECD. We start with the OECD's estimates[10] of the relative propensities of different counterfeit products that originate from each of a range of source countries.

- **Step 2:** Identify the relevant categories of GDP that are likely to be exposed to counterfeit products. Only a limited amount of total economic activity is likely to be exposed to counterfeit activity[11]. The OECD identified a number of sensitive product categories[12]. We map these sensitive product categories to relevant GDP statistics for each source country.

- **Step 3:** Estimate the value of domestic counterfeit and pirated production and consumption for each country. We apply the counterfeiting propensities from step 1 to the categories of GDP identified in step 2 for each source economy[13]. We sum over all source economies to give a global estimate of domestic counterfeit production and consumption.

---

[8]    As the most counterfeited product and source economy combination, a 10% counterfeiting rate for headgear originating from Hong Kong, China was used as a baseline from which all other counterfeiting rates were calculated.

[9]    Updated to $250 billion in the 2009 OECD update.

[10]   Specifically, the GTRIC matrix developed by the OECD that sets out estimated propensities of counterfeiting by product and source economy.

[11]   GDP captures more than the production of goods, so while counterfeiting and piracy impacts virtually every product category, only part of GDP is affected.

[12]   These were categories of products believed to be exposed to counterfeiting and piracy activity.

[13]   This makes the assumption that there is a strong relationship between the ratio of counterfeit products in a country's exports and the ratio of counterfeit products in its domestic production (we are also implicitly assuming that there are no countries that produce counterfeits for domestic production only). In recognition of the fact that there are likely to be some countries for which this assumption is inappropriate, we have drawn on a range of other sources to understand and vary the assumed relationship between counterfeiting and piracy in international trade and domestic

Analysis and Findings

## 2.2.2   Data sources

Two main sources of information were used for the calculations outlined above:

- ▫   the OECD's estimates of counterfeiting and piracy propensities by product category and source economy; and

- ▫   data on GDP in the relevant areas of economic activity for each of the source economies identified by the OECD.

We describe each in turn below.

### OECD estimates of counterfeiting and piracy propensities

The OECD provides details of the counterfeiting and piracy propensities that underpin its estimates of counterfeiting activity in world trade in their report[14]. Two separate indices are reported, the GTRIC-p index and the GTRIC-e index. The GTRIC-p index provides the counterfeiting baseline factors for each counterfeit-sensitive product category. The GTRIC-e index provides the baseline counterfeiting factors for each source economy.   The two indices can be combined to form the GTRIC matrix which provides counterfeiting and piracy propensities by product category and source economy.   Mimicking the assumptions made by the OECD, we have used the same baseline counterfeiting rate to calculate the maximum likely counterfeiting rate for each product category and source economy represented within the GTRIC matrix[15].

### GDP data

The data on GDP was collected from the UN Statistics Division Statistical Database[16].   This database includes gross value added statistics broken down according to the International Standard Industrial Classification of All Economic Activities (ISIC).   The breakdown of economic activity presented in the table below is reported consistently for each source economy.

---

counterfeiting/piracy production and consumption. The sources used include a study by the Japan Patent Office and a study by the State University Graduate School of Economics for the Brand Manufacturers Association in Russia. These studies are used to calculate an appropriate range for our estimates.

14      OECD, *The Economic Impact of Counterfeiting and Piracy*, 2008 (hereinafter "2008 OECD Piracy Study").

15      In practice as GDP information was only available at an aggregated product level, we have calculated an import-weighted counterfeiting propensity across all product categories for each source economy.

16      UN Statistics Division Statistical Databases - National Accounts Main Aggregates - Value added by Economic Activity

Analysis and Findings

**Table 3.** Breakdown of economic activity

| ISIC category | Description of economic activity |
|---|---|
| ISIC A & B | Agriculture, hunting, forestry, fishing |
| ISIC C, D & E | Mining, manufacturing, utilities |
| ISIC D (also reported separately) | Manufacturing |
| ISIC F | Construction |
| ISIC G & H | Wholesale, retail trade, restaurants and hotels |
| ISIC I | Transport, storage and communication |
| ISIC J, K, L, M, N, O & P | Other activities |

The OECD identified 63 sensitive product categories[17]: so called because they were likely to contain counterfeit and pirated products. This classification was made using HS chapters, which are relevant to world trade. There is not an exact match between the HS classification and the ISIC classification, which is relevant for classifying GDP, but the majority of sensitive product categories identified by the OECD fall within ISIC D: manufacturing. We used this ISIC category as a proxy for the sensitive product categories contained within GDP. This captures the majority of sensitive products identified by the OECD but it will also include some sub-categories of manufacturing that are not deemed to be sensitive. For this reason, the value of domestic counterfeiting and piracy calculated using this measure is likely to be an upper estimate.

2.2.3    Results and simulations

Using the methodology and data described above and assuming a strong relationship between the ratio of counterfeit products in exports and domestic production, we estimate that the maximum global value of domestic counterfeiting and piracy production and consumption is **$170 billion**[18].

---

[17]    At the 2 digit HS level.

[18]    Rounded to the nearest billion and including an uplift to reflect those source countries where data was unavailable to make accurate estimates.

Analysis and Findings

The above estimate is based on the assumption that the ratio of domestic consumption to exports is consistent across countries. However, this may not always be the case. In particular, an analysis carried out by the Japan Patent Office[19] suggests that the ratio may differ across countries. The Japan Patent Office surveyed Japanese companies regarding their experience involving competition with counterfeit and pirated products when selling in other countries. The survey respondents reported the number of incidents where they had encountered competition from counterfeit and pirated goods. They specifically identified the country where such competition was encountered and also the country where the counterfeit good was produced.

The results of the study suggest that counterfeiting and piracy is, on average, more prevalent in traded products than it is in domestic production and consumption. The study shows that the number of incidents of Japanese firms encountering counterfeit products produced domestically was around half (55%) the number of incidents of Japanese firms encountering counterfeit products imported into the country. However, it is possible to break this figure down further to show that the relationship between domestic counterfeiting and counterfeiting in trade may not be the same in every counterfeit-producing economy. In fact, the results of the study show that:

◻   in Asia, domestically produced counterfeit products are more likely to be exported to other countries than to be consumed domestically; but

◻   outside of Asia, domestically produced products are more likely to be consumed domestically than to be exported

Table 4 below shows key estimates calculated using the information contained within the study by the Japan Patent Office. According to the data from this study, of all counterfeit and pirated goods produced within Asia, around a third (34%) are consumed domestically with two thirds (66%) being traded internationally. In contrast, outside of Asia, over half (55%) of counterfeits that are produced are consumed domestically, with the remainder traded internationally. The figure for outside Asia is further supported by a 2008 study[20] in Russia. It suggested that between 2004 and 2007, domestic production and consumption of counterfeited goods was more than 150% of imports of counterfeited goods in Russia.

---

[19]   Japan Patent Office, FY2004 Survey Report on Losses Caused By Counterfeiting, March 2005 (hereinafter "Japanese Counterfeiting Study").

[20]   "Changing Scale and Pattern of Anti-Counterfeit Measures in Russia's Consumer Market," prepared by State University Graduate School of Economics for Brand Manufacturers' Association (RusBrand), page 20. RusBrand is a partnership of 54 consumer goods manufacturers operating in Russia.

Analysis and Findings

**Table 4.** Breakdown of the ratio of domestic and traded counterfeit and pirated products

| | % of all counterfeit goods produced | |
|---|---|---|
| | **Consumed domestically** | Exported |
| **Asia** | 34% | **66%** |
| **Outside of Asia** | 55% | **45%** |

Using the Japan Patent Office study we have adjusted the domestic counterfeit rates in our calculation to account for the differences between countries inside of Asia and outside of Asia. Applying these differential rates to the relevant source economies leads to an estimate of the value of domestic counterfeiting and piracy production and consumption of **$110 billion.**

As discussed above, the OECD did not change their estimates of the incidence of counterfeiting and piracy when they reached their $250 billion estimate of the value of counterfeiting and piracy. As the OECD's simulated propensities of counterfeiting underpin our domestic estimate, changes in the incidence of counterfeiting and piracy will also affect this estimate. If we take account of the likely increased incidence of counterfeiting activity since the OECD work was undertaken, our estimates of the total domestic value of counterfeiting and piracy production and consumption increase to **$140 - $215 billion**.

We recognize that there may be additional important variations by country in the propensity for counterfeit products to appear in exports versus domestic production, not currently captured by the studies we have examined. For example, there are likely to be key differences between developing and developed countries. However, there is currently not enough data to allow our estimates to be further refined to take account of such differences. In consequence, the estimate of $140 to $215 billion represents our best estimate based on currently available information.

## 2.3 Digital piracy

Over the last decade there has been a notable increase in digital piracy. The rapid growth in piracy has particularly affected the recorded music, movie and software industries, all of which have suffered significant and rapidly increasing losses as a result of digital piracy. The increase in digital piracy has been driven by two main factors:

□   technological advances mean that it is now much easier to illegally reproduce music, movies and software; and

□   the growth of the internet and the emergence of online websites that facilitate file sharing and downloading have greatly increased the ability to illegally distribute pirated music, movies and software.

As ever with counterfeiting and piracy, estimating the value of unlicensed digital files available on line is complex. Although they noted the prevalence of digital piracy, the OECD was unable to include an estimate in their 2008 report. Throughout this section we follow the methodology used by the OECD's study – we try to get a robust and consistent picture of the value of digital piracy across the three industries.

We note that the value of unlicensed digital files available on line (hereinafter referred to as commercial value) is largely dependent on estimations of volume and will inevitably be greater than business losses, which depend crucially on the assumed substitution rates. We have focused here on value as a first step in understanding the impact of pirated goods, and to remove from debate the controversy that normally surrounds assumptions regarding substitution rates.

This section draws on the most recent industry and academic studies to provide a consistent aggregated estimate of the value of digital piracy across these three industries. In so doing, we build on the methodologies and findings of the most recent industry studies. Where available, we draw on more recent data to update the industry studies and to improve the consistency of the digital piracy estimates across the three industries. In order to be consistent with the OECD's approach used elsewhere in this report, our approach has been to identify the volume of digital piracy and to place a value on that digital piracy using the average price of legitimately available digital products.

In order to test the robustness of the industry findings, the analysis also considers relevant academic literature to generate a range of estimates for each industry. Estimated values for counterfeited and pirated recorded music, movies and software are considered first individually in turn before being aggregated.

## 2.3.1   Recorded music

Recorded music sales have diminished significantly over the last decade. According to the International Federation of the Phonographic Industry (IFPI), the annual amount of retail music sales have fallen by almost $15 billion dollars between 1999 and 2008. While the widespread development of online file sharing sites from 1999 is clearly associated with the decline in sales of CDs, digital piracy has continued to escalate despite considerable industry and consumer education initiatives, the availability of a wide variety of legal online services for consumers, lawsuits and other actions against the most visible file sharing sites.

Analysis and Findings

Unsurprisingly, trying to understand the extent to which digital piracy is driving the substantial sales losses has attracted considerable attention from the music industry and from academics. In this report, we have drawn on the most recent industry figures about legal download prices and the volume of illegal music downloads to generate an estimate of the commercial value of digital music piracy. To test the robustness of these estimates we have also considered the evidence from a range of academic papers on digital piracy.

Drawing these sources together we find that the commercial value of recorded music digital piracy was between **$17 billion and $40 billion** in 2008, and was most likely closer to $40 billion. It is important to note again that these figures provide an estimate of the total value of unlicensed digital files available on line; they are not an estimate of the business losses associated with digital piracy, and should not be interpreted as doing so. The rest of this section sets out the basis of our estimate.

### Industry estimates of the value of digital piracy of recorded music

The latest industry study on piracy of recorded music was published by IFPI in July 2006[21]. It estimated that in 2005, 20 billion songs were illegally downloaded on a global basis. This number was based on consumer research in 10 music markets (including the US, Germany, UK and Brazil) as well as a number of third party surveys. In 2008[22], IFPI updated its estimate of the number of files illegally shared on a global basis at more than 40 billion. This figure was based on collating two key pieces of information from studies for each of 16 separate countries[23]:

□ the number of consumers illegally downloading music; and

---

21    International Federation of the Phonographic Industry ("IFPI"), The Recording Industry 2006 Piracy Report: Protecting Creativity in Music, July 2006; (hereinafter "IFPI Piracy Report"), http://www.ifpi.org/content/library/piracy-report2006.pdf.

22    International Federation of the Phonographic Industry ("IFPI"), IFPI Digital Music Report 2009: Key Statistics

23    Canada: CRIA Consumer Study of Radio and Music, Pollara, Feb 2006, US: NPD Group, 2007, Jupiter Research (Denmark, France, Italy, Netherlands, Sweden), 2007/2008, France: GfK research, 2007 + IPSOS research, May 2008, Germany: Brenner-Studie 2008, GfK Consumer Panel, Jan 2008, Italy: Luigi Einaudi Foundation, 2008 + AC Nielsen, 2008, Poland: Gemius Research, ZPAV, Sept 2008, Spain: Estudio Base Sobre la Piratería en la Industria de Contenidos, GfK, June 2008 + Spanish Ministry of Culture Report, Oct 2007, UK: Music Industry Losses Project, Jupiter Research, BPI, 2007 + Music Piracy in GB, IPSOS, BPI, Mar 2006, Australia: AusCERT, Home Users Computer Security Survey 2008 + ARIA 2006 Music Survey, Quantum Research, Legal and Illegal Downloading Behaviour, Jan 2007, Japan: Report on Current Situation of Use of File-Sharing Software, Media Interactive, RIAJ, Dec 2008 + Report on Current Situation of Usage of Illegal Mobile Music Distribution, Nomura Research Intitute, RIAJ, Dec 2008, Argentina: Los Argentinos y La Musica, Cuore Research, CAPIF, Nov 2005, Chile: Descarga de Musica por Internet, IPSOS, IFPI, June 2004, Brazil: Estudo de Piratatia, IPSOS, ABPD, May 2007, Mexico: Illegal Music Downloads over the Internet in Mexico, IPSOS, AMPROFON, Sep 2008

□    the average number of music files downloaded per month.

Notably, the figure of 40 billion estimated by IFPI may be on the conservative side. It is based on consumer responses, which may be understated. It also relates to illegal music downloads only, thereby excluding mobile piracy and illegal streaming, which appear to be growing areas, especially with the ever increasing download speeds and the advent of 3G, high speed mobile technology[24].

Following the OECD value approach, estimating the commercial value of digital piracy of recorded music involves multiplying the estimated volume of illegally downloaded songs by a reasonable commercial price for their legitimate counterparts. Data from the Recording Industry Association of America (RIAA)[25] reports average retail prices of a legal single download in the US is approximately $1.

Using the information on download volumes from IFPI and on retail prices reported by RIAA, we are able to estimate the commercial value of illegal downloads of recorded music. To be conservative, we have assumed that all of the 40 billion illegal downloads in the IFPI data are single, rather than album, downloads[26]. If these 40 billion illegal downloads per year have an average retail price of $1, the basic analysis suggests that the commercial value of illegal downloads of recorded music is approximately $40 billion.

### Academic evidence on the value of digital piracy of recorded music

To test the robustness of these estimates we have also considered the evidence from a range of academic papers on digital piracy. We have reviewed the academic literature to generate an alternative estimate of the value of digital piracy, which can be used to frame the data collected by IFPI. While the papers we have identified do not look specifically at the value of digital piracy in this industry, we can use the results from a combination of studies to estimate the likely commercial value of digitally pirated music.

---

[24]    IFPI do not currently have estimates of the magnitude of this illegal activity.

[25]    Recording Industry Association of America (RIAA) 2008 Year-End Shipment Statistics

[26]    The average retail price for an album is likely to be approximately $10. Source: Recording Industry Association of America (RIAA) 2008 Year-End Shipment Statistics

Analysis and Findings

## Academic findings

● **Liebowitz 2006[27]**: concludes that file sharing has brought significant harm to the recording industry in the US. The birth of online file sharing mid-1999 and the very large decline in CD album sales that immediately followed provide powerful evidence on their own. Notably, Liebowitz also finds that the two music genres that are less likely to be downloaded in file-sharing systems, classical and jazz, did not participate in the sales decline up to 2004, whereas other genres, more likely to be affected by file sharing (hard rock, rap, alternative, R&B) generally did participate. Liebowitz investigates key alternative explanations for the observed impact on recorded music sales other than file sharing including album prices, income, music quality, markets for substitutes and complements, portability and librarying. He concludes that none of these explanations individually hold much weight.

● **Zentner (2005)[28]**: finds that counties with higher internet and broadband penetration have experienced larger reductions in music sales, which supports the correlation between the rise in digital piracy and the fall of music industry sales. He also finds evidence that file sharing may explain a change in the composition of legitimate sales by repertoire, with a higher reduction of sales of types of music that are shared more heavily. His analysis, based on data from 1997 to 2002, suggests that, at the average level of internet usage, a country is likely to have experienced a decline in legitimate music sales of up to 24%.

● **Rob and Waldfogel (2006)[29]**: use individual-level data on album downloads and purchases by 500 college students in the US. They find evidence that each album download reduces purchases by about 0.2 in their sample (a displacement rate of approximately 1 in 5), although possibly by much more. Their data also suggests that downloading reduces the per capita expenditure of the sample (on hit albums released between 1999-2003) from $126 to $101 (approx. 20%).

---

27      Liebowitz, S., (2006) File Sharing: Creative Destruction Or Just Plain Destruction?, *Journal of Law and Economics*, vol. XLIX, The University of Chicago.

28      Zentner, A. (2005). File Sharing and International Sales of Copyrighted Music: An Empirical Analysis with a Panel of Countries. *Topics in Economic Analysis and Policy* 5, 21, pp/ 1-15.

29      Rob, R. and Waldfogel, Joel. (2006). Piracy on the High C's: Music Downloading, Sales Displacement and Social Welfare in a Sample of College Students. *Journal of Law and Economics*, Vol. 49: Issue: 1, pp. 29-62

Analysis and Findings

● **Michel (2004)[30]**: uses micro-level data from the Consumer Expenditure Survey, from 1995 to 2003, to examine the impact of Internet file sharing on music sales. He finds that file sharing may explain a reduction in sales of up to 13% for some consumers.

● **Oberholzer-Gee and Strumpf (2007)[31]**: provides the most notable exception to the finding that digital piracy has generated significant losses to the music industry. The study uses a matched sample of downloads and U.S. sales data for a large number of albums. They estimate that the impact of digital piracy on music sales could not have been larger than 0.7% of sales. They hypothesize that there are several other plausible candidates to explain the decline in sales including growing competition from other forms of entertainment such as recorded movies. However, their more recent study[32] recognizes that the empirical evidence of the effect of file sharing on sales is mixed and acknowledges that many studies conclude that music piracy can explain as much as 20% of the recent decline in industry sales.

While none of the studies we have considered estimates directly the total commercial value of digital piracy, two key findings emerge from the literature which allow us to derive such an estimate:

● Digital piracy is estimated to have had a significant negative impact on retail music sales. Work by Zentner (see above), for example, suggests that as much as a quarter of the total decline in music sales may be attributable to digital piracy. Applying this to the $14.8 billion sales decline in 2008, identified by IFPI would suggest industry losses associated with digital piracy of over $3.5 billion. To put this figure in context, total global retail sales of digital music amounted to $6.3 billion in 2008, which suggests that digital music sales could have been more than 50% higher in 2008 in the absence of digital piracy. Moreover, the data used in the Zentner study covers the period 1997 to 2002, and so likely under-estimates the impact of digital piracy today, given digital piracy's well documented increase over the last decade.

● Academic estimates suggest that the displacement rate for music sales is between 15% and 20%. This means that every 5-6 illegal downloads

---

[30]    Michel, N. J., (2006). The Impact of Digital File Sharing on the Music Industry: An empirical analysis, *Topics in Economic Analysis and Policy*, Vol. 6: No: 1, Article 18.

[31]    Oberholzer-Gee, F. and Strumpf, K. (2007). The Effect of File Sharing on Record Sales: An Empirical Analysis, *Journal of Political Economy*, Vol. 115, pp. 1-42

[32]    Oberholzer-Gee, F., and Strumpf, K. (2010). File Sharing and Copyright. *NBER Innovation Policy & the Economy* (MIT Press) 10.

Analysis and Findings

displaces a legal sale. Note, this factor is fundamentally different to the work described above, which sought to identify directly the proportion of revenue loss associated with digital piracy. The displacement analysis seeks to identify the extent to which users substitute illegal downloads for music which they would otherwise have purchased legitimately – it therefore seeks to identify sales that were never realized by the music industry due to digital piracy. For example, if this displacement rate were applied to the documented number of downloaded tracks reported by IFPI in 2008, then the academic literature would suggest that unrealized sales attributed to digital piracy equaled approximately $8 billion. As a result, the two academic approaches suggest a range of losses to the music industry attributable to digital piracy in 2008 -- from $3.5 billion to $8 billion in a single year.

As discussed above, and in keeping with the OECD methodology, our focus is however on identifying the total commercial value of digitally pirated music rather than the associated business losses. We therefore need to translate the evidence gathered from the academic studies (loss figures) into a commercial value figure using both the estimates for the proportion of business losses associated with digital piracy and the academic estimates of the likely displacement rate between legal and illegal music downloads.

Starting with the reported sales decline of $14.8 billion in 2008, if digital piracy could be responsible for 24% of this loss, then this suggests industry losses attributed to digital piracy equaled approximately $3.5 billion. Using the estimated displacement rates to derive an estimate of value[33] implies a commercial value of unlicensed digital files available on line of $17 – $21 billion[34].

This estimated range is likely to be conservative and represents the lower bound of the value of digital piracy. This is because many of these studies estimate the effect of digital piracy based on data for the period only up to 2003 and they proxy digital piracy with data on internet penetration. However, average global internet penetration[35] has increased significantly, by around 15% per year between 2003 and 2007[36]. We therefore expect that the commercial value of unlicensed digital files available on line in 2008 is significantly higher.

---

[33]    In line with the studies by Leibowitz (2004) and Rob and Waldfogel (2004). Liebowitz (2004) estimates that between 5 and 6 illegal downloads are likely to be required to replace a single legitimate album purchase. Rob and Waldfogel (2004) also estimate that around 5 illegal downloads are required to replace a single legitimate album purchase.

[34]    Estimated by multiplying the $3.5 billion sales decline by 5 and 6 respectively. Note again, that this is not a loss figure, rather it provides an estimate of the value of illegal downloads, using the price of their legitimate counterparts.

[35]    As measured by internet users per capita.

[36]    Data taken from Nationmaster.com drawing on information from the CIA World Factbooks for 2003 and 2008

Analysis and Findings

*Findings*

As noted above, it is extremely difficult to get an accurate estimate of the commercial value of digital piracy of recorded music and no single approach currently provides the answer. For this reason, we have drawn on both the most recent industry figures and the most recent academic literature to provide a range of estimates. We find that the commercial value of unlicensed digital files available on line and attributable to digital piracy is likely to lie somewhere between **$17 billion and $40 billion** in 2008, as noted on p. 28 and p. 24, respectively . However, because the lower end of this estimate is based on academic studies that make use of out of date data, we expect that the estimate is likely to lie towards the upper end of this range.

2.4.2    Movies

Digital piracy took slightly longer to become a significant problem in the movie, than in the movie industry. For movies, digital piracy began to become a serious problem from 2003 and was widely associated with the rapid increase in broadband penetration and broadband speed which made downloading movies both feasible and attractive. Without broadband or with a low broadband speed downloading a movie took a long time and appears to have deterred widespread piracy.

Up to now, movie revenues have not suffered as significantly as recorded music revenues. However, there has been a marked slowing in revenue growth rates since 2003, coinciding with the increased penetration of broadband internet. Between 1990 and 2003, global movie industry revenues grew at an average rate of 6.4% per annum[37]. Between 2003 and 2008 global movie industry revenues grew at an average rate of just 2.6% per annum[38].

As before, we have focused on developing an estimate of the *value* of digital piracy of movies, rather than estimating the associated business losses. The most recent estimates for digital piracy in movies are from 2005. We estimate that the commercial value of digital movie piracy was likely to be between **$10 billion and $16 billion** in 2005.

These figures are likely to be highly conservative given the significant increase in internet penetration and broadband speeds that has taken place since 2005. Moreover, given the continuing rapid growth in broadband penetration and speed it is highly likely that the value of digitally pirated movies will grow rapidly in the years to come.

The rest of this section provides details of how we have reached this estimate.

---

[37]    PriceWaterhouseCoopers

[38]    ibid.

Analysis and Findings

*Industry estimate of business losses associated with digital movie piracy*

The most recent industry study on the recorded movie industry was published by the Motion Picture Association (MPA) and L.E.K in 2006[39]. The study involved a major survey effort where 20,600 movie consumers in 22 countries were interviewed. This information was used to estimate:

□    the number of pirated units[40];

□    the number of these units that would have been purchased if they had not have been pirated[41]; and

□    the commercial value of the units that would have been purchased absent piracy[42].

The results obtained for these 22 countries were extrapolated to 42 additional countries using a regression model[43]. The study estimated that consumer spending on the movie industry was $18.2 billion lower in 2005 than it would have been in the absence of *all* counterfeiting and piracy activity. The study estimated that $7 billion of the estimated consumer spending losses were associated with digital piracy in the form of illegally downloaded movies from the internet.

*Translating the loss figures into value figures*

The MPA L.E.K. study has gone beyond what we are trying to do in this study, and has estimated substitution rates for digital piracy to arrive at estimates of the losses associated with digital piracy. To allow comparison with music and software, however, we need to transform the business loss estimates from the MPA L.E.K. study into the commercial value of piracy. To do so, we use estimates of the likely substitution rate between legal and illegal movie downloads.

---

[39]    The Cost of Movie Piracy, an analysis prepared by L.E.K. for the Motion Picture Association, May 2006, http://www.mpaa.org/researchStatistics.asp, (hereinafter "MPA-L.E.K. Study").

[40]    Based on survey estimates of the movie-watching population, the incidence of piracy in the population of movie-watchers and the number of units pirated.

[41]    Based on consumer evidence of substitution rates and their split by window. For example, theatrical, home entertainment (rental), home entertainment (sell-through) and Pay-Per-View/Video-On-Demand.

[42]    Average retail price based on a range of secondary research including Screen Digest, Wilkofsky Gruen, Kagan, Euromonitor and IDC.

[43]    It is worth noting that the directly researched countries accounted for approximately 95% of the total legitimate market (percentage of consumer spending on feature film) and approximately 80% of the total loss from piracy.

Analysis and Findings

While academic research into the impact of illegal movie downloads is relatively limited, the studies we have found suggest that substitution rates are likely to be relatively high and may lie somewhere between 45% and 67%. This implies that only 1.5 to 2.2 illegal purchases are required to replace a legitimate movie purchase (see the box below for details). This is in line with the findings from a recent study by the UK film council which estimated substitution rates of 53% for movies.

## Academic Findings

● **Rob and Waldfogel, (2007)[44]**: estimate the substitution rate between paid and unpaid consumption of movies for a sample of US undergraduate students in 2005. The study estimates that on average 5.2% of the movie consumption of students in the sample is unpaid for. Of this 5.2% unpaid consumption, 3.5% replaces legitimate movie consumption, implying a substitution rate of approximately 67%.

Clearly we need to be careful when applying results from a sample of students as they may not be representative of the total population of illegal movie downloaders. However, we can take some comfort from the MPA L.E.K. finding that a typical downloader is a male aged between 16 and 24. As such the typical downloader may closely resemble the students contained within the Rob and Waldfogel dataset.

● **Rob and Waldfogel, (2006)[45]** and **Rob and Waldfogel, (2007)[46]**: As there are so few academic studies on the movie industry, it is worth comparing the results of the study above with a similar study undertaken by Rob and Waldfogel on the music industry in 2006.

For their study of the music industry they found a substitution rate of around 20% between illegal recorded music purchases and legitimate ones. This compares to the substitution rate of around 67% they estimated for their movie sample and implies that the substitution rate for movies may be around three times as high as the substitution rate

---

[44]    Rob, R. and Waldfogel, Joel. (2006). Piracy on the Silver Screen. The Journal of Industrial Economics, Vol. LV: No. 3, pp. 379-395

[45]    Rob, R. and Waldfogel, Joel. (2006). Piracy on the High C's: Music Downloading, Sales Displacement and Social Welfare in a Sample of College Students. *Journal of Law and Economics*, Vol. 49: Issue: 1, pp. 29-62

[46]    Rob, R. and Waldfogel, Joel. (2006). Piracy on the Silver Screen. The Journal of Industrial Economics, Vol. LV: No. 3, pp. 379-395

for recorded music[47].

Other academic studies of the recorded music industry (described in the music section above) suggest substitution rates of between 15% and 20%. If we assume that the substitution rate for movies is three times higher than for recorded music (in line with the Rob and Waldfogel findings), we find that movie substitution rates could be between 45% and 67% (this implies that between 1.5 and 2.2 illegal movie purchases are required to replace a legitimate movie purchase.

Applying the figures on substitution rates to the $7 billion loss figure estimated by the MPA L.E.K. study implies a total commercial value of illegal downloads of between $10 billion and $16 billion[48].

Again, we would expect these estimates to be conservative. The $7 billion loss figure on which they are based was estimated in 2006. The global number of internet users has increased by around 18% per year since 2000[49]. Broadband speeds have also been improving significantly with time, making the illegal download of files of significant size, such as movies, increasingly feasible and attractive. We therefore expect that the commercial value of digital piracy in 2008 could be significantly higher than suggested here.

### Findings

As noted above, it is difficult to get an accurate estimate of the commercial value of digital piracy of movies. To construct our estimate we have taken the industry estimates of consumer spending losses associated with digital movie piracy. We have then used estimates of the substitution rates between legal and illegal movie purchases (based on the academic literature) to translate these figures into an estimate of the value of digitally pirated movie products. Based on this evidence, we estimate that the commercial value of digital movie piracy was somewhere between **$10 billion and $16 billion** in 2005. We expect that these figures are likely to be conservative given the significant increase in internet penetration and broadband speed in recent years.

### 2.5.2 Software

The software industry also suffers significantly as a result of piracy in both its physical and digital forms. Most illegal software use occurs in otherwise legal

---

[47]    Rob and Waldfogel (2007) attribute the differences between music and movies to different costs of obtaining unpaid copies and different total costs of consuming them (largely the cost of time required for downloading and watching or listening to the file).

[48]    Estimated by multiplying the $7 billion sales decline by 1.5 and 2.2 respectively.

[49]    World Internet Usage Statistics, 2000 to 2010.

Analysis and Findings

businesses that may, for example, buy licenses to install a program on 10 PCs but then install it on 50 or 5,000. This issue of "under-licensing" is the most serious piracy problem for the software industry, and is somewhat unique when compared to the piracy issues of other digital industries. There are also covert criminal enterprises that sell cheap counterfeit copies of software programs online and offline. The internet is among the many means by which unauthorized software can be acquired by consumers and businesses.

Similar to the other forms of digital piracy we have already discussed, estimating the value of *digital* software counterfeiting and piracy is extremely difficult. Although there are numerous academic studies that look at software piracy, there appears to be a lack of academic research on the scale and impact of the problem. However, a number of recent studies by the Business Software Alliance (BSA) and IDC help to shed some light on this challenging area.

In this section we summarize the methodology and results from the work by BSA and IDC, which provide an estimate of the *total* commercial value of software piracy. We then draw on related data collected by BSA which provide a preliminary indication of the contribution of digital piracy to this total[50].

Our findings suggest that the value of digitally pirated software products is likely to be between **$1.5 billion and $19 billion**. We note the size of this range, but anticipate that the true value is likely to be towards the upper end.

*An estimate of the value of all software piracy*

The Business Software Alliance (BSA) and IDC published a study on piracy of software products in 2008[51]. The study estimates the prevalence of *all* software piracy (digital and physical) and the commercial value of that software in the market. The study uses the concept of complementary goods (those that are used together) to estimate the volume of software piracy. The basic principle is that the size of the market for the illegal product can be estimated from understanding the market for another complementary product, personal computers, which are supplied legally. As the complementary product is supplied by legal businesses, new sales and the existing stock of the product can more readily be determined.

50    No information available at present allows us to estimate the volume of digitally pirated software illegally installed on computers. We therefore draw on information related to the availability of illegal software on the internet. Specifically, we make use of information on the number of take down notices issued by BSA in relation to suspicious software available on P2P and BitTorrent sites. In so doing, we note the significant issues surrounding the use of this information. Given the vast range of pricing for software programs, estimating an average retail value for illegally downloaded software is also extremely difficult. For that reason, we have used a range of estimates of retail prices to generate our estimates of the commercial value of digital software piracy.

51    Business Software Alliance (BSA) and IDC, *2008 Piracy Study*, May 2009, (hereinafter, BSA/IDC 2008 Piracy Study.").

Analysis and Findings

Specifically, the study estimates the number of pirated software units installed in a given year by understanding the relationship between new sales and the existing stock of personal computers (PC)[52] and the software installed on these computers.

The study makes use of a range of data sources to determine:

- □ the amount of PC packaged software installed in a given year[53]; and

- □ the amount of packaged software paid for or otherwise legally acquired in a given year[54].

The difference between the two is the estimated volume of pirated software installed and put into use in a given year[55]. The estimated number of pirated software units in each country is multiplied by an average value that represents a blend of software distribution prices to determine the commercial value of pirated software put into the market in that year. The price used is based on a country-specific matrix of software prices including retail, volume license, OEM, free/open source and a matrix of products including security, office automation, operating systems and more. These matrices are multiplied together to get a final blended software price. In practice, because of the many methods of deploying software, this price is likely to be lower than retail prices one would find in stores.

On this basis, the study estimates that the commercial value of *all* counterfeit and pirated software installed and put into use was $53 billion in 2008.

---

52  IDC tracks the number of computers in a country quarterly across 105 countries, either in products called "PC Trackers" or as part of custom assignments. The remaining few countries are researched annually for the study.

53  To ascertain the total software installed on PCs, both proprietary "paid for" software and legally acquired free and open source software, IDC conducts an annual survey totalling 6000 consumer responses and 4300 business user responses across a mix of 28 countries. For countries that are not surveyed, IDC relies on a correlation between the number of software units per PC and an emerging market measure published by the International Telecommunications Union called the Information Development Index.

54  IDC measures the size of the legitimate and "paid-for" software market each year using data it routinely publishes from about 80 countries as well as 20 or so more countries studied on an annual basis for the purpose of this study.

55  The IDC study measures the volume and value of pirated software actually *installed* in a given year. It does not track the availability of pirated software or illegal software that is acquired but not installed. If, for example, a software program was illegally downloaded but not subsequently installed onto the PC, it would *not* be counted by the IDC study.

Analysis and Findings

*A preliminary estimate of the value of digital software piracy*

For this study, we are specifically interested in the value of digital software piracy rather than total software piracy[56]. We therefore need to estimate how much of the $53 billion estimated by BSA and IDC is related to digitally acquired software products. In line with the OECD methodology, we therefore need to estimate the volume of digitally pirated products and multiply this volume by a reasonable retail price.

Estimating the volume of illegally downloaded software products is complex. BSA currently collects information on two alternative measures of the volume of illegal activity on the internet:

◻   the number of BSA member company offerings of illegal software available on various P2P and BitTorrent sites[57]; and

◻   the volume of downloading of BSA member software available on these P2P and BitTorrent sites.

Neither of these measures accurately reflects the volume of this software illegally installed on computers, nor does it capture the broad availability of pirated software online around the world. The first measure is likely to be an underestimate because it does not reflect the multiple times a single piece of software may be accessed via these sites. On the other hand, the second measure is likely to be an overestimate because not all occurrences of leeching are likely to result in software that is subsequently installed and used[58].

To be conservative, we have used the volume of suspicious software BSA has identified as being available on P2P and BitTorrent sites to generate our estimates. BSA issued 7.3 million take-down notices for P2P sites and 152,286 take down notices for BitTorrent sites in 2009. This brings the total take down notices issued in 2009 to 7.5 million.

Ascertaining an average retail value for the software title catalogue covered by the take-down notices issued by BSA is also extremely complex. Prices can range from $50 to more than $5000 per product depending on the type of product considered. To generate a range of estimates for the value of digital software

---

56     Physical software products which are illegally distributed should be captured within the OECD estimates of international trade and the estimates in this study of domestic counterfeiting and piracy. However, illegal use of software will not be captured by these estimates.

57     BSA make use of a number of tools to monitor BitTorrent networks and P2P networks for suspicious activity in countries where scanning is permitted by law. Once BSA has identified offerings of illegal software via various websites and P2P networks it may issue takedown notices to the Internet Service Providers asking them to remove the pirated software.

58     The improvement in upload and download speeds for P2P and BitTorrent users associated with having a wide catalogue of software available, make this a particular issue.

Analysis and Findings

piracy, we have applied estimates of the *average* retail value ranging between $200 per product (likely to be extremely conservative) and $2,500 per product.

Combining our assumptions on volume and value imply that the total value of digital software piracy is between **$1.5 billion and $19 billion**. The lower end of this estimate is likely to be extremely conservative for the following reasons:

 □   the volume estimates rely on BSA monitoring activity across only those countries where it is legal to scan for suspicious activity;

 □   the estimates relate to a selection of BSA member software titles and not the broader universe of pirated software available online;

 □   the specific piece of software for which a takedown notice has been issued may have been accessed and installed by multiple individuals, so the number of take down notices may significantly underestimate the number of illegal copies installed[59]; and

 □   given the range of retail prices for illegally downloaded software, an average value of $200 is likely to be extremely conservative.

We would therefore expect the true value of digital software piracy to lie towards the upper end of this range. However, in the absence of additional evidence to refine our estimate, the range of $1.5 billion to $19 billion represents our best current estimate of the commercial value of digital software piracy. Work is ongoing within the industry to try to understand more fully the magnitude of digital piracy.

## 2.5.3    The total value of digital piracy

This section has brought together information from the most recent industry and academic studies for recorded music, movies and piracy to provide the first aggregated estimate of the value of digital piracy across these three industries. The underlying industry and academic studies have used a range of different techniques, as appropriate to their industries, to generate estimates of the scale and impact of digital piracy.

We have used the information provided within these studies to generate a consistent set of estimates that can be combined to provide an initial estimate of the total value of digital piracy. Our findings suggest that the total value of digital piracy for 2008 is likely to be between $21.5 billion and $75 billion. We expect

---

[59]    On the other hand, it is also possible that for some take-down notices, no illegal software was actually installed.

Analysis and Findings

that the estimates for each of the industries are likely to lie towards the upper end of the ranges presented, which implies that the total value of digital piracy may be closer to $75 billion than to $21.5 billion.

**Table 5.** Global value of digital piracy

| | Global value of digital piracy (billions of US dollars) |
|---|---|
| Digital piracy of recorded music | $17 billion - $40 billion |
| Digital piracy of recorded movies | $10 billion - $16 billion |
| Digital piracy of software | $1.5 billion - $19 billion |
| **Total** | **$28.5 billion - $75 billion** |

Analysis and Findings

# 3 The broader economy-wide effects of counterfeiting and piracy

This section of the report provides a brief summary of previous analysis carried out by Frontier[60] in relation to the OECD's Category 4: Broader economy-wide effects. In doing so, we bring together estimates for the four key categories identified in the OECD's report.

The objective of our previous analysis was to develop a simple model based on publicly available data to estimate the cost to governments and consumers of counterfeit products. In other words, these somewhat hard-to-define impacts on governments, consumers and society in general have largely been conveyed through case studies, anecdotes and product or country specific data. Our objective was to tell the story with numbers, by introducing methodologies to give the limited data an empirical foundation.

Counterfeiting clearly impacts legitimate businesses, causing lost sales, lower profits and loss of brand trust and value. However, in an interconnected economy, consumers and governments also suffer. Governments see lower tax revenues and higher spending on welfare, health services and crime prevention. Consumers receive poorer quality products that are unregulated and unsafe. Moreover, as businesses suffers lower income and damaged brands, it may have to cut jobs and reduce investment leading in turn to lower economic growth. These wider economic and social effects of counterfeiting and piracy were the primary focus of our previous analysis. The analysis focused on two countries in detail – the UK and Mexico – and provided illustrative estimates for the G20.

## 3.1 Key findings

Counterfeiting and piracy are estimated to cost G20 governments and consumers over €100 billion every year.[61] The G20 economies lose approximately €62 billion in tax revenues and higher welfare spending, €20 billion in increased costs of crime, €14.5 billion in the economic cost of deaths resulting from counterfeiting and another €100 million for the additional cost of health services to treat injuries caused by dangerous fake products. Finally, a number of G20 economies may be missing out on higher FDI as a result of concerns over IPR enforcement. That lost investment could give rise to additional tax losses of more than €5 billion across the G20.

---

[60] Frontier Economics, The Impact of Counterfeiting on Governments and Consumers, December 2009

[61] Note, the original study was conducted in with a Euro basis and are republished here. Conversions to US$ at an average exchange rate of 1.25 US$ to Euro were used for presentation in the Executive Summary and Conclusions of this Report.

The broader economy-wide effects of counterfeiting and piracy


Counterfeiting also has a big impact on employment across the G20 economies. Our analysis suggests that approximately 2.5 million jobs have been destroyed by counterfeiting and piracy – alternatively, if counterfeiting and piracy could be eradicated or seriously reduced, up to 2.5 million jobs could be created in the legitimate economies of the G20.

While it is likely that many of those who lost their jobs have gone on to find reemployment, the personal and family trauma associated with even temporary unemployment should not be lightly discounted. For example, people may quickly get into arrears on mortgages or personal debts, have difficulty paying medical expenses (as benefits are often linked to employment) or be forced to move to find alternative employment. Even when workers do find new jobs, they are likely to pay less. Moreover, our estimates suggest that 160,000 workers will fail to find new jobs, with devastating consequences for their personal financial situations and harmful consequences for government as welfare bills rise and taxes fall.

- Counterfeiting and piracy cost the G20 economies approximately €62 billion annually in lost tax revenues and higher welfare spending. This is based on the analysis showing the cost in the UK of €4.1 billion and in Mexico of €1.4 billion.
- For the G20 overall, the economic and social costs of crime increases by more than €20 billion for every 1 % increase in the crime rate caused by the trade in counterfeit and pirated goods. In the UK a 1% increase in crime costs society approximately €1.7 billion, while in Mexico a 1% increase in crime leads to costs of €290 million.
- The economic cost of lives lost to counterfeiting and piracy can add up to €14.5 billion each year across the G20 economies, not including a cost for additional health services caused by dangerous fake products of more than €100 million each year.
- Lost taxes associated with lower FDI could be more than €5 billion per year. This is based on estimates of tax losses for Mexico of over €500 million.
- In the UK 380,000 jobs are destroyed as a result of counterfeiting. 31,000 workers are unlikely to be able to find reemployment. In Mexico 480,000 jobs are destroyed with 26,000 unlikely to find alternative employment.

## 3.2 Headline findings – UK

Applying our methodology to the four sectors (luxury goods, pharmaceuticals, food and beverages and software) in the UK we find that counterfeiting costs the government €500 million in lost taxes and higher welfare payments. This is made

up of losses in sales tax, corporation tax, excise duty and income tax and by increases in benefit payments.

To extrapolate these findings to the total UK economy, we based our estimate on the fact that these four industries account for 6% of UK GDP. However, we also accounted for the fact that these four sectors may be more prone to counterfeiting than the economy as a whole.[62] With this as the base, a conservative estimate of the cost for the UK economy as a whole could be in the order of €4.1 billion. For comparison, this is equivalent to 2.5% of total UK government tax receipts.

Another relevant comparison is the fact that €4.1 billion in lost tax revenue and increased welfare spending is more than 1.5 times what the UK currently spends in total on Customs activity. It also represents just less than half the UK's overseas aid commitment in 2010.

Because firms producing legitimate products lose sales to counterfeits, counterfeiting can also lead to job losses. In the short term (less than a year) around 15,000 jobs in the UK in the four sectors are lost due to the impact of counterfeits. The impact of these losses on the government's tax receipts and benefit payments are captured above. Longer term, in an economy with low overall unemployment like the UK, we would expect to see the majority of these workers obtaining employment elsewhere in the economy. Long term unemployment is likely to affect around 1,200 jobs across the four sectors.

It is important to note again that these job losses relate only to the four sectors we have analysed. A conservative estimate for the UK economy as a whole would be in the order of 380,000 jobs lost in the short run, and almost 31,000 permanent job losses.

The links between counterfeiting and other forms of criminal activity are becoming better identified. There is widespread evidence that the huge profits from counterfeiting are used to fund other criminal activities. Obviously, we cannot measure this effect directly. However, even taking the most modest assumption that counterfeiting were to be responsible for raising the UK crime rate by just 1%, the economic and social cost of crime in the UK would increase by €1.7 billion. This figure captures the cost imposed on the criminal justice system as well as other social costs such as the cost of lives lost (homicides) and the cost of insurance and security to protect against crime.

---

[62]  A simple scaling up from the four sectors to the economy as a whole would suggest a loss to government of approximately €10 billion. To account for the fact that the industries under consideration might be more prone to counterfeiting than the economy as a whole, the loss to government was discounted by 50%.

The broader economy-wide effects of counterfeiting and piracy

The €1.7 billion in additional cost represents more than 80% of total expenditures on the courts service in the UK and almost 5% of total expenditure on the criminal justice system in the UK.

In summary, conservative estimates suggest that counterfeiting costs the UK:

- €4.1 billion in lost taxes and higher welfare spending;
- 380,000 jobs in the short term and 31,000 in the long term; and
- €1.7 billion for every 1% increase in crime caused by counterfeiting.

## 3.3 Headline findings – Mexico

In Mexico counterfeiting across the four sectors (luxury goods, pharmaceuticals, food and beverages and software) costs the government approximately €145 million per year. This loss is made up of losses in sales tax, corporation tax, excise duty and income tax.

The four sectors account for approximately 8% of Mexican GDP. On conservative estimates, the total revenue impact for the Mexican government could be in the order of €1.4 billion or 1% of government tax receipts. This is equivalent to 30% of what Mexico spends in pre-primary education or 10% in secondary education.

As with the UK, the impact of counterfeiting also leads to job losses in the short and long term. Across the four industries short term job losses in Mexico are estimated to be approximately 10,000. Longer term jobs losses are estimated to be around 500 for the four industries. Looking at the economy as a whole, short term job losses are likely to exceed 480,000 while in the long term approximately 26,000 jobs are likely to be lost.

As well as losing tax receipts from Mexico-based companies as a result of counterfeiting, the Mexican government may also be missing out on significant tax payments from multinationals that would invest in the Mexican economy if there was stricter IPR enforcement. Technologically intensive sectors are the most likely to lose out on key technology transfer and foreign direct investment.

If better IPR enforcement could create the conditions that would attract foreign direct investment, this would have a clear impact on the output of the Mexican economy and on productivity. Estimates from recent academic work on the determinants of FDI suggest that for developing countries exports could increase by as much as 20% as a result of better IPR enforcement. For Mexico that would suggest an increase in total economic output of 11%. Even if we were to assume that Mexican output increased by only a more modest 2% in technologically intensive sectors, government tax receipts would still increase by around €520 million.

### The broader economy-wide effects of counterfeiting and piracy

The cost to the economy and society of crime linked to counterfeiting is also significant in Mexico. If criminal activities linked to counterfeiting were to cause the crime rate to increase by just 1%, the total cost of crime in Mexico would increase by over €290 million.

In summary, conservative estimates suggest that counterfeiting costs Mexico:

◻   €1.4 billion in lost taxes and higher welfare spending;

◻   €520 million of tax losses from lost FDI;

◻   480,000 jobs in the short term and 26,000 in the long term; and

◻   €290 million for every 1% increase in crime caused by counterfeiting.

## 3.4   Illustrative findings - G20

This study has also considered what these findings could imply at a G20 level, deriving assumptions from the more focussed research conducted on the UK and Mexico.

Obviously, more accurate results would be generated by implementing the methodology for each of the G20 countries. However, to illustrate the potential magnitude of the impact on government and consumers, we have extrapolated the findings of our analysis from the UK and Mexico to the G20.

Estimated on this basis, total estimated tax losses and increased expenditure across the member economies of the G20 could be in the order of €14 billion for the four sectors (luxury goods, pharmaceuticals, food and beverages and software) studied. Applying this approach to the G20 economies in their entirety, suggests that each year governments must find approximately €62 billion in order to cover tax losses and higher welfare spending.

Job losses could be around 540,000 in the short term and 34,000 in the longer term for the four sectors analysed. For the G20 economies as a whole short term losses are approximately 2.5 million. Alternatively, if counterfeiting and piracy could be eradicated or seriously reduced, up to 2.5 million jobs could be created in the legitimate economies of the G20. It should also be noted that these estimates do not include secondary impacts on employment that may well be experienced by suppliers, retailers and other sectors in the supply chain.

While it is likely that many of those who lost their jobs have gone on to find reemployment, the personal and family trauma associated with even temporary unemployment should not be lightly discounted. For example, people may quickly get into arrears on mortgages or personal debts, have difficulty paying medical expenses (as benefits are often linked to employment) or be forced to relocate to find alternative employment.

The   broader   economy-wide   effects   of counterfeiting and piracy

Finally, it is important to note that our previous analysis focused only on the G20 economies and so are likely to under-estimate the negative global impacts of counterfeiting and piracy on employment.

The links between counterfeiting and other criminal activities may also be leading to substantial costs for the G20 governments and their citizens. For the G20 as a whole, the economic and social costs of crime increase by over €20 billion for every 1% increase in the crime rate caused by counterfeiting.

Finally, counterfeit products are unregulated and unsafe. Every year thousands of consumers living and working in countries throughout the G20 suffer accidents and injuries as a result of unregulated counterfeit products. Many, if not most, of these products have been purchased unwittingly by consumers. Unfortunately, 3,000 consumers lose their lives every year as a result of their exposure to dangerous counterfeit products (primarily through counterfeit food and medicines). On conservative assumptions, the economic cost of lives lost to counterfeiting can add up to €14.5 billion each year across the G20 economies.

Accidents and ill-health relating to counterfeiting also put a strain on health services across the G20. While there are few good sources of information on the total incidence of accidents and ill-health caused by counterfeiting, even the most modest assumptions suggests that across the G20 the costs to the health services are likely to exceed €100 million.

For the G20 as a whole therefore our analysis suggests that counterfeiting costs governments and consumers:

◻  approximately €62 billion annually in lost tax revenues and higher welfare spending;

◻  approximately 2.5 million jobs across the G20 countries in the short term (less than 1 year);

◻  €20 billion for every 1 % increase in the crime rate caused by the trade in counterfeit and pirated goods; and

◻  €14.5 billion each year as a result of the 3,000 deaths linked to counterfeit products, not including a cost for additional health services caused by dangerous fake products of more than €100 million each year.

The broader economy-wide effects of counterfeiting and piracy

# 4    Conclusions

The previous chapters of this report have focused on generating estimates of the commercial value of counterfeiting and piracy associated with four categories of impacts delineated in the OECD's 2008 report, namely:

● **Category 1: Counterfeit and pirated goods moving through international trade.** We updated the OECD's estimate of the value of counterfeit and pirated goods moving through international trade, drawing on new customs seizure data indicating that the incidence of counterfeiting and piracy has increased relative to the 2005-based customs data used in the OECD's 2008 study.

● **Category 2: Value of domestically produced and consumed counterfeit and pirated products.** We developed a methodology, derived from the OECD's modeling work, to generate an estimate of the value of domestic manufacture and consumption of counterfeit and pirate products – thereby capturing an estimated value of fake products that do not cross borders.

● **Category 3: Volume of pirated digital products being distributed via the Internet.** We described, evaluated and contextualized industry reports and academic studies on the value of digital piracy of recorded music, movies and software. We then used these studies to produce an estimate of the total value of digital piracy that has been calculated using consistent assumptions and methodology across these industries.

● **Category 4: Broader economy-wide effects.** We provided a summary of previous analysis aimed at identifying the broader economy-wide effects of counterfeiting and piracy.

And, because the value and volume of counterfeiting and digital piracy appears to be increasing rapidly, we have also undertaken to estimate these impacts in 2015. This work is delineated in section 4.3, below.

## 4.1    Estimates of total value of counterfeit and pirated products

Chapter 2 of this report focused on generating estimates of the commercial value of counterfeiting and piracy in three of the impact categories excluded from the OECD's 2008 report, namely:

▫    increases in the estimate of counterfeit and pirated products moving through international trade due to increases in the incidence of counterfeiting and piracy since 2005;

□    the value of domestic manufacture and consumption of counterfeit and pirated goods (the OECD's $250 billion figure focuses on counterfeiting in international trade alone, that is fakes seized at border crossings); and

□    the value of digital piracy of recorded music, movies and software (not captured in trade statistics).

We have combined our estimates for each of these three areas with the original OECD estimate to generate a total estimate of the value of counterfeiting and piracy for 2008 of between **$455 billion and $650 billion**. The breakdown of this estimate is shown in Table 6 below.

**Table 6.** Estimate of the total value of counterfeit and pirated products (2008)

| OECD Category | Estimate |
|---|---|
| Internationally traded counterfeit and pirated products | $285 billion - $360 billion |
| Domestically produced and consumed counterfeit and pirated products | $140 billion - $215 billion |
| Digitally pirated products | $30 billion - $75 billion |
| **Total** | **$455 billion - $650 billion** |

Source: Frontier Economics

It is important to note that these estimates are likely to provide a conservative estimate of the impact of counterfeiting and piracy. The estimates of the value of counterfeiting are based on 2008 data (the last year for which complete data was available), and given the rapid increase in counterfeiting and piracy observed between 2005 and 2008, is likely to under-estimate the level of counterfeiting and piracy beyond 2008. It is for this reason that we have provided estimates to 2015.

It is also important to note that this study, following in the footsteps of the OECD report, has not attempted to estimate business losses associated with counterfeiting and piracy. This is primarily because the likely variations and other difficulties associated with estimating substitution effects across substantially different countries and industries introduces an additional level/degree of variables which could undermine our aim to as accurately as possible characterize the magnitude of the unfair competition for legitimate economic activity and the unchecked growth of an emerging "underground economy".

Conclusions

## 4.2    Broader economy wide effects of counterfeiting and piracy

In addition to their work on economic impacts, the OECD examined – but did not provide quantitative estimates for a range of broader economy-wide effects: *'Counterfeiting and piracy can have broad economy-wide effects on trade, foreign investment, employment, innovation, criminality and the environment. Concerning the microeconomic effects, the sales volume, prices and costs of rights holders are impacted, as are investment, royalties and brand value. For consumers, counterfeit and pirated products may offer cheap alternatives to genuine goods but are usually of inferior quality. For certain types of infringing goods, the health and safety of consumers may be put at significant risk. With respect to governments, counterfeiting and piracy have effects on tax revenues, government expenditures, and, when corruption takes place, the effectiveness of public institutions. (p. 133)*

These social costs are far from insignificant and merit treatment sufficient to ensure that they are not overlooked when considering the full range of negative impacts resulting from counterfeiting and piracy. In an associated study[63] (excerpted in Chapter 3 of this report), Frontier explored the value and impact of these broader economy-wide effects. Notably, this work did not capture all of the thirteen "broader economy wide effect" cost-categories identified by the OECD; we only tackled impact of counterfeiting and piracy on government tax revenues, legitimate employment, increased costs of crime, economic costs on consumer health and safety, and downward pressures on FDI flows. Moreover, the scope of this report was limited to only the 20 countries comprising the "group of 20", and so will be an under-estimate of the global impact of counterfeiting and piracy. The findings, however, are relevant to this report and serve to complete the picture of the total impacts to "economy and society". We found:

● **Counterfeiting and piracy are estimated to cost G20 governments and consumers over \$125 billion every year. Of this:**

  □ the G20 economies lose approximately \$77.5 billion in tax revenues and higher welfare spending, \$25 billion in increased costs of crime, \$18.1 billion in the economic cost of deaths resulting from counterfeiting and another \$125 million for the additional cost of health services to treat injuries caused by dangerous fake products; and

  □ a number of G20 economies may be missing out on higher FDI as a result of concerns over IPR enforcement. That lost investment could give rise to additional tax losses of more than \$6.25 billion across the G20.

---

[63] Frontier Economics, The Impact of Counterfeiting on Governments and Consumers, December 2009

## Employment

This report has not considered explicitly the impact of counterfeiting and piracy on employment. However, Frontier's previous study, which focused on the wider social and economic impacts of counterfeiting and piracy found that counterfeiting and piracy has significant negative impacts on employment across the G20 economies. Our previous analysis found that **approximately 2.5 million jobs have been destroyed by counterfeiting and piracy** – alternatively, if counterfeiting and piracy could be eradicated or seriously reduced, up to 2.5 million jobs could be created in the legitimate economies of the G20. It should also be noted that these estimates do not include secondary impacts on employment that may well be experienced by suppliers, retailers and other sectors in the supply chain.

While it is likely that many of those who lost their jobs have gone on to find reemployment, the personal and family trauma associated with even temporary unemployment should not be lightly discounted. For example, people may quickly get into arrears on mortgages or personal debts, have difficulty paying medical expenses (as benefits are often linked to employment) or be forced to relocate to find alternative employment.

Finally, it is important to note that our previous analysis focused only on the G20 economies and so are likely to under-estimate the negative global impacts of counterfeiting and piracy on employment.

## 4.3   A growing problem – projections to 2015

The estimates provided above indicate the significant scale of counterfeiting and piracy. However, they are based on data from 2008. Given the trend of rapid increases in counterfeit and pirated products, it is instructive to consider an illustration of the extent to which counterfeiting and piracy may continue to grow over the next few years. Specifically, using observed growth rates for the past decade we forecast forward to provide an illustration of the potential magnitude of counterfeiting and piracy in 2015.

## Product counterfeiting

The value of counterfeiting and piracy appears to be increasing rapidly over time. The OECD's original estimate was based on 2005 data. Updating this estimate to reflect increases in trade and seizures since 2005, we find that the value of counterfeit and pirated products in trade has increased by up to 22% per year over this period. Even if we assume that this growth rate were to slow considerably, say to 15%, it would still result in a significant increase in the total value of counterfeit and pirated products. Given the methodology used to estimate domestically produced and consumed counterfeiting and piracy, we use

Conclusions

the same growth rate to estimate the potential level of domestic production and consumption of counterfeit and pirated goods in 2015.

Table 7 shows that if physical production of counterfeit and pirated products were to grow at 15%, then the value of internationally traded and domestically produced and consumed counterfeit and pirated products could be between $1.14 and $1.53 trillion in 2015.

## Digital piracy

Our findings for 2008 also suggest that digital piracy accounts for between 6.5% and 12% of the total value of counterfeit and pirated products consumed. However, it is worth recalling that digital piracy is a relatively new problem compared to physical piracy (emerging only in the last decade). Against this back drop, this scale of impact is concerning. It indicates the extent to which the problem has grown over a short period of time. Evidence on digital piracy also suggests that it is a problem that is likely to continue growing quickly over the next few years with increased internet access and broadband speeds.

There are two approaches we can take to projecting digital piracy into the future:

1. The global number of internet users has increased from around 361 million in 2000 to almost 2 billion in 2010[64], implying a compound annual growth rate of approximately 18% per annum. If digital piracy was to increase at the same rate, it would be expected to have a value of between $90 and $240 billion by 2015.

2. Alternatively, if we use the relatively conservative assumption that digital piracy will maintain its total share of counterfeiting and piracy (i.e. growth will not continue to outstrip physical counterfeiting and piracy), we find that by 2015, digital piracy is likely to have a value of between $80 billion and $210 billion.

---

64    World Internet Usage Statistics, 2000 to 2010.

Conclusions

**Table 7.** Estimate of the value of physical counterfeit and pirated products (2015)

| OECD Category | Estimate |
| --- | --- |
| Internationally traded counterfeit and pirated products | $770 billion - $960 billion |
| Domestically produced and consumed counterfeit and pirated products | $370 billion - $570 billion |
| Digital piracy | $80 billion - $240 billion |
| Broader economy wide effects[†]* | $125 + |
| Employment losses* | 2.5 million + |
| **Total** | **$1,220 billion - $1,770 billion** |

Source: Frontier Economics

[†] Effects on government tax revenues, welfare spending, costs of crime health services, FDI flows

* Estimate limited to G20 economies

Overall, these estimates imply that the upper bound of the global value of counterfeit and pirated could be **$1.77 trillion.** According to the IMF forecasts, international GDP is forecast to be over $80 trillion in 2015.[65] Considering our estimates for the value of international counterfeited and pirated goods, this suggests that global production of counterfeit and physical products could make up as much as 2% of global GDP.

## 4.4    The complete picture

The OECD report was seminal in its effort to develop analytical, data-based methodologies for estimating the value of internationally traded counterfeit and pirated products.

Moreover, its delineation of four key categories of economic and social impact are widely understood to represent a more complete picture of the full impact of counterfeiting and piracy on the economy, society and development.

---

65    International Monetary Fund, World Economic Outlook Database, October 2010, http://www.imf.org/external/pubs/ft/weo/2010/02/weodata/weorept.aspx?sy=2008&cy=2015& scsm=1&ssd=1&sort=country&ds=.&br=1&c=001&s=NGDPD&grp=1&a=1&pr.x=91&pr.y=12

However, the lack of quantitative analysis of three of these additional impact categories is likely to result in a substantial underestimate of the scope of counterfeiting and piracy.

For these reasons, this report has endeavoured to account for these shortcomings by:

(1) drawing out the additional impacts left un-quantified in the OECD report;

(2) introducing methodologies for estimating the magnitude of these additional cost categories;

(3) projecting forward the magnitude of the problem;

(4) providing a starting point for future analytical work, to be taken up by OECD, intergovernmental organizations, national governments and/or academia.

By filling in the gaps left by the OECD, we present a more practical and complete picture of the economic and social impacts of counterfeiting and piracy. The following table compiles the set of findings we refer to as *the complete picture*, drawing together estimates for the total value of counterfeit and pirated products in 2008, along with projections for 2015.

Conclusions

**Table 8. The Complete Picture.** Estimate of the total value of counterfeit and pirated products in 2008 and 2015, and impacts on the broader economy and employment

| OECD Category | Estimate in $ billions (2008) | Estimate in $ billions (2015) |
|---|---|---|
| Internationally traded counterfeit and pirated products | $285 - $360 | $770 - $960 |
| Domestically produced and consumed counterfeit and pirated products | $140 - $215 | $370 - $570 |
| Digitally pirated products | $30 - $75 | $80 - $240 |
| *sub total* | **$455 - $650** | **$1,220 - $1,770** |
| Broader economy wide effects[†]* | $125 | *$125 +* |
| Employment losses* | 2.5 million | *2.5 million +* |

Source: Frontier Economics

[†] Effects on government tax revenues, welfare spending, costs of crime health services, FDI flows

* Estimate limited to G20 economies

Conclusions

# Annexe 1: US Analysis and Findings

As noted in the main body of the report, an important next stage in the analysis is to start developing more granular country level estimates of the impact of counterfeiting and piracy. In the annexe below, we provide an illustrative assessment of the value of counterfeiting and piracy in the US, based on the findings from our global analysis.

This section provides estimates of what the global findings set out above imply for the US. We set out preliminary estimates of the share of global counterfeit and pirated goods accounted for by the US. For the purposes of this report, we focus on understanding the US share of *consumption* of counterfeit and pirated goods. It would also be possible to examine the US share of counterfeit and pirated goods *production*, but the consumption-based share is more likely to be relevant to US-based businesses. It is also consistent with the methodologies used to generate the global estimates set out above.

We find that the US consumption-based share of counterfeit and pirated goods is between **$66 billion and $100 billion** (based on 2008 data). We find that the US consumes between $45 billion and $60 billion of internationally traded counterfeit and pirated products, $12 billion to $14 billion domestically produced counterfeit products and between $9 billion and $25 billion digitally pirated products.

The rest of this section provides details of how these estimates have been derived.

## 4.4.1    International trade

Earlier in this report, we estimated that global counterfeit and pirated products in international trade were worth between $287 and $363 billion in 2008. In this section we estimate the US share of this figure by taking the US share of total world imports as a proxy for their share of counterfeit and pirated world imports. On this basis, we estimate that the US imports between **$46 billion and $58 billion** in pirated and counterfeit products.

### *A proxy for the US share of global counterfeit and pirated imports*

To estimate the US share of internationally traded counterfeit and pirated products we need to understand how many such products are imported into the US. The OECD estimates of internationally traded counterfeit products do not help us in this respect as they are organized by source economy rather than destination economy. This tells us where the counterfeit goods were produced rather than where they were consumed.

To reach a preliminary estimate we have therefore taken the US share of total world imports as a proxy for its share of total counterfeit imports. In 2007, the

US imported approximately $2 trillion worth of goods, which equates to roughly 16% of total world value of imports. So long as the US propensity to import counterfeit products is broadly equivalent to its overall propensity to import, this provides a reasonable proxy for the US consumption-based share. To be clear, we are not saying that the rate at which the US imports counterfeit and pirated goods is the same as for all other goods. Rather, this assumption implies that, if for every $100 of world imports the US consumes $16, then for every $100 of counterfeit imports the US would also consume $16 worth.

### Findings

Taking 16% of the total value of counterfeit and pirated goods in international trade implies that the US consumes $46-$58 billion of internationally traded counterfeit and pirated products. Clearly, if the US has a greater propensity to import counterfeit products than all products in general then this measure will understate the value of counterfeit and pirated goods in the US. We would anticipate that the US may, in fact, have a lower propensity to import counterfeit products than to import all products in general, so the US share is more likely to be at the lower end of the range we have estimated.

### 4.4.2 Domestic production and consumption

As detailed earlier, we estimated that the global value of domestically produced and consumed counterfeit and pirated products was between $140 and $215 billion in 2008. In this section we estimate the US share of this number by extracting the US figures directly implied by our global analysis. On this basis, we find that the US consumes between **$12 billion and $14 billion** domestically produced counterfeit and pirated products.

### Extracting the US figures implicit in our global analysis

The global estimate of $140 billion to $215 billion domestically produced and consumed counterfeit and pirated products was generated by:

● **Step 1:** Taking the simulated counterfeiting propensities for each product category and each source economy estimated by the OECD.

● **Step 2:** Identifying the relevant categories of GDP that are likely to be exposed to counterfeit products for each economy.

● **Step 3:** Estimating the value of domestic counterfeit and pirated production and consumption for each economy by applying the counterfeiting propensities from Step 1 to the categories of GDP identified in Step 2.

This methodology then involved aggregating each of the country-specific estimates to reach a global estimate. This means that we are able to extract the US number directly from the global analysis we undertook. For our global

analysis we also varied the assumption about the link between the propensity for a source economy to export counterfeit and pirated products and its propensity to produce them for local consumption. Specifically, we used evidence from a study by the Japan Patent Office to support the hypothesis that counterfeiting is *less prevalent in trade* than in domestic production and consumption outside of Asia. The range of estimates produced for the US also reflects this variation in assumptions.

### Findings

The US figures implied by our global analysis suggest that the US consumes between $12 and $14 billion worth of domestically produced and consumed counterfeit products.

### 4.4.3  Digital piracy

Earlier in this report we provided estimates of the global value of digital piracy. In this section, we look specifically to understand the value of digitally pirated products consumed by the US. We cover recorded music, movies and software in turn.

### Recorded music

We estimated that the global value of digitally pirated recorded music was between $17 and $40 billion in 2008 but more likely to be towards the upper end of this range. In this section we apply the two alternative approaches used to generate the global estimates to US-specific recorded music figures. On this basis, we find that the US consumes between **$7 - $20 billion** worth of digitally pirated recorded music.

#### *Updating industry estimates to be US specific*

Our starting point for estimating the global value of digitally pirated recorded music was to take IFPI estimates of the number of illegal music downloads and to multiply these by the commercial value of $1 per single.

Following the same approach for the US involves estimating the volume of US illegal music downloads and an appropriate value for their legal counterparts. We continue to use the average retail price of a legal single download in the US[66] as the appropriate measure of value for our analysis. But, it is more difficult to get an accurate estimate of the volume of illegal downloads made by US consumers.

We can proxy the volume of US illegal music downloads by assuming that US consumers account for a similar proportion of legal and illegal music downloads.

---

[66]    Recording Industry Association of America (RIAA) 2008 Year-End Shipment Statistics

IFPI[67] estimate that US consumers account for 50% of all music downloads in the legitimate market. If we assume that they also account for a similar proportion of downloads in the illegal market, this implies that around 20 billion songs are illegally downloaded by US consumers[68].

Using the estimates of US download volumes and the average retail price described above, we estimate that the commercial value of illegal downloads of recorded music is approximately $20 billion. Again, we have been conservative in our estimate by assuming that all of the 20 billion illegal US downloads are singles[69].

### Using academic studies to generate US specific estimates

● To complement the industry specific analysis set out above, we also drew on a range of academic studies that have examined the issue of digital music piracy. These papers are described in detail in the main digital piracy section above.

● There appears to be an emerging consensus amongst these papers about the impact of digital piracy on the music industry. Specifically, they appear to agree that:

  □ digital piracy is responsible for around 24% of the global sales decline that has occurred in the music industry; and

  □ between 5 and 6 illegal downloads are required to replace a single legitimate album purchase[70].

Whilst these studies attempt to measure business losses rather than the value of digital piracy, their findings have implications for the scale of digitally pirated music available. The findings suggest that digital piracy could be responsible for approximately $1.45 billion (24%) of the $6 billion sales decline experienced by the US between 1999 and 2008[71]. As between 5 and 6 illegal downloads are

---

67     International Federation of the Phonographic Industry ("IFPI"), The Recording Industry 2006 Piracy Report: Protecting Creativity in Music, July 2006; (hereinafter "IFPI Piracy Report"), http://www.ifpi.org/content/library/piracy-report2006.pdf.

68     50% of the total 40 billion illegal downloads estimated by IFPI.

69     The average retail price for an album is likely to be approximately $10. Source: Recording Industry Association of America (RIAA) 2008 Year-End Shipment Statistics

70     In line with the studies by Leibowitz (2004) and Rob and Waldfogel (2004). Leibowitz (2004) estimates that between 5 and 6 illegal downloads are likely to be required to replace a single legitimate album purchase. Rob and Waldfogel (2004) also estimate that around 5 illegal downloads are required to replace a single legitimate album purchase.

71     Recording Industry Association of America (RIAA) 2008 Year-End Shipment Statistics

required to replace a single legitimate album purchase[72], this implies a total commercial value of illegal downloads of between $7.2 and $8.6 billion[73].

As for our global analysis, we suggest that this estimate is likely to be extremely conservative. Many of the academic studies used here estimate the effect of digital movie piracy based on data for the period up to 2003 and proxy digital piracy with data on internet penetration. The global number of internet users has increased by around 18% per year since 2000[74]. We therefore expect that the commercial value of US digital piracy in 2008 could be significantly higher than suggested here. This could be an area for further investigation in the future.

### Findings

As noted in the global estimate section, it is extremely difficult to get an accurate estimate of the commercial value of digital piracy of recorded music and no single approach currently provides the answer. For this reason, we have drawn on industry figures and the academic literature to provide a range of estimates. We find that the US consumed $7 - $20 billion digitally pirated recorded music in 2008. However, because the lower end of this estimate is based on academic studies that make use of out-of-date data and do not account for the rapid growth of broad band penetration and mobile technologies, we expect that the estimate is likely to lie towards the upper end of this range.

### Movies

We estimated that the commercial value of global digital movie piracy was likely to be between $10 billion and $16 billion in 2005. In this section we make use of the US specific estimates of movie business losses from digital piracy to provide an estimate of the US share of this global figure. We find that the US consumed between **$1.4 billion and $2 billion** worth of digitally pirated movies in 2005. As for the global figures above, we note that these figures are likely to be extremely conservative.

### Industry estimate of US business losses associated with digital movie piracy

The global estimate described above made use of the study published by the Motion Picture Association (MPA) and L.E.K in 2006[75]. This study estimated

---

[72]    In line with the studies by Leibowitz (2004) and Rob and Waldfogel (2004). Liebowitz (2004) estimates that between 5 and 6 illegal downloads are likely to be required to replace a single legitimate album purchase. Rob and Waldfogel (2004) also estimate that around 5 illegal downloads are required to replace a single legitimate album purchase.

[73]    Estimated by multiplying the $1.2 billion sales decline by 5 and 6 respectively.

[74]    World Internet Usage Statistics, 2000 to 2010.

[75]    The Cost of Movie Piracy, an analysis prepared by L.E.K. for the Motion Picture Association, May 2006, http://www.mpaa.org/researchStatistics.asp, (hereinafter "MPA-L.E.K. Study").

that there were $7 billion of estimated consumer spending losses associated with digital piracy in the form of illegally downloaded movies from the internet.

The study also provided a US specific figure for business losses. It found that the US share of the $7 billion global losses was approximately $918 million (13% of total global losses).

### *Translating the loss figures into value figures*

As indicated earlier, we need to transform the business loss estimates from the MPA L.E.K. study into a commercial value of digital movie piracy. To do so, we use estimates of the likely substitution rate between legal and illegal movie downloads.

While academic research into the impact of illegal movie downloads is relatively limited, the studies that exist suggest that substitution rates are likely to be relatively high and may lie somewhere between 45% and 67%. This implies that only 1.5 to 2.2 illegal purchases are required to replace a legitimate movie purchase (see the earlier section on digital movie piracy for details). Applying the figures on substitution rates to the $918 million US loss figure estimated by the MPA L.E.K study implies a total commercial value of US illegal downloads of between $1.4 billion and $2 billion[76].

### *Findings*

We find that the US consumes between **$1.4 billion and $2 billion** worth of digitally pirated movies. As for the global estimates above, we would expect these estimates to be conservative. The $918 million loss figure on which they are based was estimated in 2006. The global number of internet users has increased by around 18% per year since 2000[77]. Broadband speeds have also been improving significantly with time, making the illegal download of files of significant size, such as movies, increasingly feasible and attractive. We therefore expect that the US consumption-based value of digital piracy in 2008 could be significantly higher than suggested here.

### Software

Earlier in the report, we estimated that the global value of digitally pirated software products was likely to be between $1.5 billion and $19 billion in 2008. By using information on the US share of total software piracy, we have been able to translate this figure into an estimate of the US share of digital software piracy. On this basis, we estimate that the US consumes between **$320 million and $3 billion** of digitally pirated software. Again, we note the size of this range, which

---

76    Estimated by multiplying the $918 million sales decline by 1.5 and 2.2 respectively.

77    World Internet Usage Statistics, 2000 to 2010.

are due to the difficulties in estimating this figure, but anticipate that the true value is likely to be towards the upper end.

*A preliminary estimate of the value of US digital software piracy*

The global estimate made use of information on the number of take down notices issued by BSA and the range of retail values for software products as measures of the volume and value of digital software piracy.

To produce a US specific estimate using the same methodology would require specific information on the number of take down notices related to US consumers and also on US specific retail prices for the relevant software. This information is not currently available.

Our estimate is therefore based on estimating the US share of digitally pirated software by assuming that the US share of digitally pirated software is the same as its share of total pirated software. The study on the piracy of software products published by the Business Software Alliance (BSA) and IDC in 2008[78] provides us with relevant information on which to base our estimate. It estimates that the commercial value of *all* counterfeit and pirated software was $53 billion in 2008. The US was estimated to account for approximately $9.1 billion (17%) of this total. Assuming that the US accounts for 17% of our estimated global figure, we find that the US consumes between $64 million and $3 billion of digitally pirated software.

### Findings

We estimate that the US consumes between **$64 million and $3 billion** of digitally pirated software. However, because of the conservative assumptions behind the lower bound of this estimate (discussed above) we would expect the true value of US digital software piracy to lie towards the upper end of this range.

### The total value of US counterfeiting and piracy

In this section of the report we have focused on generating US specific estimates of the value of counterfeiting and piracy. Our estimates cover international trade in counterfeit and pirated goods, domestically produced and consumed goods and digitally pirated products. Overall, we find that the US consumes between **$66 billion and $100 billion** worth of counterfeit and pirated products.

---

[78]     Business Software Alliance (BSA) and IDC, *2008 Piracy Study*, May 2009, (hereinafter, BSA/IDC 2008 Piracy Study.").

FRONTIER ECONOMICS EUROPE

BRUSSELS | COLOGNE | LONDON | MADRID


Frontier Economics Ltd   71 High Holborn   London   WC1V 6DA

Tel. +44 (0)20 7031 7000   Fax. +44 (0)20 7031 7001   www.frontier-economics.com

# EXHIBIT B

## 2013 Registrar Accreditation Agreement

1. Registrar Accreditation Agreement

2. Whois Accuracy Program Specification

3. Registration Data Directory Service (Whois) Specification

4. Consensus and Temporary Policy Specification

5. Specification on Privacy and Proxy Registrations

6. Data Retention Specification

7. Registrar Information Specification

8. Additional Registrar Operation Specification

9. Registrants' Benefits and Responsibilities

10. Logo License Specification

11. Compliance Certificate

12. Transition Addendum



# Registrar
# Accreditation
# Agreement

---

This REGISTRAR ACCREDITATION AGREEMENT (this "Agreement") is by and between the Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [Organization type and jurisdiction] ("Registrar"), and shall be deemed made on _____, at Los Angeles, California, USA.

**1. DEFINITIONS.** For purposes of this Agreement, the following definitions shall apply:

1.1 "Account Holder" means the person or entity that is paying for the Registered Name or otherwise controls the management of the registered name, when that person or entity is not the Registered Name Holder.

1.2 "Accredited" or "Accreditation" means to identify and set minimum standards for the performance of registration functions, to recognize persons or entities meeting those standards, and to enter into an accreditation agreement that sets forth the rules and procedures applicable to the provision of Registrar Services.

1.3 "Affiliate" means a person or entity that, directly or indirectly, through one or more intermediaries, Controls, is controlled by, or is under common control with, the person or entity specified.

1.4 "Affiliated Registrar" is another Accredited registrar that is an Affiliate of Registrar.

1.5 "Applicable Registrar Family" means, with respect to Affiliated Registrars, such Affiliated Registrar as a group.

1.6 "Consensus Policy" has the meaning set forth in the Consensus Policies and Temporary Policies Specification attached hereto.

1.7 "Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person or entity, whether through the ownership of securities, as trustee or executor, by serving as an employee or a

member of a board of directors or equivalent governing body, by contract, by credit arrangement or otherwise.

1.8    "DNS" refers to the Internet domain-name system.

1.9    The "Effective Date" is _____.

1.10   The "Expiration Date" is _____.

1.11   "gTLD" or "gTLDs" refers to the top-level domain(s) of the DNS delegated by ICANN pursuant to a registry agreement that is in full force and effect, other than any country code TLD (ccTLD) or internationalized domain name (IDN) country code TLD.

1.12   "gTLD Zone-File Data" means all data contained in a DNS zone file for the registry, or for any subdomain for which Registry Services are provided and that contains Registered Names, as provided to nameservers on the Internet.

1.13   "Illegal Activity" means conduct involving use of a Registered Name sponsored by Registrar that is prohibited by applicable law and/or exploitation of Registrar's domain name resolution or registration services in furtherance of conduct involving the use of a Registered Name sponsored by Registrar that is prohibited by applicable law.

1.14   "Personal Data" refers to data about any identified or identifiable natural person.

1.15   "Registered Name" refers to a domain name within the domain of a gTLD, whether consisting of two (2) or more (e.g., john.smith.name) levels, about which a gTLD Registry Operator (or an Affiliate or subcontractor thereof engaged in providing Registry Services) maintains data in a Registry Database, arranges for such maintenance, or derives revenue from such maintenance. A name in a Registry Database may be a Registered Name even though it does not appear in a zone file (e.g., a registered but inactive name).

1.16   "Registered Name Holder" means the holder of a Registered Name.

1.17   The word "registrar," when appearing without an initial capital letter, refers to a person or entity that contracts with Registered Name Holders and with a Registry Operator and collects registration data about the Registered Name Holders and submits registration information for entry in the Registry Database.

1.18   "Registrar Approval" means the receipt of either of the following approvals:

   1.18.1 The affirmative approval of Applicable Registrars accounting for 90% of the Total Registered Names Under Management by the Applicable Registrars; provided that, for purposes of calculating the Total Registered

Names Under Management by Applicable Registrars, the Total Registered Names Under Management by each Applicable Registrar Family shall not exceed the Total Registered Names Under Management of the Applicable Registrar Family that is the fifth largest Applicable Registrar Family (measured by number of Registered Names Under Management), both for purposes of the numerator and the denominator; or

1.18.2 The affirmative approval of 50% plus one of the Applicable Registrars that participate in the process to approve or disapprove (i.e. vote for or against, but not abstain or otherwise fail to vote) a proposed amendment under Section 6, and the affirmative approval of Applicable Registrars accounting for 66.67% of the Total Registered Names Under Management by all Applicable Registrars; provided that, for purposes of calculating the Total Registered Names Under Management by Applicable Registrars, the Total Registered Names Under Management by each Applicable Registrar Family shall not exceed the total Registered Names Under Management of the Applicable Registrar Family that is the fifth largest Applicable Registrar Family (measured by number of Registered Names Under Management), both for purposes of the numerator and the denominator. An example of these calculations is set forth in Appendix 1 attached hereto.

1.19 "Registrar Services" means the services subject to this Agreement provided by a registrar in connection with a gTLD, and includes contracting with Registered Name Holders, collecting registration data about the Registered Name Holders, and submitting registration information for entry in the Registry Database.

1.20 "Registry Data" means all Registry Database data maintained in electronic form, and shall include gTLD Zone-File Data, all data used to provide Registry Services and submitted by registrars in electronic form, and all other data used to provide Registry Services concerning particular domain name registrations or nameservers maintained in electronic form in a Registry Database.

1.21 "Registry Database" means a database comprised of data about one or more DNS domain names within the domain of a registry that is used to generate either DNS resource records that are published authoritatively or responses to domain-name availability lookup requests or Whois queries, for some or all of those names.

1.22 A "Registry Operator" is the person or entity then responsible, in accordance with an agreement between ICANN (or its assignee) and that person or entity (those persons or entities) or, if that agreement is terminated or expires, in accordance with an agreement between the US Government and that person or entity (those persons or entities), for providing Registry Services for a specific gTLD.

1.23 "Registry Services," with respect to a particular gTLD, shall have the meaning defined in the agreement between ICANN and the Registry Operator for that gTLD.

1.24 A "Reseller" is a person or entity that participates in Registrar's distribution channel for domain name registrations (a) pursuant to an agreement, arrangement or understanding with Registrar or (b) with Registrar's actual knowledge, provides some or all Registrar Services, including collecting registration data about Registered Name Holders, submitting that data to Registrar, or facilitating the entry of the registration agreement between the Registrar and the Registered Name Holder.

1.25 "Restricted Amendment" means (i) an amendment of the Consensus Policies and Temporary Policies Specification or (ii) the term of this Agreement as specified in Section 5.1, as such term may be extended pursuant to Section 5.2.

1.26 A Registered Name is "sponsored" by the registrar that placed the record associated with that registration into the registry. Sponsorship of a registration may be changed at the express direction of the Registered Name Holder or, in the event a registrar loses Accreditation, in accordance with then-current ICANN Specifications and Policies.

1.27 "Specifications and/or Policies" include Consensus Policies, Specifications (such as the Whois Accuracy Program Specification) referenced in this Agreement, and any amendments, policies, procedures, or programs specifically contemplated by this Agreement or authorized by ICANN's Bylaws.

1.28 "Term of this Agreement" begins on the Effective Date and continues to the earlier of (a) the Expiration Date, or (b) termination of this Agreement.

1.29 "Total Registered Names Under Management" means the total number of Registered Names sponsored by all Applicable Registrars as reflected in the latest monthly reports submitted to ICANN by Registrars.

1.30 "Whois Accuracy Program Specification" means the Whois Accuracy Program Specification attached hereto, as updated from time to time in accordance with this Agreement.

1.31 "Whois Specification" means the Registration Data Directory Service (Whois) Specification attached hereto, as updated from time to time in accordance with this Agreement.

1.32 "Working Group" means representatives of the Applicable Registrars and other members of the community that the Registrar Stakeholder Group appoints, from time to time, to serve as a working group to consult on amendments to the Applicable Registrar Agreements (excluding bilateral amendments pursuant to Section 6.9).

## 2. ICANN OBLIGATIONS.

2.1    Accreditation. During the Term of this Agreement and subject to the terms and conditions of this Agreement, Registrar is hereby Accredited by ICANN to act as a registrar (including to insert and renew registration of Registered Names in the Registry Database) for gTLDs.

2.2    Registrar Use of ICANN Name, Website and Trademarks. ICANN hereby grants to Registrar a non-exclusive, worldwide, royalty-free license during the Term of this Agreement (a) to state that it is Accredited by ICANN as a registrar for gTLDs, and (b) to link to pages and documents within the ICANN website. Subject to the terms and conditions set forth in the Logo License Specification attached hereto, ICANN hereby grants to Registrar a non-exclusive, worldwide right and license to use the Trademarks (as defined in the Logo License Specification). No other use of ICANN's name, website or Trademarks is licensed hereby. This license may not be assigned or sublicensed by Registrar to any other party, including, without limitation, any Affiliate of Registrar or any Reseller.

2.3    General Obligations of ICANN. With respect to all matters that impact the rights, obligations, or role of Registrar, ICANN shall during the Term of this Agreement:

> 2.3.1    exercise its responsibilities in an open and transparent manner;
>
> 2.3.2    not unreasonably restrain competition and, to the extent feasible, promote and encourage robust competition;
>
> 2.3.3    not apply standards, policies, procedures or practices arbitrarily, unjustifiably, or inequitably and not single out Registrar for disparate treatment unless justified by substantial and reasonable cause; and
>
> 2.3.4    ensure, through its reconsideration and independent review policies, adequate appeal procedures for Registrar, to the extent it is adversely affected by ICANN standards, policies, procedures or practices.

2.4    Use of ICANN Accredited Registrars. In order to promote competition in the registration of domain names, and in recognition of the value that ICANN-Accredited registrars bring to the Internet community, ICANN has ordinarily required gTLD registries under contract with ICANN to use ICANN-Accredited registrars, and ICANN will during the course of this agreement abide by any ICANN adopted Specifications or Policies requiring the use of ICANN-Accredited registrars by gTLD registries.

## 3. REGISTRAR OBLIGATIONS.

3.1 Obligations to Provide Registrar Services. During the Term of this Agreement, Registrar agrees that it will operate as a registrar for one or more gTLDs in accordance with this Agreement.

3.2 Submission of Registered Name Holder Data to Registry. During the Term of this Agreement:

3.2.1 As part of its registration of Registered Names in a gTLD, Registrar shall submit to, or shall place in the Registry Database operated by, the Registry Operator for the gTLD the following data elements:

3.2.1.1 The name of the Registered Name being registered;

3.2.1.2 The IP addresses of the primary nameserver and secondary nameserver(s) for the Registered Name;

3.2.1.3 The corresponding names of those nameservers;

3.2.1.4 Unless automatically generated by the registry system, the identity of the Registrar;

3.2.1.5 Unless automatically generated by the registry system, the expiration date of the registration; and

3.2.1.6 Any other data the Registry Operator requires be submitted to it.

The agreement between the Registry Operator of a gTLD and Registrar may, if approved by ICANN in writing, state alternative required data elements applicable to that gTLD, in which event, the alternative required data elements shall replace and supersede Subsections 3.2.1.1 through 3.2.1.6 stated above for all purposes under this Agreement but only with respect to that particular gTLD. When seeking approval for alternative required data elements, the data elements set forth in Subsections 3.2.1.1 through 3.2.1.6 should be considered suggested minimum requirements.

3.2.2 Within seven (7) days after receiving any updates from the Registered Name Holder to the data elements listed in Subsections 3.2.1.2, 3.1.2.3, and 3.2.1.6 for any Registered Name that Registrar sponsors, Registrar shall submit the updated data elements to, or shall place those elements in the Registry Database operated by, the relevant Registry Operator.

3.2.3 In order to allow reconstitution of the Registry Database in the event of an otherwise unrecoverable technical failure or a change in the designated Registry Operator, within ten (10) days of any such request by ICANN,

Registrar shall submit an electronic database containing the data elements listed in Subsections 3.2.1.1 through 3.2.1.6 for all active records in the registry sponsored by Registrar, in a format specified by ICANN, to the Registry Operator for the appropriate gTLD.

3.3    Public Access to Data on Registered Names.  During the Term of this Agreement:

3.3.1    At its expense, Registrar shall provide an interactive web page and, with respect to any gTLD operating a "thin" registry, a port 43 Whois service (each accessible via both IPv4 and IPv6) providing free public query-based access to up-to-date (i.e., updated at least daily) data concerning all active Registered Names sponsored by Registrar in any gTLD.  Until otherwise specified by a Consensus Policy, such data shall consist of the following elements as contained in Registrar's database:

3.3.1.1    The name of the Registered Name;

3.3.1.2    The names of the primary nameserver and secondary nameserver(s) for the Registered Name;

3.3.1.3    The identity of Registrar (which may be provided through Registrar's website);

3.3.1.4    The original creation date of the registration;

3.3.1.5    The expiration date of the registration;

3.3.1.6    The name and postal address of the Registered Name Holder;

3.3.1.7    The name, postal address, e-mail address, voice telephone number, and (where available) fax number of the technical contact for the Registered Name; and

3.3.1.8    The name, postal address, e-mail address, voice telephone number, and (where available) fax number of the administrative contact for the Registered Name.

The agreement between the Registry Operator of a gTLD and Registrar may, if approved by ICANN in writing, state alternative required data elements applicable to that gTLD, in which event, the alternative required data elements shall replace and supersede Subsections 3.3.1.1 through 3.3.1.8 stated above for all purposes under this Agreement but only with respect to that particular gTLD.

3.3.2    Upon receiving any updates to the data elements listed in Subsections 3.3.1.2, 3.3.1.3, and 3.3.1.5 through 3.3.1.8 from the Registered Name Holder,

Registrar shall promptly update its database used to provide the public access described in Subsection 3.3.1.

3.3.3    Registrar may subcontract its obligation to provide the public access described in Subsection 3.3.1 and the updating described in Subsection 3.3.2, provided that Registrar shall remain fully responsible for the proper provision of the access and updating.

3.3.4    Registrar shall abide by any Consensus Policy that requires registrars to cooperatively implement a distributed capability that provides query-based Whois search functionality across all registrars. If the Whois service implemented by registrars does not in a reasonable time provide reasonably robust, reliable, and convenient access to accurate and up-to-date data, the Registrar shall abide by any Consensus Policy requiring Registrar, if reasonably determined by ICANN to be necessary (considering such possibilities as remedial action by specific registrars), to supply data from Registrar's database to facilitate the development of a centralized Whois database for the purpose of providing comprehensive Registrar Whois search capability.

3.3.5    In providing query-based public access to registration data as required by Subsections 3.3.1 and 3.3.4, Registrar shall not impose terms and conditions on use of the data provided, except as permitted by any Specification or Policy established by ICANN. Unless and until ICANN establishes a different Consensus Policy, Registrar shall permit use of data it provides in response to queries for any lawful purposes except to: (a) allow, enable, or otherwise support the transmission by e-mail, telephone, postal mail, facsimile or other means of mass unsolicited, commercial advertising or solicitations to entities other than the data recipient's own existing customers; or (b) enable high volume, automated, electronic processes that send queries or data to the systems of any Registry Operator or ICANN-Accredited registrar, except as reasonably necessary to register domain names or modify existing registrations.

3.3.6    In the event that ICANN determines, following analysis of economic data by an economist(s) retained by ICANN (which data has been made available to Registrar), that an individual or entity is able to exercise market power with respect to registrations or with respect to registration data used for development of value-added products and services by third parties, Registrar shall provide third-party bulk access to the data subject to public access under Subsection 3.3.1 under the following terms and conditions:

> 3.3.6.1    Registrar shall make a complete electronic copy of the data available at least one (1) time per week for download by third parties who have entered into a bulk access agreement with Registrar.

3.3.6.2   Registrar may charge an annual fee, not to exceed US$10,000, for such bulk access to the data.

3.3.6.3   Registrar's access agreement shall require the third party to agree not to use the data to allow, enable, or otherwise support any marketing activities, regardless of the medium used. Such media include but are not limited to e-mail, telephone, facsimile, postal mail, SMS, and wireless alerts.

3.3.6.4   Registrar's access agreement shall require the third party to agree not to use the data to enable high-volume, automated, electronic processes that send queries or data to the systems of any Registry Operator or ICANN-Accredited registrar, except as reasonably necessary to register domain names or modify existing registrations.

3.3.6.5   Registrar's access agreement must require the third party to agree not to sell or redistribute the data except insofar as it has been incorporated by the third party into a value-added product or service that does not permit the extraction of a substantial portion of the bulk data from the value-added product or service for use by other parties.

3.3.7   To comply with applicable statutes and regulations and for other reasons, ICANN may adopt a Consensus Policy establishing limits (a) on the Personal Data concerning Registered Names that Registrar may make available to the public through a public-access service described in this Subsection 3.3 and (b) on the manner in which Registrar may make such data available. Registrar shall comply with any such Consensus Policy.

3.3.8   Registrar shall meet or exceed the requirements set forth in the Whois Specification.

3.4   Retention of Registered Name Holder and Registration Data.

3.4.1   For each Registered Name sponsored by Registrar within a gTLD, Registrar shall collect and securely maintain, in its own electronic database, as updated from time to time:

3.4.1.1   the data specified in the Data Retention Specification attached hereto for the period specified therein;

3.4.1.2   The data elements listed in Subsections 3.3.1.1 through 3.3.1.8;

3.4.1.3   the name and (where available) postal address, e-mail address, voice telephone number, and fax number of the billing contact;

3.4.1.4 any other Registry Data that Registrar has submitted to the Registry Operator or placed in the Registry Database under Subsection 3.2; and

3.4.1.5 the name, postal address, e-mail address, and voice telephone number provided by the customer of any privacy service or licensee of any proxy registration service, in each case, offered or made available by Registrar or its Affiliates in connection with each registration. Effective on the date that ICANN fully implements a Proxy Accreditation Program established in accordance with Section 3.14, the obligations under this Section 3.4.1.5 will cease to apply as to any specific category of data (such as postal address) that is expressly required to be retained by another party in accordance with such Proxy Accreditation Program.

3.4.2 During the Term of this Agreement and for two (2) years thereafter, Registrar (itself or by its agent(s)) shall maintain the following records relating to its dealings with the Registry Operator(s) and Registered Name Holders:

3.4.2.1 In electronic form, the submission date and time, and the content, of all registration data (including updates) submitted in electronic form to the Registry Operator(s);

3.4.2.2 In electronic, paper, or microfilm form, all written communications constituting registration applications, confirmations, modifications, or terminations and related correspondence with Registered Name Holders, including registration contracts; and

3.4.2.3 In electronic form, records of the accounts of all Registered Name Holders with Registrar.

3.4.3 During the Term of this Agreement and for two (2) years thereafter, Registrar shall make the data, information and records specified in this Section 3.4 available for inspection and copying by ICANN upon reasonable notice. In addition, upon reasonable notice and request from ICANN, Registrar shall deliver copies of such data, information and records to ICANN in respect to limited transactions or circumstances that may be the subject of a compliance-related inquiry; provided, however, that such obligation shall not apply to requests for copies of the Registrar's entire database or transaction history. Such copies are to be provided at Registrar's expense. In responding to ICANN's request for delivery of electronic data, information and records, Registrar may submit such information in a format reasonably convenient to Registrar and acceptable to ICANN so as to minimize disruption to the Registrar's business. In the event Registrar believes that the provision of any such data, information or records to ICANN would

violate applicable law or any legal proceedings, ICANN and Registrar agree to discuss in good faith whether appropriate limitations, protections, or alternative solutions can be identified to allow the production of such data, information or records in complete or redacted form, as appropriate. ICANN shall not disclose the content of such data, information or records except as expressly required by applicable law, any legal proceeding or Specification or Policy.

3.4.4   Notwithstanding any other requirement in this Agreement or the Data Retention Specification, Registrar shall not be obligated to maintain records relating to a domain registration beginning on the date two (2) years following the domain registration's deletion or transfer away to a different registrar.

3.5   Rights in Data. Registrar disclaims all rights to exclusive ownership or use of the data elements listed in Subsections 3.2.1.1 through 3.2.1.3 for all Registered Names submitted by Registrar to the Registry Database for, or sponsored by Registrar in, each gTLD for which it is Accredited. Registrar does not disclaim rights in the data elements listed in Subsections 3.2.1.4 through 3.2.1.6 and Subsections 3.3.1.3 through 3.3.1.8 concerning active Registered Names sponsored by it in each gTLD for which it is Accredited, and agrees to grant non-exclusive, irrevocable, royalty-free licenses to make use of and disclose the data elements listed in Subsections 3.2.1.4 through 3.2.1.6 and 3.3.1.3 through 3.3.1.8 for the purpose of providing a service or services (such as a Whois service under Subsection 3.3.4) providing interactive, query-based public access. Upon a change in sponsorship from Registrar of any Registered Name in each gTLD for which it is Accredited, Registrar acknowledges that the registrar gaining sponsorship shall have the rights of an owner to the data elements listed in Subsections 3.2.1.4 through 3.2.1.6 and 3.3.1.3 through 3.3.1.8 concerning that Registered Name, with Registrar also retaining the rights of an owner in that data. Nothing in this Subsection prohibits Registrar from (1) restricting bulk public access to data elements in a manner consistent with this Agreement and any Specifications or Policies or (2) transferring rights it claims in data elements subject to the provisions of this Subsection 3.5.

3.6   Data Escrow. During the Term of this Agreement, on a schedule, under the terms, and in the format specified by ICANN, Registrar shall submit an electronic copy of the data described in Subsections 3.4.1.2 through 3.4.1.5 to ICANN or, at Registrar's election and at its expense, to a reputable escrow agent mutually approved by Registrar and ICANN, such approval also not to be unreasonably withheld by either party. The data shall be held under an agreement among Registrar, ICANN, and the escrow agent (if any) providing that (1) the data shall be received and held in escrow, with no use other than verification that the deposited data is complete, consistent, and in proper format, until released to ICANN; (2) the data shall be released from escrow upon expiration without renewal or termination of this Agreement; and (3) ICANN's rights under the escrow agreement shall be assigned with any assignment of this Agreement. The escrow shall provide that in

the event the escrow is released under this Subsection, ICANN (or its assignee) shall have a non-exclusive, irrevocable, royalty-free license to exercise (only for transitional purposes) or have exercised all rights necessary to provide Registrar Services.

3.7 Business Dealings, Including with Registered Name Holders.

3.7.1 In the event ICANN adopts a Specification or Policy that is supported by a consensus of ICANN-Accredited registrars as reflected in the Registrar Stakeholder Group (or any successor group), establishing or approving a Code of Conduct for ICANN-Accredited registrars, Registrar shall abide by that Code of Conduct.

3.7.2 Registrar shall abide by applicable laws and governmental regulations.

3.7.3 Registrar shall not represent to any actual or potential Registered Name Holder that Registrar enjoys access to a registry for which Registrar is Accredited that is superior to that of any other registrar Accredited for that registry.

3.7.4 Registrar shall not activate any Registered Name unless and until it is satisfied that it has received a reasonable assurance of payment of its registration fee. For this purpose, a charge to a credit card, general commercial terms extended to creditworthy customers, or other mechanism providing a similar level of assurance of payment shall be sufficient, provided that the obligation to pay becomes final and non-revocable by the Registered Name Holder upon activation of the registration.

3.7.5 At the conclusion of the registration period, failure by or on behalf of the Registered Name Holder to consent that the registration be renewed within the time specified in a second notice or reminder shall, in the absence of extenuating circumstances, result in cancellation of the registration by the end of the auto-renew grace period (although Registrar may choose to cancel the name earlier).

3.7.5.1 Extenuating circumstances are defined as: UDRP action, valid court order, failure of a Registrar's renewal process (which does not include failure of a registrant to respond), the domain name is used by a nameserver that provides DNS service to third-parties (additional time may be required to migrate the records managed by the nameserver), the registrant is subject to bankruptcy proceedings, payment dispute (where a registrant claims to have paid for a renewal, or a discrepancy in the amount paid), billing dispute (where a registrant disputes the amount on a bill), domain name subject to litigation in a court of competent jurisdiction, or other circumstance as approved specifically by ICANN.

3.7.5.2   Where Registrar chooses, under extenuating circumstances, to renew a domain name without the explicit consent of the registrant, the registrar must maintain a record of the extenuating circumstances associated with renewing that specific domain name for inspection by ICANN consistent with clauses 3.4.2 and 3.4.3 of this registrar accreditation agreement.

3.7.5.3   In the absence of extenuating circumstances (as defined in Section 3.7.5.1 above), a domain name must be deleted within 45 days of either the registrar or the registrant terminating a registration agreement.

3.7.5.4   Registrar shall provide notice to each new registrant describing the details of their deletion and auto-renewal policy including the expected time at which a non-renewed domain name would be deleted relative to the domain's expiration date, or a date range not to exceed ten (10) days in length. If a registrar makes any material changes to its deletion policy during the period of the registration agreement, it must make at least the same effort to inform the registrant of the changes as it would to inform the registrant of other material changes to the registration agreement (as defined in clause 3.7.7 of the registrars accreditation agreement).

3.7.5.5   If Registrar operates a website for domain name registration or renewal, details of Registrar's deletion and auto-renewal policies must be clearly displayed on the website.

3.7.5.6   If Registrar operates a website for domain registration or renewal, it should state, both at the time of registration and in a clear place on its website, any fee charged for the recovery of a domain name during the Redemption Grace Period.

3.7.5.7   In the event that a domain which is the subject of a UDRP dispute is deleted or expires during the course of the dispute, the complainant in the UDRP dispute will have the option to renew or restore the name under the same commercial terms as the registrant. If the complainant renews or restores the name, the name will be placed in Registrar HOLD and Registrar LOCK status, the WHOIS contact information for the registrant will be removed, and the WHOIS entry will indicate that the name is subject to dispute. If the complaint is terminated, or the UDRP dispute finds against the complainant, the name will be deleted within 45 days. The registrant retains the right under the existing redemption grace period provisions to recover the name at any time during the Redemption Grace Period, and retains the right to renew the name before it is deleted.

3.7.6    Registrar shall not insert or renew any Registered Name in any gTLD registry in a manner contrary to (i) any Consensus Policy stating a list or specification of excluded Registered Names that is in effect at the time of insertion or renewal, or (ii) any list of names to be reserved from registration as required by the specific Registry Operator for which the Registrar is providing Registrar Services.

3.7.7    Registrar shall require all Registered Name Holders to enter into an electronic or paper registration agreement with Registrar including at least the provisions set forth in Subsections 3.7.7.1 through 3.7.7.12, and which agreement shall otherwise set forth the terms and conditions applicable to the registration of a domain name sponsored by Registrar.  The Registered Name Holder with whom Registrar enters into a registration agreement must be a person or legal entity other than the Registrar, provided that Registrar may be the Registered Name Holder for domains registered for the purpose of conducting its Registrar Services, in which case the Registrar shall submit to the provisions set forth in Subsections 3.7.7.1 through 3.7.7.12 and shall be responsible to ICANN for compliance with all obligations of the Registered Name Holder as set forth in this Agreement and Specifications and Policies. Registrar shall use commercially reasonable efforts to enforce compliance with the provisions of the registration agreement between Registrar and any Registered Name Holder that relate to implementing the requirements of Subsections 3.7.7.1 through 3.7.7.12 or any Consensus Policy.

> 3.7.7.1   The Registered Name Holder shall provide to Registrar accurate and reliable contact details and correct and update them within seven (7) days of any change during the term of the Registered Name registration, including: the full name, postal address, e-mail address, voice telephone number, and fax number if available of the Registered Name Holder; name of authorized person for contact purposes in the case of an Registered Name Holder that is an organization, association, or corporation; and the data elements listed in Subsections 3.3.1.2, 3.3.1.7 and 3.3.1.8.

> 3.7.7.2   A Registered Name Holder's willful provision of inaccurate or unreliable information, its willful failure to update information provided to Registrar within seven (7) days of any change, or its failure to respond for over fifteen (15) days to inquiries by Registrar concerning the accuracy of contact details associated with the Registered Name Holder's registration shall constitute a material breach of the Registered Name Holder-registrar contract and be a basis for suspension and/or cancellation of the Registered Name registration.

> 3.7.7.3   Any Registered Name Holder that intends to license use of a domain name to a third party is nonetheless the Registered Name

Holder of record and is responsible for providing its own full contact information and for providing and updating accurate technical and administrative contact information adequate to facilitate timely resolution of any problems that arise in connection with the Registered Name. A Registered Name Holder licensing use of a Registered Name according to this provision shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee and the identity of the licensee within seven (7) days to a party providing the Registered Name Holder reasonable evidence of actionable harm.

3.7.7.4 Registrar shall provide notice to each new or renewed Registered Name Holder stating:

> 3.7.7.4.1 The purposes for which any Personal Data collected from the applicant are intended;
>
> 3.7.7.4.2 The intended recipients or categories of recipients of the data (including the Registry Operator and others who will receive the data from Registry Operator);
>
> 3.7.7.4.3 Which data are obligatory and which data, if any, are voluntary; and
>
> 3.7.7.4.4 How the Registered Name Holder or data subject can access and, if necessary, rectify the data held about them.

3.7.7.5 The Registered Name Holder shall consent to the data processing referred to in Subsection 3.7.7.4.

3.7.7.6 The Registered Name Holder shall represent that notice has been provided equivalent to that described in Subsection 3.7.7.4 to any third-party individuals whose Personal Data are supplied to Registrar by the Registered Name Holder, and that the Registered Name Holder has obtained consent equivalent to that referred to in Subsection 3.7.7.5 of any such third-party individuals.

3.7.7.7 Registrar shall agree that it will not process the Personal Data collected from the Registered Name Holder in a way incompatible with the purposes and other limitations about which it has provided notice to the Registered Name Holder in accordance with Subsection 3.7.7.4 above.

3.7.7.8 Registrar shall agree that it will take reasonable precautions to protect Personal Data from loss, misuse, unauthorized access or disclosure, alteration, or destruction.

3.7.7.9 The Registered Name Holder shall represent that, to the best of the Registered Name Holder's knowledge and belief, neither the registration of the Registered Name nor the manner in which it is directly or indirectly used infringes the legal rights of any third party.

3.7.7.10 For the adjudication of disputes concerning or arising from use of the Registered Name, the Registered Name Holder shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registered Name Holder's domicile and (2) where Registrar is located.

3.7.7.11 The Registered Name Holder shall agree that its registration of the Registered Name shall be subject to suspension, cancellation, or transfer pursuant to any Specification or Policy, or pursuant to any registrar or registry procedure not inconsistent with any Specification or Policy, (1) to correct mistakes by Registrar or the Registry Operator in registering the name or (2) for the resolution of disputes concerning the Registered Name.

3.7.7.12 The Registered Name Holder shall indemnify and hold harmless the Registry Operator and its directors, officers, employees, and agents from and against any and all claims, damages, liabilities, costs, and expenses (including reasonable legal fees and expenses) arising out of or related to the Registered Name Holder's domain name registration.

3.7.8 Registrar shall comply with the obligations specified in the Whois Accuracy Program Specification. In addition, notwithstanding anything in the Whois Accuracy Program Specification to the contrary, Registrar shall abide by any Consensus Policy requiring reasonable and commercially practicable (a) verification, at the time of registration, of contact information associated with a Registered Name sponsored by Registrar or (b) periodic re-verification of such information. Registrar shall, upon notification by any person of an inaccuracy in the contact information associated with a Registered Name sponsored by Registrar, take reasonable steps to investigate that claimed inaccuracy. In the event Registrar learns of inaccurate contact information associated with a Registered Name it sponsors, it shall take reasonable steps to correct that inaccuracy.

3.7.9 Registrar shall abide by any Consensus Policy prohibiting or restricting warehousing of or speculation in domain names by registrars.

3.7.10 Registrar shall publish on its website(s) and/or provide a link to the Registrants' Benefits and Responsibilities Specification attached hereto and shall not take any action inconsistent with the corresponding provisions of this Agreement or applicable law.

3.7.11 Registrar shall make available a description of the customer service handling processes available to Registered Name Holders regarding Registrar Services, including a description of the processes for submitting complaints and resolving disputes regarding the Registrar Services.

3.7.12 Nothing in this Agreement prescribes or limits the amount Registrar may charge Registered Name Holders for registration of Registered Names.

3.8    Domain-Name Dispute Resolution. During the Term of this Agreement, Registrar shall have in place a policy and procedures for resolution of disputes concerning Registered Names. Until ICANN adopts an alternative Consensus Policy or other Specification or Policy with respect to the resolution of disputes concerning Registered Names, Registrar shall comply with the Uniform Domain Name Dispute Resolution Policy ("UDRP") identified on ICANN's website (www.icann.org/general/consensus-policies.htm), as may be modified from time to time. Registrar shall also comply with the Uniform Rapid Suspension ("URS") procedure or its replacement, as well as with any other applicable dispute resolution procedure as required by a Registry Operator for which Registrar is providing Registrar Services.

3.9    Accreditation Fees. As a condition of Accreditation, Registrar shall pay Accreditation fees to ICANN. These fees consist of yearly and variable fees.

3.9.1    Registrar shall pay ICANN a yearly Accreditation fee in an amount established by the ICANN Board of Directors, in conformity with ICANN's bylaws and articles of incorporation. This yearly Accreditation fee shall not exceed US$4,000. Payment of the yearly fee shall be due within thirty (30) days after invoice from ICANN, provided that Registrar may elect to pay the yearly fee in four (4) equal quarterly installments.

3.9.2    Registrar shall pay the variable Accreditation fees established by the ICANN Board of Directors, in conformity with ICANN's bylaws and articles of incorporation, provided that in each case such fees are reasonably allocated among all registrars that contract with ICANN and that any such fees must be expressly approved by registrars accounting, in the aggregate, for payment of two-thirds of all registrar-level fees. Registrar shall pay such fees in a timely manner for so long as all material terms of this Agreement remain in full force and effect, and notwithstanding the pendency of any dispute between Registrar and ICANN.

3.9.3    For any payments thirty (30) days or more overdue, Registrar shall pay interest on late payments at the rate of 1.5% per month or, if less, the maximum rate permitted by applicable law from later of the date of the invoice or the date the invoice is sent pursuant to Section 7.6 of this Agreement. On reasonable notice given by ICANN to Registrar, accountings submitted by Registrar shall be subject to verification by an audit of

Registrar's books and records by an independent third-party designated by ICANN that shall preserve the confidentiality of such books and records (other than its findings as to the accuracy of, and any necessary corrections to, the accountings).

3.9.4    The Accreditation fees due under this Agreement are exclusive of tax. All taxes, duties, fees and other governmental charges of any kind (including sales, turnover, services, use and value-added taxes) that are imposed by or under the authority of any government or any political subdivision thereof on the Accreditation fees for any services, software and/or hardware shall be borne by Registrar and shall not be considered a part of, a deduction from, or an offset against such Accreditation fees. All payments due to ICANN shall be made without any deduction or withholding on account of any tax, duty, charge, or penalty except as required by applicable law, in which case, the sum payable by Registrar from which such deduction or withholding is to be made shall be increased to the extent necessary to ensure that, after making such deduction or withholding, ICANN receives (free from any liability with respect thereof) a net sum equal to the sum it would have received but for such deduction or withholding being required.

3.10    Insurance. Registrar shall maintain in force commercial general liability insurance or similar liability insurance as specified by ICANN with policy limits of at least US$500,000 covering liabilities arising from Registrar's registrar business during the Term of this Agreement.

3.11    Obligations of Registrars under common controlling interest. Registrar shall be in breach of this Agreement if:

3.11.1    ICANN terminates an Affiliated Registrar's accreditation agreement with ICANN (an "Affiliate Termination");

3.11.2    Affiliated Registrar has not initiated arbitration challenging ICANN's right to terminate the Affiliated Registrar's accreditation agreement under Section 5.8 of this Agreement, or has initiated such arbitration and has not prevailed;

3.11.3    the Affiliate Termination was the result of misconduct that materially harmed consumers or the public interest;

3.11.4    a second Affiliated Registrar has pursued, after the Affiliate Termination, the same course of conduct that resulted in the Affiliate Termination; and

3.11.5    ICANN has provided Registrar with written notice that it intends to assert the provisions of this Section 3.11 with respect to Registrar, which notice shall identify in reasonable detail the factual basis for such assertion,

and Registrar has failed to cure the impugned conduct within fifteen (15) days of such notice.

3.12 <u>Obligations Related to Provision of Registrar Services by Third Parties</u>. Registrar is responsible for the provision of Registrar Services for all Registered Names that Registrar sponsors being performed in compliance with this Agreement, regardless of whether the Registrar Services are provided by Registrar or a third party, including a Reseller. Registrar must enter into written agreements with all of its Resellers that enable Registrar to comply with and perform all of its obligations under this Agreement. In addition, Registrar must ensure that:

3.12.1 Its Resellers do not display the ICANN or ICANN-Accredited Registrar logo, or otherwise represent themselves as Accredited by ICANN, unless they have written permission from ICANN to do so.

3.12.2 Any registration agreement used by reseller shall include all registration agreement provisions and notices required by the ICANN Registrar Accreditation Agreement and any ICANN Consensus Policies, and shall identify the sponsoring registrar or provide a means for identifying the sponsoring registrar, such as a link to the InterNIC Whois lookup service.

3.12.3 Its Resellers identify the sponsoring registrar upon inquiry from the customer.

3.12.4 Its Resellers comply with any ICANN-adopted Specification or Policy that establishes a program for accreditation of individuals or entities who provide proxy and privacy registration services (a "Proxy Accreditation Program"). Among other features, the Proxy Accreditation Program may require that: (i) proxy and privacy registration services may only be provided in respect of domain name registrations by individuals or entities Accredited by ICANN pursuant to such Proxy Accreditation Program; and (ii) Registrar shall prohibit Resellers from knowingly accepting registrations from any provider of proxy and privacy registration services that is not Accredited by ICANN pursuant the Proxy Accreditation Program. Until such time as the Proxy Accreditation Program is established, Registrar shall require Resellers to comply with the Specification on Privacy and Proxy Registrations attached hereto.

3.12.5 Its Resellers' customers are provided with a link to an ICANN webpage detailing registrant educational information, as detailed in subsection 3.16 below.

3.12.6 In the event Registrar learns that a Reseller is causing Registrar to be in breach of any of the provisions of this Agreement, Registrar shall take reasonable steps to enforce its agreement with such Reseller so as to cure and prevent further instances of non-compliance.

3.12.7 Its Resellers shall publish on their website(s) and/or provide a link to the Registrants' Benefits and Responsibilities Specification attached hereto and shall not take any action inconsistent with the corresponding provisions of this Agreement or applicable law.

Registrar shall use commercially reasonable efforts to enforce compliance with the provisions of the agreement between Registrar and any Reseller that relate to the provisions of Registrar Services.

3.13 Registrar Training. Registrar's primary contact as identified in Subsection 7.6 below or designee (so long as the designee is employed by Registrar or an Affiliated Registrar) shall complete a training course covering registrar obligations under ICANN policies and agreements. The course will be provided by ICANN at no expense to Registrar, and shall be available in an online format.

3.14 Obligations Related to Proxy and Privacy Services. Registrar agrees to comply with any ICANN-adopted Specification or Policy that establishes a Proxy Accreditation Program. Registrar also agrees to reasonably cooperate with ICANN in the development of such program. Until such time as the Proxy Accreditation Program is established, Registrar agrees to comply with the Specification on Privacy and Proxy Registrations attached hereto.

3.15 Registrar Self-Assessment and Audits. Registrar shall complete and deliver to ICANN on a schedule and in the form specified by ICANN from time to time in consultation with registrars a Registrar self-assessment. Registrar shall complete and deliver to ICANN within twenty (20) days following the end of each calendar year, in a form specified by ICANN a certificate executed by the president, chief executive officer, chief financial officer or chief operating officer (or their equivalents) of Registrar certifying compliance with the terms and conditions of this Agreement. ICANN may from time to time (not to exceed twice per calendar year) conduct, or engage a third party to conduct on its behalf, contractual compliance audits to assess compliance by Registrar with the terms and conditions of this Agreement. Any audits pursuant to this Section 3.15 shall be tailored to achieve the purpose of assessing compliance, and ICANN will (a) give reasonable advance notice of any such audit, which notice shall specify in reasonable detail the categories of documents, data and other information requested by ICANN, and (b) use commercially reasonable efforts to conduct such audit in such a manner as to not unreasonably disrupt the operations of Registrar. As part of such audit and upon request by ICANN, Registrar shall timely provide all responsive documents, data and any other information necessary to demonstrate Registrar's compliance with this Agreement. Upon no less than ten (10) days notice (unless otherwise agreed to by Registrar), ICANN may, as part of any contractual compliance audit, conduct site visits during regular business hours to assess compliance by Registrar with the terms and conditions of this Agreement. ICANN shall not disclose Registrar confidential information gathered through such audits except as required by applicable law, legal proceedings, or as expressly permitted by any Specification or

Policy (including ICANN's Documentary Information Disclosure Policy, as such policy may be amended from time to time); provided, however, that, except as required by applicable law or legal proceedings, ICANN shall not release any information that Registrar has marked as, or has otherwise designated in writing to ICANN as, a "confidential trade secret," "confidential commercial information" or "confidential financial information" of Registrar. If any applicable law, legal proceeding or Specification or Policy permits such disclosure, ICANN will provide Registrar no less than fifteen (15) days notice of its intent to disclose such information, unless such notice is prohibited by law or legal proceeding. Such notice shall include to whom and in what manner ICANN plans to disclose such information.

3.16 <u>Link to Registrant Educational Information</u>. ICANN has published an educational webpage summarizing the terms of the Registrar Accreditation Agreement and related Consensus Policies_(as of the date of this Agreement, located at: http://www.icann.org/en/registrars/registrant-rights-responsibilities-en.htm). Registrar shall provide a link to such webpage on any website it may operate for domain name registration or renewal clearly displayed to its Registered Name Holders at least as clearly as its links to policies or notifications required to be displayed under ICANN Consensus Policies. ICANN may, in consultation with registrars, update the content and/or URL for this website.

3.17 <u>Registrar Contact, Business Organization and Officer Information</u>. Registrar shall provide to ICANN and maintain accurate and current information as specified in the Registrar Information Specification to this Agreement. In addition, Registrar shall publish on each website through which Registrar provides or offers Registrar Services the information specified as requiring such publication in the Registrar Information Specification. Registrar shall notify ICANN within five (5) days of any changes to such information and update Registrar's website(s) within twenty (20) days of any such changes.

3.18 <u>Registrar's Abuse Contact and Duty to Investigate Reports of Abuse</u>.

> 3.18.1 Registrar shall maintain an abuse contact to receive reports of abuse involving Registered Names sponsored by Registrar, including reports of Illegal Activity. Registrar shall publish an email address to receive such reports on the home page of Registrar's website (or in another standardized place that may be designated by ICANN from time to time). Registrar shall take reasonable and prompt steps to investigate and respond appropriately to any reports of abuse.

> 3.18.2 Registrar shall establish and maintain a dedicated abuse point of contact, including a dedicated email address and telephone number that is monitored 24 hours a day, seven days a week, to receive reports of Illegal Activity by law enforcement, consumer protection, quasi-governmental or other similar authorities designated from time to time by the national or

territorial government of the jurisdiction in which the Registrar is established or maintains a physical office. Well-founded reports of Illegal Activity submitted to these contacts must be reviewed within 24 hours by an individual who is empowered by Registrar to take necessary and appropriate actions in response to the report. In responding to any such reports, Registrar will not be required to take any action in contravention of applicable law.

3.18.3 Registrar shall publish on its website a description of its procedures for the receipt, handling, and tracking of abuse reports. Registrar shall document its receipt of and response to all such reports. Registrar shall maintain the records related to such reports for the shorter of two (2) years or the longest period permitted by applicable law, and during such period, shall provide such records to ICANN upon reasonable notice.

3.19 Additional Technical Specifications to Implement IPV6, DNSSEC and IDNs. Registrar shall comply with the Additional Registrar Operations Specification attached hereto.

3.20 Notice of Bankruptcy, Convictions and Security Breaches. Registrar will give ICANN notice within seven (7) days of (i) the commencement of any of the proceedings referenced in Section 5.5.8. (ii) the occurrence of any of the matters specified in Section 5.5.2 or Section 5.5.3 or (iii) any unauthorized access to or disclosure of registrant account information or registration data. The notice required pursuant to Subsection (iii) shall include a detailed description of the type of unauthorized access, how it occurred, the number of registrants affected, and any action taken by Registrar in response.

3.21 Obligations of Registrars Affiliated with Registry Operators. In the event Registrar is Affiliated with any Registry Operator or back-end registry operator (an "Affiliated Relationship") during the Term of this Agreement, Registrar shall comply with all ICANN Specifications and Policies that may be developed from time to time with respect to such Affiliated Relationships, and will notify ICANN within thirty (30) days of the occurrence of the event that created the Affiliate relationship (e.g., the closing of any merger, acquisition or other transaction, or the execution of any agreement, in each case, giving rise to such Affiliated Relationship).

3.22 Cooperation with Emergency Registry Service Providers. In the event that ICANN transitions the operation of a registry for a gTLD in which Registrar sponsors Registered Names to an emergency registry service provider, Registrar shall cooperate in all reasonable respects with such emergency registry service provider, including by entering into a registry-registrar agreement with such provider necessary to effect the transition and by providing all Registered Name Holder data reasonably requested by such emergency operator for the purpose of facilitating an efficient transition of the registry for the gTLD.

4. PROCEDURES FOR ESTABLISHMENT OR REVISION OF SPECIFICATIONS AND POLICIES.

4.1 Compliance with Consensus Policies and Temporary Policies. During the Term of this Agreement, Registrar shall comply with and implement all Consensus Policies and Temporary Policies in existence as of the Effective Date found at http://www.icann.org/general/consensus-policies.htm, and as may in the future be developed and adopted in accordance with the ICANN Bylaws, provided such future Consensus Policies and Temporary Policies are adopted in accordance with the procedures and relate to those topics and subject to those limitations set forth in the Consensus Policies and Temporary Policies Specification to this Agreement.

5. TERM, TERMINATION AND DISPUTE RESOLUTION.

5.1 Term of Agreement. This Agreement shall be effective on the Effective Date and shall have an initial term running until the Expiration Date, unless sooner terminated.

5.2 Renewal. This Agreement and Registrar's Accreditation will be renewed for successive periods of five (5) years upon the Expiration Date and the expiration of each successive five-year term thereafter under the terms and conditions of this Agreement, unless:

> 5.2.1    at the time of such renewal, Registrar no longer meets the ICANN registrar Accreditation criteria then in effect;

> 5.2.2    Registrar is not in compliance with its obligations under this Agreement at the time of the Expiration Date or at the expiration of any successive five (5) year term thereafter;

> 5.2.3    Registrar has been given notice by ICANN of three (3) or more material breaches of this Agreement within the two (2) years preceding the Expiration Date or the date of expiration of any successive five (5) year term thereafter; or

> 5.2.4    this Agreement has terminated prior to the Expiration Date or the expiration date of any successive five (5) year term thereafter.

In the event Registrar intends to renew this Agreement pursuant to this Section 5.2, Registrar shall provide ICANN written notice thereof during the period that is no more than ninety (90) days and no less than sixty (60) days prior to the Expiration Date and each successive five (5) year term thereafter. The provision of such notice shall not be a condition to renewal hereunder. Pursuant to its customary practices (as may be modified by ICANN), ICANN will provide notice to Registrar of the Expiration Date and the date of expiration of any subsequent term hereunder.

5.3   Right to Substitute Updated Agreement.  In the event that, during the Term of this Agreement, ICANN adopts a revised form Registrar accreditation agreement (the "Updated RAA"), Registrar (provided it has not received (i) a notice of breach that it has not cured or (ii) a notice of termination or suspension of this Agreement under this Section 5) may elect, by giving ICANN written notice, to enter into the Updated RAA.  In the event of such election, Registrar and ICANN shall as soon as practicable enter into the Updated RAA for the term specified in the Updated RAA, and this Agreement will be deemed terminated.

5.4   Termination of Agreement by Registrar.  This Agreement may be terminated before its expiration by Registrar by giving ICANN thirty (30) days written notice. Upon such termination by Registrar, Registrar shall not be entitled to any refund of fees paid to ICANN pursuant to this Agreement.

5.5   Termination of Agreement by ICANN.  This Agreement may be terminated before its expiration by ICANN in any of the following circumstances:

   5.5.1   There was a material misrepresentation, material inaccuracy, or materially misleading statement in Registrar's application for Accreditation or renewal of Accreditation or any material accompanying the application.

   5.5.2   Registrar:

      5.5.2.1   is convicted by a court of competent jurisdiction of a felony or other serious offense related to financial activities, or is judged by a court of competent jurisdiction to have:

         5.5.2.1.1   committed fraud,

         5.5.2.1.2   committed a breach of fiduciary duty, or

         5.5.2.1.3   with actual knowledge (or through gross negligence) permitted Illegal Activity in the registration or use of domain names or in the provision to Registrar by any Registered Name Holder of inaccurate Whois information; or

         5.5.2.1.4   failed to comply with the terms of an order issued by a court of competent jurisdiction relating to the use of domain names sponsored by the Registrar;

      or is the subject of a judicial determination that ICANN reasonably deems as the substantive equivalent of any of the foregoing; or

      5.5.2.2   is disciplined by the government of its domicile for conduct involving dishonesty or misuse of funds of others; or

5.5.2.3 is the subject of a non-interlocutory order issued by a court or arbitral tribunal, in each case of competent jurisdiction, finding that Registrar has, directly or through an Affiliate, committed a specific violation(s) of applicable national law or governmental regulation relating to cybersquatting or its equivalent; or

5.5.2.4 is found by ICANN, based on its review of the findings of arbitral tribunals, to have been engaged, either directly or through its Affiliate, in a pattern and practice of trafficking in or use of domain names identical or confusingly similar to a trademark or service mark of a third party in which the Registered Name Holder has no rights or legitimate interest, which trademarks have been registered and are being used in bad faith.

5.5.3 Registrar knowingly employs any officer that is convicted of a misdemeanor related to financial activities or of any felony, or is judged by a court of competent jurisdiction to have committed fraud or breach of fiduciary duty, or is the subject of a judicial determination that ICANN reasonably deems as the substantive equivalent of any of the foregoing and such officer is not terminated within thirty (30) days of Registrar's knowledge of the foregoing; or any member of Registrar's board of directors or similar governing body is convicted of a misdemeanor related to financial activities or of any felony, or is judged by a court of competent jurisdiction to have committed fraud or breach of fiduciary duty, or is the subject of a judicial determination that ICANN reasonably deems as the substantive equivalent of any of the foregoing and such member is not removed from Registrar's board of directors or similar governing body within thirty (30) days of Registrar's knowledge of the foregoing.

5.5.4 Registrar fails to cure any breach of this Agreement within twenty-one (21) days after ICANN gives Registrar notice of the breach.

5.5.5 Registrar fails to comply with a ruling granting specific performance under Sections 5.7 or 7.1.

5.5.6 Registrar has been in fundamental and material breach of its obligations under this Agreement at least three (3) times within a twelve (12) month period.

5.5.7 Registrar continues acting in a manner that ICANN has reasonably determined endangers the stability or operational integrity of the Internet after receiving three (3) days notice of that determination.

5.5.8 (i) Registrar makes an assignment for the benefit of creditors or similar act; (ii) attachment, garnishment or similar proceedings are commenced against Registrar, which proceedings are a material threat to Registrar's ability to provide Registrar Services for gTLDs, and are not

dismissed within sixty (60) days of their commencement; (iii) a trustee, receiver, liquidator or equivalent is appointed in place of Registrar or maintains control over any of Registrar's property; (iv) execution is levied upon any property of Registrar, (v) proceedings are instituted by or against Registrar under any bankruptcy, insolvency, reorganization or other laws relating to the relief of debtors and such proceedings are not dismissed within thirty (30) days of their commencement, or (vi) Registrar files for protection under the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq., or a foreign equivalent or liquidates, dissolves or otherwise discontinues its operations.

5.6   Termination Procedures.  This Agreement may be terminated in circumstances described in Subsections 5.5.1 though 5.5.6 above only upon fifteen (15) days written notice to Registrar (in the case of Subsection 5.5.4 occurring after Registrar's failure to cure), with Registrar being given an opportunity during that time to initiate arbitration under Subsection 5.8 to determine the appropriateness of termination under this Agreement.  This Agreement may be terminated immediately upon notice to Registrar in circumstances described in Subsections 5.5.7 and 5.5.8.

5.7   Suspension.

5.7.1   Upon the occurrence of any of the circumstances set forth in Section 5.5, ICANN may, in ICANN's sole discretion, upon delivery of a notice pursuant to Subsection 5.7.2, elect to suspend Registrar's ability to create or sponsor new Registered Names or initiate inbound transfers of Registered Names for any or all gTLDs for a period of up to a twelve (12) months following the effectiveness of such suspension.  Suspension of a Registrar does not preclude ICANN's ability to issue a notice of termination in accordance with the notice requirements of Section 5.6.

5.7.2   Any suspension under Subsections 5.7.1 will be effective upon fifteen (15) days written notice to Registrar, with Registrar being given an opportunity during that time to initiate arbitration under Subsection 5.8 to determine the appropriateness of suspension under this Agreement.

5.7.3   Upon suspension, Registrar shall notify users, by posting a prominent notice on its web site, that it is unable to create or sponsor new gTLD domain name registrations or initiate inbound transfers of Registered Names. Registrar's notice shall include a link to the notice of suspension from ICANN.

5.7.4   If Registrar acts in a manner that ICANN reasonably determines endangers the stability or operational integrity of the Internet and upon notice does not immediately cure, ICANN may suspend this Agreement for five (5) working days pending ICANN's application for more extended specific performance or injunctive relief under Subsection 7.1.  Suspension

of the Agreement under this Subsection may, at ICANN's sole discretion, preclude the Registrar from (i) providing Registration Services for gTLDs delegated by ICANN on or after the date of delivery of such notice to Registrar and (ii) creating or sponsoring new Registered Names or initiating inbound transfers of Registered Names for any gTLDs. Registrar must also post the statement specified in Subsection 5.7.3.

5.8 Resolution of Disputes Under this Agreement. Subject to the limitations set forth in Section 6 and Section 7.4, disputes arising under or in connection with this Agreement, including (1) disputes arising from ICANN's failure to renew Registrar's Accreditation and (2) requests for specific performance, shall be resolved in a court of competent jurisdiction or, at the election of either party, by an arbitration conducted as provided in this Subsection 5.8 pursuant to the International Arbitration Rules of the American Arbitration Association ("AAA"). The arbitration shall be conducted in English and shall occur in Los Angeles County, California, USA. Except as set forth in Section 7.4.5, there shall be one (1) arbitrator agreed by the parties from a list of AAA arbitrators, or if parties do not agree on an arbitrator within fifteen (15) days of the AAA request that the parties designate an arbitrator, the AAA shall choose and appoint an arbitrator, paying due regard to the arbitrator's knowledge of the DNS. The parties shall bear the costs of the arbitration in equal shares, subject to the right of the arbitrator to reallocate the costs in their award as provided in the AAA rules. The parties shall bear their own attorneys' fees in connection with the arbitration, and the arbitrator may not reallocate the attorneys' fees in conjunction with its award. The arbitrator shall render its decision within ninety (90) days of the conclusion of the arbitration hearing. In the event Registrar initiates arbitration to contest the appropriateness of termination of this Agreement by ICANN pursuant to Section 5.5 or suspension of Registrar by ICANN pursuant to Section 5.7.1, Registrar may at the same time request that the arbitration panel stay the termination or suspension until the arbitration decision is rendered. The arbitration panel shall order a stay: (i) upon showing by Registrar that continued operations would not be harmful to consumers or the public interest, or (ii) upon appointment by the arbitration panel of a qualified third party to manage the operations of the Registrar until the arbitration decision is rendered. In furtherance of sub-clause (ii) above, the arbitration panel is hereby granted all necessary authority to appoint a qualified third-party to manage the operations of the Registrar upon the Registrar's request and if the panel deems it appropriate. In selecting the third-party manager, the arbitration panel shall take into consideration, but shall not be bound by, any expressed preferences of Registrar. Any order granting a request for a stay must be issued within fourteen (14) days after the filing of the arbitration. If an order granting a request for a stay is not issued within fourteen (14) days, ICANN has the right to proceed with the termination of this Agreement pursuant to Section 5.5 or suspension of the Registrar pursuant to Section 5.7.1. In the event Registrar initiates arbitration to contest an Independent Review Panel's decision under Subsection 4.3.3 sustaining the ICANN Board of Director's determination that a specification or policy is supported by consensus, Registrar may at the same time request that the arbitration

panel stay the requirement that it comply with the policy until the arbitration decision is rendered, and that request shall have the effect of staying the requirement until the decision or until the arbitration panel has granted an ICANN request for lifting of the stay. In all litigation involving ICANN concerning this Agreement (whether in a case where arbitration has not been elected or to enforce an arbitration award), jurisdiction and exclusive venue for such litigation shall be in a court located in Los Angeles, California, USA; however, the parties shall also have the right to enforce a judgment of such a court in any court of competent jurisdiction. For the purpose of aiding the arbitration and/or preserving the rights of the parties during the pendency of an arbitration, the parties shall have the right to seek temporary or preliminary injunctive relief from the arbitration panel or in a court located in Los Angeles, California, USA, which shall not be a waiver of this arbitration agreement.

5.9     Limitations on Monetary Remedies for Violations of this Agreement. ICANN's aggregate monetary liability for violations of this Agreement shall not exceed an amount equal to the Accreditation fees paid by Registrar to ICANN under Subsection 3.9 of this Agreement during the preceding twelve-month period. Registrar's monetary liability to ICANN for violations of this Agreement shall be limited to Accreditation fees owing to ICANN under this Agreement and, except in the case of a good faith disagreement concerning the interpretation of this agreement, reasonable payment to ICANN for the reasonable and direct costs including attorney fees, staff time, and other related expenses associated with legitimate efforts to enforce Registrar compliance with this agreement and costs incurred by ICANN to respond to or mitigate the negative consequences of such behavior for Registered Name Holders and the Internet community. In the event of repeated willful material breaches of the agreement, Registrar shall be liable for sanctions of up to five (5) times ICANN's enforcement costs, but otherwise in no event shall either party be liable for special, indirect, incidental, punitive, exemplary, or consequential damages for any violation of this Agreement.

6.  **AMENDMENT AND WAIVER.**

6.1     If the ICANN Board of Directors determines that an amendment to this Agreement (including to the Specifications referred to herein, unless such Specifications expressly do not permit amendment thereto) and all other registrar agreements between ICANN and the Applicable Registrars (the "Applicable Registrar Agreements") is desirable (each, a "Special Amendment"), ICANN may adopt a Special Amendment pursuant to the requirements of and process set forth in this Section 6; provided that a Special Amendment may not be a Restricted Amendment.

6.2     Prior to submitting a Special Amendment for Registrar Approval, ICANN shall first consult in good faith with the Working Group regarding the form and substance of such Special Amendment. The duration of such consultation shall be reasonably determined by ICANN based on the substance of the Special Amendment. Following

such consultation, ICANN may propose the adoption of a Special Amendment by publicly posting such amendment on its website for no less than thirty (30) calendar days (the "Posting Period") and providing notice of such proposed amendment to the Applicable Registrars in accordance with Section 7.6. ICANN will consider the public comments submitted on a Special Amendment during the Posting Period (including comments submitted by the Applicable Registrars).

6.3   If, within one hundred eighty (180) calendar days following the expiration of the Posting Period (the "Approval Period"), the ICANN Board of Directors approves a Special Amendment (which may be in a form different than submitted for public comment, but must address the subject matter of the Special Amendment posted for public comment, as modified to reflect and/or address input from the Working Group and public comments), ICANN shall provide notice of, and submit, such Special Amendment for approval or disapproval by the Applicable Registrars. If, during the sixty (60) calendar day period following the date ICANN provides such notice to the Applicable Registrars, such Special Amendment receives Registrar Approval, such Special Amendment shall be deemed approved (an "Approved Amendment") by the Applicable Registrars, and shall be effective and deemed an amendment to this Agreement on the date that is sixty (60) calendar days following the date ICANN provided notice of the approval of such Approved Amendment to Registrar (the "Amendment Effective Date"). In the event that a Special Amendment does not receive Registrar Approval, the Special Amendment shall be deemed not approved by the Applicable Registrars (a "Rejected Amendment"). A Rejected Amendment will have no effect on the terms and conditions of this Agreement, except as set forth below.

6.4   If the ICANN Board of Directors reasonably determines that a Rejected Amendment falls within the subject matter categories set forth in Section 1.2 of the Consensus Policies and Temporary Policies Specification, the ICANN Board of Directors may adopt a resolution (the date such resolution is adopted is referred to herein as the "Resolution Adoption Date") requesting an Issue Report (as such term is defined in ICANN's Bylaws) by the Generic Names Supporting Organization (the "GNSO") regarding the substance of such Rejected Amendment. The policy development process undertaken by the GNSO pursuant to such requested Issue Report is referred to herein as a "PDP." If such PDP results in a Final Report supported by a GNSO Supermajority (as defined in ICANN's Bylaws) that either (i) recommends adoption of the Rejected Amendment as Consensus Policy or (ii) recommends against adoption of the Rejected Amendment as Consensus Policy, and, in the case of (i) above, the Board adopts such Consensus Policy, Registrar shall comply with its obligations pursuant to Section 4 of this Agreement. In either case, ICANN will abandon the Rejected Amendment and it will have no effect on the terms and conditions of this Agreement. Notwithstanding the foregoing provisions of this Section 6.4, the ICANN Board of Directors shall not be required to initiate a PDP with respect to a Rejected Amendment if, at any time in the twelve (12) month period preceding the submission of such Rejected Amendment for Registrar Approval pursuant to Section 6.3, the subject matter of such Rejected Amendment was the

subject of a concluded or otherwise abandoned or terminated PDP that did not result in a GNSO Supermajority recommendation.

6.5    If (i) a Rejected Amendment does not fall within the subject matter categories set forth in Section 1.2 of the Consensus Policies and Temporary Policies Specification , (ii) the subject matter of a Rejected Amendment was, at any time in the twelve (12) month period preceding the submission of such Rejected Amendment for Registrar Approval pursuant to Section 6.3, the subject of a concluded or otherwise abandoned or terminated PDP that did not result in a GNSO Supermajority recommendation, or (iii) a PDP does not result in a Final Report supported by a GNSO Supermajority that either (a) recommends adoption of the Rejected Amendment as Consensus Policy or (b) recommends against adoption of the Rejected Amendment as Consensus Policy (or such PDP has otherwise been abandoned or terminated for any reason), then, in any such case, such Rejected Amendment may still be adopted and become effective in the manner described below.  In order for the Rejected Amendment to be adopted, the following requirements must be satisfied:

> 6.5.1    the subject matter of the Rejected Amendment must be within the scope of ICANN's mission and consistent with a balanced application of its core values (as described in ICANN's Bylaws);
>
> 6.5.2    the Rejected Amendment must be justified by a Substantial and Compelling Reason in the Public Interest, must be likely to promote such interest, taking into account competing public and private interests that are likely to be affected by the Rejected Amendment, and must be narrowly tailored and no broader than reasonably necessary to address such Substantial and Compelling Reason in the Public Interest;
>
> 6.5.3    to the extent the Rejected Amendment prohibits or requires conduct or activities, imposes material costs on the Applicable Registrars, and/or materially reduces public access to domain name services, the Rejected Amendment must be the least restrictive means reasonably available to address the Substantial and Compelling Reason in the Public Interest;
>
> 6.5.4    the ICANN Board of Directors must submit the Rejected Amendment, along with a written explanation of the reasoning related to its determination that the Rejected Amendment meets the requirements set out in subclauses (i) through (iii) above, for public comment for a period of no less than thirty (30) calendar days; and
>
> 6.5.5    following such public comment period, the ICANN Board of Directors must (i) engage in consultation (or direct ICANN management to engage in consultation) with the Working Group, subject matter experts, members of the GNSO, relevant advisory committees and other interested stakeholders with respect to such Rejected Amendment for a period of no less than sixty

(60) calendar days; and (ii) following such consultation, reapprove the Rejected Amendment (which may be in a form different than submitted for Registrar Approval, but must address the subject matter of the Rejected Amendment, as modified to reflect and/or address input from the Working Group and public comments) by the affirmative vote of at least two-thirds of the members of the ICANN Board of Directors eligible to vote on such matter, taking into account any ICANN policy affecting such eligibility, including ICANN's Conflict of Interest Policy (a "Board Amendment").

Such Board Amendment shall, subject to Section 6.6, be deemed an Approved Amendment, and shall be effective and deemed an amendment to this Agreement on the date that is sixty (60) calendar days following the date ICANN provided notice of the approval of such Board Amendment to Registrar (which effective date shall be deemed the Amendment Effective Date hereunder). Notwithstanding the foregoing, a Board Amendment may not amend the registrar fees charged by ICANN hereunder, or amend this Section 6.

6.6   Notwithstanding the provisions of Section 6.5, a Board Amendment shall not be deemed an Approved Amendment if, during the thirty (30) calendar day period following the approval by the ICANN Board of Directors of the Board Amendment, the Working Group, on the behalf of the Applicable Registrars, submits to the ICANN Board of Directors an alternative to the Board Amendment (an "Alternative Amendment") that meets the following requirements:

> 6.6.1   sets forth the precise text proposed by the Working Group to amend this Agreement in lieu of the Board Amendment;
>
> 6.6.2   addresses the Substantial and Compelling Reason in the Public Interest identified by the ICANN Board of Directors as the justification for the Board Amendment; and
>
> 6.6.3   compared to the Board Amendment is: (a) more narrowly tailored to address such Substantial and Compelling Reason in the Public Interest, and (b) to the extent the Alternative Amendment prohibits or requires conduct or activities, imposes material costs on Affected Registrars, or materially reduces access to domain name services, is a less restrictive means to address the Substantial and Compelling Reason in the Public Interest.

Any proposed amendment that does not meet the requirements of subclauses 6.6.1 through 6.6.3 in the immediately preceding sentence shall not be considered an Alternative Amendment hereunder and therefore shall not supersede or delay the effectiveness of the Board Amendment. If, following the submission of the Alternative Amendment to the ICANN Board of Directors, the Alternative Amendment receives Registrar Approval, the Alternative Amendment shall supersede the Board Amendment and shall be deemed an Approved Amendment hereunder (and shall be effective and deemed an amendment to this Agreement on

the date that is sixty (60) calendar days following the date ICANN provided notice of the approval of such Alternative Amendment to Registrar, which effective date shall deemed the Amendment Effective Date hereunder), unless, within a period of sixty (60) calendar days following the date that the Working Group notifies the ICANN Board of Directors of Registrar Approval of such Alternative Amendment (during which time ICANN shall engage with the Working Group with respect to the Alternative Amendment), the ICANN Board of Directors by the affirmative vote of at least two-thirds of the members of the ICANN Board of Directors eligible to vote on such matter, taking into account any ICANN policy affecting such eligibility, including ICANN's Conflict of Interest Policy, rejects the Alternative Amendment. If (A) the Alternative Amendment does not receive Registrar Approval within thirty (30) days of submission of such Alternative Amendment to the Applicable Registrars (and the Working Group shall notify ICANN of the date of such submission), or (B) the ICANN Board of Directors rejects the Alternative Amendment by such two-thirds vote, the Board Amendment (and not the Alternative Amendment) shall be effective and deemed an amendment to this Agreement on the date that is sixty (60) calendar days following the date ICANN provided notice to Registrar (which effective date shall deemed the Amendment Effective Date hereunder). If the ICANN Board of Directors rejects an Alternative Amendment, the board shall publish a written rationale setting forth its analysis of the criteria set forth in Sections 6.6.1 through 6.6.3. The ability of the ICANN Board of Directors to reject an Alternative Amendment hereunder does not relieve the Board of the obligation to ensure that any Board Amendment meets the criteria set forth in Section 6.5.1 through 6.5.5.

6.7    In the event that Registrar believes an Approved Amendment does not meet the substantive requirements set out in this Section 6 or has been adopted in contravention of any of the procedural provisions of this Section 6, Registrar may challenge the adoption of such Special Amendment pursuant to the dispute resolution provisions set forth in Section 5.8, except that such arbitration shall be conducted by a three-person arbitration panel. Any such challenge must be brought within sixty (60) calendar days following the date ICANN provided notice to Registrar of the Approved Amendment, and ICANN may consolidate all challenges brought by registrars (including Registrar) into a single proceeding. The Approved Amendment will be deemed not to have amended this Agreement during the pendency of the dispute resolution process.

6.8    Registrar may apply in writing to ICANN for an exemption from the Approved Amendment (each such request submitted by Registrar hereunder, an "Exemption Request") during the thirty (30) calendar day period following the date ICANN provided notice to Registrar of such Approved Amendment.

6.8.1    Each Exemption Request will set forth the basis for such request and provide detailed support for an exemption from the Approved Amendment. An Exemption Request may also include a detailed description and support for any alternatives to, or a variation of, the Approved Amendment proposed by such Registrar.

6.8.2    An Exemption Request may only be granted upon a clear and convincing showing by Registrar that compliance with the Approved Amendment conflicts with applicable laws or would have a material adverse effect on the long-term financial condition or results of operations of Registrar. No Exemption Request will be granted if ICANN determines, in its reasonable discretion, that granting such Exemption Request would be materially harmful to registrants or result in the denial of a direct benefit to registrants.

6.8.3    Within ninety (90) calendar days of ICANN's receipt of an Exemption Request, ICANN shall either approve (which approval may be conditioned or consist of alternatives to or a variation of the Approved Amendment) or deny the Exemption Request in writing, during which time the Approved Amendment will not amend this Agreement.

6.8.4    If the Exemption Request is approved by ICANN, the Approved Amendment will not amend this Agreement; provided, that any conditions, alternatives or variations of the Approved Amendment required by ICANN shall be effective and, to the extent applicable, will amend this Agreement as of the Amendment Effective Date. If such Exemption Request is denied by ICANN, the Approved Amendment will amend this Agreement as of the Amendment Effective Date (or, if such date has passed, such Approved Amendment shall be deemed effective immediately on the date of such denial), provided that Registrar may, within thirty (30) calendar days following receipt of ICANN's determination, appeal ICANN's decision to deny the Exemption Request pursuant to the dispute resolution procedures set forth in Section 5.8.

6.8.5    The Approved Amendment will be deemed not to have amended this Agreement during the pendency of the dispute resolution process. For avoidance of doubt, only Exemption Requests submitted by Registrar that are approved by ICANN pursuant to this Article 6 or through an arbitration decision pursuant to Section 5.8 shall exempt Registrar from any Approved Amendment, and no Exemption Request granted to any other Applicable Registrar (whether by ICANN or through arbitration), shall have any effect under this Agreement or exempt Registrar from any Approved Amendment.

6.9    Except as set forth in Section 4, Subsection 5.3, this Section 6, Section 7.4 and as otherwise set forth in this Agreement and the Specifications hereto, no amendment, supplement or modification of this Agreement or any provision hereof shall be binding unless executed in writing by both parties, and nothing in this Section 6 or Section 7.4 shall restrict ICANN and Registrar from entering into bilateral amendments and modifications to this Agreement negotiated solely between the two parties. No waiver of any provision of this Agreement shall be binding unless evidenced by a writing signed by the party waiving compliance with such provision. No waiver of any of the provisions of this Agreement or failure to

enforce any of the provisions hereof shall be deemed or shall constitute a waiver of any other provision hereof, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided. For the avoidance of doubt, nothing in this Section 6 or Section 7.4 shall be deemed to limit Registrar's obligation to comply with Section 4.

6.10 Notwithstanding anything in this Section 6 to the contrary, (a) if Registrar provides evidence to ICANN's reasonable satisfaction that the Approved Amendment would materially increase the cost of providing Registrar Services, then ICANN will allow up to one-hundred eighty (180) calendar days for the Approved Amendment to become effective with respect to Registrar, and (b) no Approved Amendment adopted pursuant to Section 6 shall become effective with respect to Registrar if Registrar provides ICANN with an irrevocable notice of termination pursuant to Section 5.4.

## 7. MISCELLANEOUS PROVISIONS.

7.1 Specific Performance. While this Agreement is in effect, either party may seek specific performance of any provision of this Agreement in the manner provided in Section 5.8, provided the party seeking such performance is not in material breach of its obligations.

7.2 Handling by ICANN of Registrar-Supplied Data. Before receiving any Personal Data from Registrar, ICANN shall specify to Registrar in writing the purposes for and conditions under which ICANN intends to use the Personal Data. ICANN may from time to time provide Registrar with a revised specification of such purposes and conditions, which specification shall become effective no fewer than thirty (30) days after it is provided to Registrar. ICANN shall not use Personal Data provided by Registrar for a purpose or under conditions inconsistent with the specification in effect when the Personal Data was provided. ICANN shall take reasonable steps to avoid uses of the Personal Data by third parties inconsistent with the specification.

7.3 Assignment; Change of Ownership or Management.

7.3.1 Except as set forth in this Section 7.3.1, either party may assign or transfer this Agreement only with the prior written consent of the other party, which shall not be unreasonably withheld. If ICANN fails to expressly provide or withhold its consent to any requested assignment (an "Assignment Request") of this Agreement by Registrar within thirty (30) calendar days of ICANN's receipt of notice of such Assignment Request (or, if ICANN has requested additional information from Registrar in connection with its review of such request, sixty (60) calendar days of the receipt of all requested written information regarding such request) from Registrar, ICANN shall be deemed to have consented to such requested assignment. Notwithstanding the foregoing, (i) ICANN may assign this Agreement without the consent of Registrar upon approval of the ICANN Board of Directors in conjunction with

a reorganization, reconstitution or re-incorporation of ICANN upon such assignee's express assumption of the terms and conditions of this Agreement, (ii) Registrar may assign this Agreement without the consent of ICANN to a wholly-owned subsidiary of Registrar upon such subsidiary's express assumption of the terms and conditions of this Agreement, and (iii) ICANN shall be deemed to have consented to an Assignment Request in which the assignee associated with such Assignment Request is a party to a Registrar Accreditation Agreement with ICANN on the terms set forth in this Agreement (provided that such assignee is then in compliance with the terms and conditions of such Registrar Accreditation Agreement in all material respects), unless ICANN provides to Registrar a written objection to such Assignment Request within ten (10) calendar days of ICANN's receipt of notice of such Assignment Request pursuant to this Section 7.3.1.

7.3.2    To the extent that an entity acquires a Controlling interest in Registrar's stock, assets or business, Registrar shall provide ICANN notice within seven (7) days of such an acquisition. Such notification shall include a statement that affirms that Registrar meets the Specification or Policy on Accreditation criteria then in effect, and is in compliance with its obligations under this Agreement. Within thirty (30) days of such notification, ICANN may request additional information from the Registrar establishing compliance with this Agreement, in which case Registrar must supply the requested information within fifteen (15) days. Any disputes concerning Registrar's continued Accreditation shall be resolved pursuant to Section 5.8.

7.4    Negotiation Process.

7.4.1    If either the Chief Executive Officer of ICANN ("CEO") or the Chairperson of the Registrar Stakeholder Group ("Chair") desires to discuss any revision(s) to this Agreement, the CEO or Chair, as applicable, shall provide written notice to the other person, which shall set forth in reasonable detail the proposed revisions to this Agreement (a "Negotiation Notice"). Notwithstanding the foregoing, neither the CEO nor the Chair may (i) propose revisions to this Agreement that modify any Consensus Policy then existing, (ii) propose revisions to this Agreement pursuant to this Section 7.4 on or before June 30, 2014, or (iii) propose revisions or submit a Negotiation Notice more than once during any twelve month period beginning on July 1, 2014.

7.4.2    Following receipt of the Negotiation Notice by either the CEO or the Chair, ICANN and the Working Group shall consult in good faith negotiations regarding the form and substance of the proposed revisions to this Agreement, which shall be in the form of a proposed amendment to this Agreement (the "Proposed Revisions"), for a period of at least ninety (90) calendar days (unless a resolution is earlier reached) and attempt to reach a mutually acceptable agreement relating to the Proposed Revisions (the "Discussion Period").

7.4.3    If, following the conclusion of the Discussion Period, an agreement is reached on the Proposed Revisions, ICANN shall post the mutually agreed Proposed Revisions on its website for public comment for no less than thirty (30) calendar days (the "Posting Period") and provide notice of such revisions to all Applicable Registrars in accordance with Section 7.6. ICANN and the Working Group will consider the public comments submitted on the Proposed Revisions during the Posting Period (including comments submitted by the Applicable Registrars). Following the conclusion of the Posting Period, the Proposed Revisions shall be submitted for Registrar Approval and approval by the ICANN Board of Directors. If such approvals are obtained, the Proposed Revisions shall be deemed an Approved Amendment by the Applicable Registrars and ICANN, and shall be effective and deemed an amendment to this Agreement upon sixty (60) calendar days notice from ICANN to Registrar.

7.4.4    If, following the conclusion of the Discussion Period, an agreement is not reached between ICANN and the Working Group on the Proposed Revisions, either the CEO or the Chair may provide the other person written notice (the "Mediation Notice") requiring each party to attempt to resolve the disagreements related to the Proposed Revisions through impartial, facilitative (non-evaluative) mediation in accordance with the terms and conditions set forth below. In the event that a Mediation Notice is provided, ICANN and the Working Group shall, within fifteen (15) calendar days thereof, simultaneously post the text of their desired version of the Proposed Revisions and a position paper with respect thereto on ICANN's website.

> 7.4.4.1    The mediation shall be conducted by a single mediator selected by the parties. If the parties cannot agree on a mediator within fifteen (15) calendar days following receipt by the CEO or Chair, as applicable, of the Mediation Notice, the parties will promptly select a mutually acceptable mediation provider entity, which entity shall, as soon as practicable following such entity's selection, designate a mediator, who is a licensed attorney with general knowledge of contract law and, to the extent necessary to mediate the particular dispute, general knowledge of the domain name system. Any mediator must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, or security holder of ICANN or an Applicable Registrar. If such confirmation is not provided by the appointed mediator, then a replacement mediator shall be appointed pursuant to this Section 7.4.4.1.

> 7.4.4.2    The mediator shall conduct the mediation in accordance with the rules and procedures for facilitative mediation that he or she determines following consultation with the parties. The parties shall

discuss the dispute in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute.

7.4.4.3    Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

7.4.4.4    If an agreement is reached during the mediation, ICANN shall post the mutually agreed Proposed Revisions on its website for the Posting Period and provide notice to all Applicable Registrars in accordance with Section 7.6. ICANN and the Working Group will consider the public comments submitted on the agreed Proposed Revisions during the Posting Period (including comments submitted by the Applicable Registrars). Following the conclusion of the Posting Period, the Proposed Revisions shall be submitted for Registrar Approval and approval by the ICANN Board of Directors. If such approvals are obtained, the Proposed Revisions shall be deemed an Approved Amendment by the Applicable Registrars and ICANN, and shall be effective and deemed an amendment to this Agreement upon sixty (60) days notice from ICANN to Registrar.

7.4.4.5    If the parties have not resolved the dispute for any reason by the date that is ninety (90) calendar days following receipt by the CEO or Chair, as applicable, of the Mediation Notice, the mediation shall automatically terminate (unless extended by agreement of the parties). The mediator shall deliver to the parties a definition of the issues that could be considered in future arbitration, if invoked. Those issues are subject to the limitations set forth in Section 7.4.5.2 below.

7.4.5    If, following mediation, ICANN and the Working Group have not reached an agreement on the Proposed Revisions, either the CEO or the Chair may provide the other person written notice (an "Arbitration Notice") requiring ICANN and the Applicable Registry Operators to resolve the dispute through binding arbitration in accordance with the arbitration provisions of Section 5.8, subject to the requirements and limitations of this Section 7.4.5.

7.4.5.1    If an Arbitration Notice is sent, the mediator's definition of issues, along with the Proposed Revisions (be those from ICANN, Registrars or both) shall be posted for public comment on ICANN's website for a period of no less than thirty (30) calendar days. ICANN and the Working Group will consider the public comments submitted on the Proposed Revisions during the Posting Period (including comments submitted by the Applicable Registrars), and information regarding such comments and consideration shall be provided to the a three (3) person arbitrator panel. Each party may modify is Proposed Revisions before and after the Posting Period. The arbitration

proceeding may not commence prior to the closing of such public comment period, and ICANN may consolidate all challenges brought by registrars (including Registrar) into a single proceeding. Except as set forth in this Section 7.4.5.1, the arbitration shall be conducted pursuant to Section 5.8.

7.4.5.2    No dispute regarding the Proposed Revisions may be submitted for arbitration to the extent the subject matter of the Proposed Revisions (i) relates to Consensus Policy, (ii) falls within the subject matter categories set forth in Section 1.2 of the Consensus Policies and Temporary Policies Specification , or (iii) seeks to amend any of the following provisions or Specifications of this Agreement: Sections 2, 4 and 6; subsections 3.1, 3.2, 3.3, 3.4, 3.5, 3.7, 3.8, 3.9, 3.14, 3.19, 3.21, 5.1, 5.2 or 5.3; and the Consensus Policies and Temporary Policies Specification, Data Retention Specification, WHOIS Accuracy Program Specification, Registration Data Directory Service (WHOIS) Specification or the Additional Registrar Operation Specification.

7.4.5.3    The mediator will brief the arbitrator panel regarding ICANN and the Working Group's respective proposals relating to the Proposed Revisions.

7.4.5.4    No amendment to this Agreement relating to the Proposed Revisions may be submitted for arbitration by either the Working Group or ICANN, unless, in the case of the Working Group, the proposed amendment has received Registrar Approval and, in the case of ICANN, the proposed amendment has been approved by the ICANN Board of Directors.

7.4.5.5    In order for the arbitrator panel to approve either ICANN or the Working Group's proposed amendment relating to the Proposed Revisions, the arbitrator panel must conclude that such proposed amendment is consistent with a balanced application of ICANN's core values (as described in ICANN's Bylaws) and reasonable in light of the balancing of the costs and benefits to the business interests of the Applicable Registrars and ICANN (as applicable), and the public benefit sought to be achieved by the Proposed Revisions as set forth in such amendment. If the arbitrator panel concludes that either ICANN or the Working Group's proposed amendment relating to the Proposed Revisions meets the foregoing standard, such amendment shall be effective and deemed an amendment to this Agreement upon sixty (60) calendar days notice from ICANN to Registrar and deemed an Approved Amendment hereunder.

7.4.6   With respect to an Approved Amendment relating to an amendment proposed by ICANN, Registrar may apply in writing to ICANN for an exemption from such amendment pursuant to the provisions of Section 6.8.

7.4.7   Notwithstanding anything in this Section 7.4 to the contrary, (a) if Registrar provides evidence to ICANN's reasonable satisfaction that the Approved Amendment would materially increase the cost of providing Registrar Services, then ICANN will allow up to one-hundred eighty (180) calendar days for the Approved Amendment to become effective with respect to Registrar, and (b) no Approved Amendment adopted pursuant to Section 7.4 shall become effective with respect to Registrar if Registrar provides ICANN with an irrevocable notice of termination pursuant to Section 5.4.

7.5   No Third-Party Beneficiaries. This Agreement shall not be construed to create any obligation by either ICANN or Registrar to any non-party to this Agreement, including any Registered Name Holder.

7.6   Notices and Designations. Except as provided in Section 4.4 and Section 6, all notices to be given under this Agreement shall be given in writing at the address of the appropriate party as set forth below, unless that party has given a notice of change of address in writing. Each party shall notify the other party within thirty (30) days of any change to its contact information. Any written notice required by this Agreement shall be deemed to have been properly given when delivered in person, when sent by electronic facsimile with receipt of confirmation of delivery, when scheduled for delivery by internationally recognized courier service, or when delivered by electronic means followed by an affirmative confirmation of receipt by the recipient's facsimile machine or email server. For any notice of a new Specification or Policy established in accordance with this Agreement, Registrar shall be afforded a reasonable period of time after notice of the establishment of such Specification or Policy is e-mailed to Registrar and posted on the ICANN website in which to comply with that specification, policy or program, taking into account any urgency involved. Notices and designations by ICANN under this Agreement shall be effective when written notice of them is deemed given to Registrar.

If to ICANN, addressed to:

Internet Corporation for Assigned Names and Numbers
12025 Waterfront Drive, Suite 300
Los Angeles, California  90094-2536 USA
Attention: Registrar Accreditation Notices
Telephone: 1/310/823-9358
Facsimile: 1/310/823-8649

If to Registrar, addressed to:

[Registrar Name]
[Courier Address]
[Mailing Address]
Attention: [contact person]
Registrar Website URL: [URL]
Telephone: [telephone number]
Facsimile: [fax number]
e-mail: [e-mail address]

7.7    Dates and Times. All dates and times relevant to this Agreement or its performance shall be computed based on the date and time observed in Los Angeles, California, USA.

7.8    Language. All notices, designations, and Specifications or Policies made under this Agreement shall be in the English language.

7.9    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7.10    Entire Agreement. Except to the extent (a) expressly provided in a written agreement executed by both parties concurrently herewith or (b) of written assurances provided by Registrar to ICANN in connection with its Accreditation, this Agreement (including the specifications, which form part of it) constitutes the entire agreement of the parties pertaining to the Accreditation of Registrar and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, between the parties on that subject.

7.11    Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement; (b) the balance of this Agreement shall be interpreted as if such provision were so excluded; and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives.

**ICANN**                                    **[Registrar]**


By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

## WHOIS ACCURACY PROGRAM SPECIFICATION

Registrar shall implement and comply with the requirements set forth in this Specification, as well as any commercially practical updates to this Specification that are developed by ICANN and the Registrar Stakeholder Group during the Term of the Registrar Accreditation Agreement.

1. Except as provided for in Section 3 below, within fifteen (15) days of (1) the registration of a Registered Name sponsored by Registrar, (2) the transfer of the sponsorship of a Registered Name to Registrar, or (3) any change in the Registered Name Holder with respect to any Registered Name sponsored by Registrar, Registrar will, with respect to both Whois information and the corresponding customer account holder contact information related to such Registered Name:

   a. Validate the presence of data for all fields required under Subsection 3.3.1 of the Agreement in a proper format for the applicable country or territory.

   b. Validate that all email addresses are in the proper format according to RFC 5322 (or its successors).

   c. Validate that telephone numbers are in the proper format according to the ITU-T E.164 notation for international telephone numbers (or its equivalents or successors).

   d. Validate that postal addresses are in a proper format for the applicable country or territory as defined in UPU Postal addressing format templates, the S42 address templates (as they may be updated) or other standard formats.

   e. Validate that all postal address fields are consistent across fields (for example: street exists in city, city exists in state/province, city matches postal code) where such information is technically and commercially feasible for the applicable country or territory.

   f. Verify:

      i. the email address of the Registered Name Holder (and, if different, the Account Holder) by sending an email requiring an affirmative response through a tool-based authentication method such as providing a unique code that must be returned in a manner designated by the Registrar, or

      ii. the telephone number of the Registered Name Holder (and, if different, the Account Holder) by either (A) calling or sending an SMS to the Registered Name Holder's telephone number providing a unique code that must be returned in a manner designated by the Registrar, or (B) calling the Registered Name Holder's telephone number and requiring the Registered Name Holder to provide a unique code that was sent to the

1

Registered Name Holder via web, email or postal mail.

In either case, if Registrar does not receive an affirmative response from the Registered Name Holder, Registrar shall either verify the applicable contact information manually or suspend the registration, until such time as Registrar has verified the applicable contact information. If Registrar does not receive an affirmative response from the Account Holder), Registrar shall verify the applicable contact information manually, but is not required to suspend any registration.

2. Except as provided in Section 3 below, within fifteen (15) calendar days after receiving any changes to contact information in Whois or the corresponding customer account contact information related to any Registered Name sponsored by Registrar (whether or not Registrar was previously required to perform the validation and verification requirements set forth in this Specification in respect of such Registered Name), Registrar will validate and, to the extent required by Section 1, verify the changed fields in the manner specified in Section 1 above. If Registrar does not receive an affirmative response from the Registered Name Holder providing the required verification, Registrar shall either verify the applicable contact information manually or suspend the registration, until such time as Registrar has verified the applicable contact information. If Registrar does not receive an affirmative response from the Account Holder, Registrar shall verify the applicable contact information manually, but is not required to suspend any registration.

3. Except as set forth in paragraph 4 below, Registrar is not required to perform the above validation and verification procedures in Section 1(a) through 1(f) above, if Registrar has already successfully completed the validation and verification procedures on the identical contact information and is not in possession of facts or knowledge of circumstances that suggest that the information is no longer valid.

4. If Registrar has any information suggesting that the contact information specified in Section 1(a) through 1(f) above is incorrect (such as Registrar receiving a bounced email notification or non-delivery notification message in connection with compliance with ICANN's Whois Data Reminder Policy or otherwise) for any Registered Name sponsored by Registrar (whether or not Registrar was previously required to perform the validation and verification requirements set forth in this Specification in respect of such Registered Name), Registrar must verify or re-verify, as applicable, the email address(es) as described in Section 1.f (for example by requiring an affirmative response to a Whois Data Reminder Policy notice). If, within fifteen (15) calendar days after receiving any such information, Registrar does not receive an affirmative response from the Registered Name Holder providing the required verification, Registrar shall either verify the applicable contact information manually or suspend the registration, until such time as Registrar has verified the applicable contact information. If, within fifteen (15) calendar days after receiving any such information, Registrar does not receive an affirmative response from the customer paying for the Registered Name, if applicable, providing the required verification, Registrar shall verify the applicable

2

contact information manually, but is not required to suspend any registration.

5. Upon the occurrence of a Registered Name Holder's willful provision of inaccurate or unreliable WHOIS information, its willful failure promptly to update information provided to Registrar, or its failure to respond for over fifteen (15) calendar days to inquiries by Registrar concerning the accuracy of contact details associated with the Registered Name Holder's registration, Registrar shall either terminate or suspend the Registered Name Holder's Registered Name or place such registration on clientHold and clientTransferProhibited, until such time as Registrar has validated the information provided by the Registered Name Holder.

6. The terms and conditions of this Specification shall be reviewed by ICANN in consultation with the Registrar Stakeholder Group on or about the first anniversary of the date that the form of this Agreement is first executed by a registrar.

7. Nothing within this Specification shall be deemed to require Registrar to perform verification or validation of any customer account holder information where the customer account holder does not have any Registered Names under sponsorship of Registrar.

## WHOIS ACCURACY PROGRAM SPECIFICATION

Registrar shall implement and comply with the requirements set forth in this Specification, as well as any commercially practical updates to this Specification that are developed by ICANN and the Registrar Stakeholder Group during the Term of the Registrar Accreditation Agreement.

1. Except as provided for in Section 3 below, within fifteen (15) days of (1) the registration of a Registered Name sponsored by Registrar, (2) the transfer of the sponsorship of a Registered Name to Registrar, or (3) any change in the Registered Name Holder with respect to any Registered Name sponsored by Registrar, Registrar will, with respect to both Whois information and the corresponding customer account holder contact information related to such Registered Name:

   a. Validate the presence of data for all fields required under Subsection 3.3.1 of the Agreement in a proper format for the applicable country or territory.

   b. Validate that all email addresses are in the proper format according to RFC 5322 (or its successors).

   c. Validate that telephone numbers are in the proper format according to the ITU-T E.164 notation for international telephone numbers (or its equivalents or successors).

   d. Validate that postal addresses are in a proper format for the applicable country or territory as defined in UPU Postal addressing format templates, the S42 address templates (as they may be updated) or other standard formats.

   e. Validate that all postal address fields are consistent across fields (for example: street exists in city, city exists in state/province, city matches postal code) where such information is technically and commercially feasible for the applicable country or territory.

   f. Verify:

      i. the email address of the Registered Name Holder (and, if different, the Account Holder) by sending an email requiring an affirmative response through a tool-based authentication method such as providing a unique code that must be returned in a manner designated by the Registrar, or

      ii. the telephone number of the Registered Name Holder (and, if different, the Account Holder) by either (A) calling or sending an SMS to the Registered Name Holder's telephone number providing a unique code that must be returned in a manner designated by the Registrar, or (B) calling the Registered Name Holder's telephone number and requiring the Registered Name Holder to provide a unique code that was sent to the

1

Registered Name Holder via web, email or postal mail.

In either case, if Registrar does not receive an affirmative response from the Registered Name Holder, Registrar shall either verify the applicable contact information manually or suspend the registration, until such time as Registrar has verified the applicable contact information. If Registrar does not receive an affirmative response from the Account Holder), Registrar shall verify the applicable contact information manually, but is not required to suspend any registration.

2. Except as provided in Section 3 below, within fifteen (15) calendar days after receiving any changes to contact information in Whois or the corresponding customer account contact information related to any Registered Name sponsored by Registrar (whether or not Registrar was previously required to perform the validation and verification requirements set forth in this Specification in respect of such Registered Name), Registrar will validate and, to the extent required by Section 1, verify the changed fields in the manner specified in Section 1 above. If Registrar does not receive an affirmative response from the Registered Name Holder providing the required verification, Registrar shall either verify the applicable contact information manually or suspend the registration, until such time as Registrar has verified the applicable contact information. If Registrar does not receive an affirmative response from the Account Holder, Registrar shall verify the applicable contact information manually, but is not required to suspend any registration.

3. Except as set forth in paragraph 4 below, Registrar is not required to perform the above validation and verification procedures in Section 1(a) through 1(f) above, if Registrar has already successfully completed the validation and verification procedures on the identical contact information and is not in possession of facts or knowledge of circumstances that suggest that the information is no longer valid.

4. If Registrar has any information suggesting that the contact information specified in Section 1(a) through 1(f) above is incorrect (such as Registrar receiving a bounced email notification or non-delivery notification message in connection with compliance with ICANN's Whois Data Reminder Policy or otherwise) for any Registered Name sponsored by Registrar (whether or not Registrar was previously required to perform the validation and verification requirements set forth in this Specification in respect of such Registered Name), Registrar must verify or re-verify, as applicable, the email address(es) as described in Section 1.f (for example by requiring an affirmative response to a Whois Data Reminder Policy notice). If, within fifteen (15) calendar days after receiving any such information, Registrar does not receive an affirmative response from the Registered Name Holder providing the required verification, Registrar shall either verify the applicable contact information manually or suspend the registration, until such time as Registrar has verified the applicable contact information. If, within fifteen (15) calendar days after receiving any such information, Registrar does not receive an affirmative response from the customer paying for the Registered Name, if applicable, providing the required verification, Registrar shall verify the applicable

contact information manually, but is not required to suspend any registration.

5. Upon the occurrence of a Registered Name Holder's willful provision of inaccurate or unreliable WHOIS information, its willful failure promptly to update information provided to Registrar, or its failure to respond for over fifteen (15) calendar days to inquiries by Registrar concerning the accuracy of contact details associated with the Registered Name Holder's registration, Registrar shall either terminate or suspend the Registered Name Holder's Registered Name or place such registration on clientHold and clientTransferProhibited, until such time as Registrar has validated the information provided by the Registered Name Holder.

6. The terms and conditions of this Specification shall be reviewed by ICANN in consultation with the Registrar Stakeholder Group on or about the first anniversary of the date that the form of this Agreement is first executed by a registrar.

7. Nothing within this Specification shall be deemed to require Registrar to perform verification or validation of any customer account holder information where the customer account holder does not have any Registered Names under sponsorship of Registrar.

## REGISTRATION DATA DIRECTORY SERVICE (WHOIS) SPECIFICATION

1. **Registration Data Directory Services.** Until ICANN requires a different protocol, Registrar will operate a WHOIS service available via port 43 in accordance with RFC 3912, and a web-based Directory Service providing free public query-based access to at least the elements set forth in Section 3.3.1.1 through 3.3.1.8 of the Registrar Accreditation Agreement in the format set forth in Section 1.4 of this Specification. ICANN reserves the right to specify alternative formats and protocols, and upon such specification, the Registrar will implement such alternative specification as soon as reasonably practicable.

   Following the publication by the IETF of a Proposed Standard, Draft Standard or Internet Standard and any revisions thereto (as specified in RFC 2026) relating to the web-based directory service as specified in the IETF Web Extensible Internet Registration Data Service working group, Registrar shall implement the directory service specified in any such standard (or any revision thereto) no later than 135 days after such implementation is requested by ICANN. Registrar shall implement internationalized registration data publication guidelines according to the specification published by ICANN following the work of the ICANN Internationalized Registration Data Working Group (IRD-WG) and its subsequent efforts, no later than 135 days after it is approved by the ICANN Board.

   1.1. The format of responses shall follow a semi-free text format outline below, followed by a blank line and a legal disclaimer specifying the rights of Registrar, and of the user querying the database.

   1.2. Each data object shall be represented as a set of key/value pairs, with lines beginning with keys, followed by a colon and a space as delimiters, followed by the value.

   1.3. For fields where more than one value exists, multiple numbered key/value pairs with the same key shall be allowed (for example to list multiple name servers). The first key/value pair after a blank line should be considered the start of a new record, and should be considered as identifying that record, and is used to group data, such as hostnames and IP addresses, or a domain name and registrant information, together.

   1.4. **Domain Name Data:**

      1.4.1. **Query format:** whois –h whois.example-registrar.tld EXAMPLE.TLD

      1.4.2. **Response format:**

The format of responses shall contain all the elements and follow a semi-free text format outline below. Additional data elements can be added at the end of the text

format outlined below. The data element may, at the option of Registrar, be followed by a blank line and a legal disclaimer specifying the rights of Registrar, and of the user querying the database (provided that any such legal disclaimer must be preceded by such blank line).

> Domain Name: EXAMPLE.TLD
> Registry Domain ID: D1234567-TLD
> Registrar WHOIS Server: whois.example-registrar.tld
> Registrar URL: http://www.example-registrar.tld
> Updated Date: 2009-05-29T20:13:00Z
> Creation Date: 2000-10-08T00:45:00Z
> Registrar Registration Expiration Date: 2010-10-08T00:44:59Z
> Registrar: EXAMPLE REGISTRAR LLC
> Registrar IANA ID: 5555555
> Registrar Abuse Contact Email: email@registrar.tld
> Registrar Abuse Contact Phone: +1.1235551234
> Reseller: EXAMPLE RESELLER[1]
> Domain Status: clientDeleteProhibited[2]
> Domain Status: clientRenewProhibited
> Domain Status: clientTransferProhibited
> Registry Registrant ID: 5372808-ERL[3]
> Registrant Name: EXAMPLE REGISTRANT[4]
> Registrant Organization: EXAMPLE ORGANIZATION
> Registrant Street: 123 EXAMPLE STREET
> Registrant City: ANYTOWN
> Registrant State/Province: AP[5]
> Registrant Postal Code: A1A1A1[6]
> Registrant Country: AA
> Registrant Phone: +1.5555551212
> Registrant Phone Ext: 1234[7]
> Registrant Fax: +1.5555551213
> Registrant Fax Ext: 4321
> Registrant Email: EMAIL@EXAMPLE.TLD
> Registry Admin ID: 5372809-ERL[8]

[1] Data element may be deleted, provided that if the data element is used, it must appear at this location.
[2] Note: all applicable statuses must be displayed in the Whois output.
[3] May be left blank if not available from Registry.
[4] For the Registrant, Admin and Tech contact fields requiring a "Name" or "Organization", the output must include either the name or organization (or both, if available).
[5] All "State/Province" fields may be left blank if not available.
[6] All "Postal Code" fields may be left blank if not available.
[7] All "Phone Ext", "Fax" and "Fax Ext" fields may be left blank if not available.
[8] May be left blank if not available from Registry.

Admin Name: EXAMPLE REGISTRANT ADMINISTRATIVE
Admin Organization: EXAMPLE REGISTRANT ORGANIZATION
Admin Street: 123 EXAMPLE STREET
Admin City: ANYTOWN
Admin State/Province: AP
Admin Postal Code: A1A1A1
Admin Country: AA
Admin Phone: +1.5555551212
Admin Phone Ext: 1234
Admin Fax: +1.5555551213
Admin Fax Ext: 1234
Admin Email: EMAIL@EXAMPLE.TLD
Registry Tech ID: 5372811-ERL[9]
Tech Name: EXAMPLE REGISTRANT TECHNICAL
Tech Organization: EXAMPLE REGISTRANT LLC
Tech Street: 123 EXAMPLE STREET
Tech City: ANYTOWN
Tech State/Province: AP
Tech Postal Code: A1A1A1
Tech Country: AA
Tech Phone: +1.1235551234
Tech Phone Ext: 1234
Tech Fax: +1.5555551213
Tech Fax Ext: 93
Tech Email: EMAIL@EXAMPLE.TLD
Name Server: NS01.EXAMPLE-REGISTRAR.TLD[10]
Name Server: NS02.EXAMPLE-REGISTRAR.TLD
DNSSEC: signedDelegation
URL of the ICANN WHOIS Data Problem Reporting System:
http://wdprs.internic.net/
>>> Last update of WHOIS database: 2009-05-29T20:15:00Z <<<

1.5. The format of the following data fields: domain status, individual and organizational names, address, street, city, state/province, postal code, country, telephone and fax numbers, email addresses, date and times must conform to the mappings specified in EPP RFCs 5730-5734 (or its successors), and IPv6 addresses format should conform to RFC 5952 (or its successor), so that the display of this information (or values returned in WHOIS responses) can be uniformly processed and understood.

## 2. Service Level Agreement for Registration Data Directory Services (RDDS)

### 2.1 Definitions

[9] May be left blank if not available from Registry.
[10] All associated nameservers must be listed.

o **IP address.** Refers to IPv4 or IPv6 addresses without making any distinction between the two. When there is need to make a distinction, IPv4 or IPv6 is used.
o **Probes.** Network hosts used to perform tests (see below) that are located at various global locations.
o **RDDS.** Registration Data Directory Services refers to the collective of WHOIS and Web based WHOIS services.
o **RTT.** Round-Trip Time or **RTT** refers to the time measured from the sending of the first bit of the first packet of the sequence of packets needed to make a request until the reception of the last bit of the last packet of the sequence needed to receive the response. If the client does not receive the whole sequence of packets needed to consider the response as received, the request will be considered unanswered.
o **SLR.** Service Level Requirement is the level of service expected for a certain parameter being measured in a Service Level Agreement (SLA).

## 2.2 Service Level Agreement Matrix

|  | Parameter | SLR (monthly basis) |
|---|---|---|
| RDDS | RDDS availability | less than or equal to 864 min of downtime |
|  | RDDS query RTT | less than or equal to 4000 ms, for at least 95% of the queries |
|  | RDDS update time | less than or equal to 60 min, for at least 95% of the probes |

Registrar is encouraged to do maintenance for the different services at the times and dates of statistically lower traffic for each service. Since substantial downtime is already incorporated in the availability metric, planned outages or similar; any downtime, be it for maintenance or due to system failures, will be noted simply as downtime and counted for SLA purposes.

**2.2.1 RDDS availability.** Refers to the ability of all the RDDS services for the Registrar to respond to queries from an Internet user with appropriate data from the relevant registrar system. If 51% or more of the RDDS testing probes see any of the RDDS services as unavailable during a given time, the RDDS will be considered unavailable.

**2.2.2 WHOIS query RTT.** Refers to the **RTT** of the sequence of packets from the start of the TCP connection to its end, including the reception of the WHOIS response. If the **RTT** is 5-times or more the corresponding SLR, the **RTT** will be considered undefined.

**2.2.3 Web-based-WHOIS query RTT.** Refers to the **RTT** of the sequence of packets from the start of the TCP connection to its end, including the

reception of the HTTP response for only one HTTP request. If Registrar implements a multiple-step process to get to the information, only the last step shall be measured. If the **RTT** is 5-times or more the corresponding SLR, the **RTT** will be considered undefined.

2.2.4 **RDDS query RTT.** Refers to the collective of **"WHOIS query RTT"** and **"Web-based- WHOIS query RTT"**.

2.2.5 **RDDS update time.** Refers to the time measured from the receipt of an EPP confirmation to a transform command on a domain name, host or contact, up until the servers of the RDDS services reflect the changes made.

2.2.6 **RDDS test.** Means one query sent to a particular **"IP address"** of one of the servers of one of the RDDS services. Queries shall be about existing objects in the registrar system and the responses must contain the corresponding information otherwise the query will be considered unanswered. Queries with an **RTT** 5 times higher than the corresponding SLR will be considered as unanswered. The possible results to an RDDS test are: a number in milliseconds corresponding to the **RTT** or undefined/unanswered.

2.2.7 **Measuring RDDS parameters.** Every 5 minutes, RDDS probes will select one IP address from all the public-DNS registered **"IP addresses"** of the servers for each RDDS service of the Registrar being monitored and make an **"RDDS test"** to each one. If an **"RDDS test"** result is undefined/unanswered, the corresponding RDDS service will be considered as unavailable from that probe until it is time to make a new test.

2.2.8 **Collating the results from RDDS probes.** The minimum number of active testing probes to consider a measurement valid is 10 at any given measurement period, otherwise the measurements will be discarded and will be considered inconclusive; during this situation no fault will be flagged against the SLRs.

2.2.9 **Placement of RDDS probes.** Probes for measuring RDDS parameters shall be placed inside the networks with the most users across the different geographic regions; care shall be taken not to deploy probes behind high propagation-delay links, such as satellite links.

## 2.3 Covenants of Performance Measurement

Registrar shall not interfere with measurement **Probes**, including any form of preferential treatment of the requests for the monitored services. Registrar shall respond to the measurement tests described in this Specification as it would do with any other request from Internet users (for RDDS).

## CONSENSUS POLICIES AND TEMPORARY POLICIES SPECIFICATION

1. **Consensus Policies.**

   1.1. *"Consensus Policies"* are those policies established (1) pursuant to the procedure set forth in ICANN's Bylaws and due process, and (2) covering those topics listed in Section 1.2 of this document. The Consensus Policy development process and procedure set forth in ICANN's Bylaws may be revised from time to time in accordance with the process set forth therein.

   1.2. Consensus Policies and the procedures by which they are developed shall be designed to produce, to the extent possible, a consensus of Internet stakeholders, including registrars. Consensus Policies shall relate to one or more of the following:

   1.2.1. issues for which uniform or coordinated resolution is reasonably necessary to facilitate interoperability, security and/or stability of the Internet, Registrar Services, Registry Services, or the Domain Name System ("DNS");

   1.2.2. functional and performance specifications for the provision of Registrar Services;

   1.2.3. registrar policies reasonably necessary to implement Consensus Policies relating to a gTLD registry;

   1.2.4. resolution of disputes regarding the registration of domain names (as opposed to the use of such domain names, but including where such policies take into account use of the domain names); or

   1.2.5. restrictions on cross-ownership of registry operators and registrars or Resellers and regulations and restrictions with respect to registrar and registry operations and the use of registry and registrar data in the event that a registry operator and a registrar or Reseller are affiliated.

   1.3. Such categories of issues referred to in Section 1.2 shall include, without limitation:

   1.3.1. principles for allocation of registered names in a TLD (e.g., first-come/first-served, timely renewal, holding period after expiration);

   1.3.2. prohibitions on warehousing of or speculation in domain names by registries or registrars;

   1.3.3. reservation of registered names in a TLD that may not be registered initially or that may not be renewed due to reasons reasonably related to (i) avoidance of confusion among or misleading of users, (ii) intellectual property, or (iii) the technical management of the DNS or the Internet (e.g., establishment of reservations of names from registration);

   1.3.4. maintenance of and access to accurate and up-to-date information concerning Registered Names and name servers;

   1.3.5. procedures to avoid disruptions of domain name registrations due to suspension or termination of operations by a registry operator or a registrar, including procedures for allocation of responsibility among continuing registrars of the Registered Names sponsored in a TLD by a registrar losing accreditation; and

   1.3.6. the transfer of registration data upon a change in registrar sponsoring one or more Registered Names.

1.4. In addition to the other limitations on Consensus Policies, they shall not:

    1.4.1. prescribe or limit the price of Registrar Services;

    1.4.2. modify the limitations on Temporary Policies (defined below) or Consensus Policies;

    1.4.3. modify the provisions in the Registrar Accreditation Agreement regarding terms or conditions for the renewal, termination or amendment of the Registrar Accreditation Agreement or fees paid by Registrar to ICANN; or

    1.4.4. modify ICANN's obligations to not apply standards, policies, procedures or practices arbitrarily, unjustifiably, or inequitably and to not single out Registrar for disparate treatment unless justified by substantial and reasonable cause, and exercise its responsibilities in an open and transparent manner.

2. **Temporary Policies.** Registrar shall comply with and implement all specifications or policies established by the ICANN Board of Directors (the "**Board**") on a temporary basis, if adopted by the Board by a vote of at least two-thirds of its members, so long as the Board reasonably determines that such modifications or amendments are justified and that immediate temporary establishment of a specification or policy on the subject is necessary to maintain the stability or security of Registrar Services, Registry Services or the DNS or the Internet ("**Temporary Policies**").

    2.1. Such proposed specification or policy shall be as narrowly tailored as feasible to achieve those objectives. In establishing any Temporary Policy, the Board shall state the period of time for which the Temporary Policy is adopted and shall immediately implement the Consensus Policy development process set forth in ICANN's Bylaws.

        2.1.1. ICANN shall also issue an advisory statement containing a detailed explanation of its reasons for adopting the Temporary Policy and why the Board believes such Temporary Policy should receive the consensus support of Internet stakeholders.

        2.1.2. If the period of time for which the Temporary Policy is adopted exceeds 90 days, the Board shall reaffirm its temporary adoption every 90 days for a total period not to exceed one year, in order to maintain such Temporary Policy in effect until such time as it becomes a Consensus Policy. If the one year period expires or, if during such one year period, the Temporary Policy does not become a Consensus Policy and is not reaffirmed by the Board, Registrar shall no longer be required to comply with or implement such Temporary Policy.

3. **Notice and Conflicts.** Registrar shall be afforded a reasonable period of time following notice of the establishment of a Consensus Policy or Temporary Policy in which to comply with such policy or specification, taking into account any urgency involved. In the event of a conflict between Registrar Services and Consensus Policies or any Temporary Policy, the Consensus Polices or Temporary Policy shall control, but only with respect to subject matter in conflict. For the avoidance of doubt, Consensus Policies that meet the requirements of this Specification may supplement or supersede provisions of the agreements between Registrar and ICANN, but only to the extent that such Consensus Policies relate to the matters set forth in Section 1.2 and 1.3 of this Specification.

## SPECIFICATION ON PRIVACY AND PROXY REGISTRATIONS

Until the earlier to occur of (i) January 1, 2017, and (ii) the date ICANN establishes and implements a Privacy and Proxy Accreditation Program as referenced in Section 3.14 of the Registrar Accreditation Agreement, Registrar agrees to comply, and to require its Affiliates and Resellers to comply, with the terms of this Specification, provided that ICANN and the Working Group may mutually agree to extend the term of this Specification. This Specification may not be modified by ICANN or Registrar.

1. Definitions. For the purposes of this Specification, the following definitions shall apply.

   1.1 "P/P Customer" means, regardless of the terminology used by the P/P Provider, the licensee, customer, beneficial user, beneficiary, or other recipient of Privacy Services and Proxy Services.

   1.2 "Privacy Service" is a service by which a Registered Name is registered to its beneficial user as the Registered Name Holder, but for which alternative, reliable contact information is provided by the P/P Provider for display of the Registered Name Holder's contact information in the Registration Data Service (Whois) or equivalent services.

   1.3 "Proxy Service" is a service through which a Registered Name Holder licenses use of a Registered Name to the P/P Customer in order to provide the P/P Customer use of the domain name, and the Registered Name Holder's contact information is displayed in the Registration Data Service (Whois) or equivalent services rather than the P/P Customer's contact information.

   1.4 "P/P Provider" or "Service Provider" is the provider of Privacy/Proxy Services, including Registrar and its Affiliates, as applicable.

2. Obligations of Registrar. For any Proxy Service or Privacy Service offered by the Registrar or its Affiliates, including any of Registrar's or its Affiliates' P/P services distributed through Resellers, and used in connection with Registered Names Sponsored by the Registrar, the Registrar and its Affiliates must require all P/P Providers to follow the requirements described in this Specification and to abide by the terms and procedures published pursuant to this Specification.

   2.1 Disclosure of Service Terms. P/P Provider shall publish the terms and conditions of its service (including pricing), on its website and/or Registrar's website.

2.2 <u>Abuse/Infringement Point of Contact.</u> P/P Provider shall publish a point of contact for third parties wishing to report abuse or infringement of trademarks (or other rights).

2.3 <u>Disclosure of Identity of P/P Provider.</u> P/P Provider shall publish its business contact information on its website and/or Registrar's website.

2.4 <u>Terms of service and description of procedures.</u> The P/P Provider shall publish on its website and/or Registrar's website a copy of the P/P Provider service agreement and description of P/P Provider's procedures for handling the following:

2.4.1 The process or facilities to report abuse of a domain name registration managed by the P/P Provider;

2.4.2 The process or facilities to report infringement of trademarks or other rights of third parties;

2.4.3 The circumstances under which the P/P Provider will relay communications from third parties to the P/P Customer;

2.4.4 The circumstances under which the P/P Provider will terminate service to the P/P Customer;

2.4.5 The circumstances under which the P/P Provider will reveal and/or publish in the Registration Data Service (Whois) or equivalent service the P/P Customer's identity and/or contact data; and

2.4.6 A description of the support services offered by P/P Providers to P/P Customers, and how to access these services.

2.5 <u>Escrow of P/P Customer Information.</u> Registrar shall include P/P Customer contact information in its Registration Data Escrow deposits required by Section 3.6 of the Agreement. P/P Customer Information escrowed pursuant to this Section 2.5 of this Specification may only be accessed by ICANN in the event of the termination of the Agreement or in the event Registrar ceases business operations.

3. <u>Exemptions.</u> Registrar is under no obligation to comply with the requirements of this specification if it can be shown that:

3.1 Registered Name Holder employed the services of a P/P Provider that is not provided by Registrar, or any of its Affiliates;

3.2    Registered Name Holder licensed a Registered Name to another party (i.e., is acting as a Proxy Service) without Registrar's knowledge; or

3.3    Registered Name Holder has used P/P Provider contact data without subscribing to the service or accepting the P/P Provider terms and conditions.

## DATA RETENTION SPECIFICATION

1. During the Term of this Agreement, for each Registered Name sponsored by Registrar within a gTLD, Registrar shall collect and securely maintain in its own electronic database (as updated from time to time) the data specified below:

    1.1. Registrar shall collect the following information from registrants at the time of registration of a domain name (a "Registration") and shall maintain that information for the duration of Registrar's sponsorship of the Registration and for a period of two additional years thereafter:

        1.1.1. First and last name or full legal name of registrant;

        1.1.2. First and last name or, in the event registrant is a legal person, the title of the registrant's administrative contact, technical contact, and billing contact;

        1.1.3. Postal address of registrant, administrative contact, technical contact, and billing contact;

        1.1.4. Email address of registrant, administrative contact, technical contact, and billing contact;

        1.1.5. Telephone contact for registrant, administrative contact, technical contact, and billing contact;

        1.1.6. WHOIS information, as set forth in the WHOIS Specification;

        1.1.7. Types of domain name services purchased for use in connection with the Registration; and

        1.1.8. To the extent collected by Registrar, "card on file," current period third party transaction number, or other recurring payment data.

    1.2. Registrar shall collect the following information and maintain that information for no less than one hundred and eighty (180) days following the relevant interaction:

        1.2.1. Information regarding the means and source of payment reasonably necessary for the Registrar to process the Registration transaction, or a transaction number provided by a third party payment processor;

        1.2.2. Log files, billing records and, to the extent collection and maintenance of such records is commercially practicable or consistent with industry-wide generally accepted standard practices within the industries in which Registrar operates, other

records containing communications source and destination information, including, depending on the method of transmission and without limitation: (1) Source IP address, HTTP headers, (2) the telephone, text, or fax number; and (3) email address, Skype handle, or instant messaging identifier, associated with communications between Registrar and the registrant about the Registration; and

1.2.3. Log files and, to the extent collection and maintenance of such records is commercially practicable or consistent with industry-wide generally accepted standard practices within the industries in which Registrar operates, other records associated with the Registration containing dates, times, and time zones of communications and sessions, including initial registration.

2. If, based on the receipt of either (i) a written legal opinion from a nationally recognized law firm in the applicable jurisdiction that states that the collection and/or retention of any data element specified herein by Registrar is reasonably likely to violate applicable law (the "Opinion") or (ii) a ruling of, or written guidance from, a governmental body of competent jurisdiction providing that compliance with the data collection and/or retention requirements of this Specification violates applicable law, Registrar determines in good faith that the collection and/or retention of any data element specified in this Specification violates applicable law, Registrar may provide written notice of such determination to ICANN and request a waiver from compliance with specific terms and conditions of this Specification (a "Waiver Request"). Such written notice shall: (i) specify the relevant applicable law, the allegedly offending data collection and retention elements, the manner in which the collection and/or retention of such data violates applicable law, and a reasonable description of such determination and any other facts and circumstances related thereto, (ii) be accompanied by a copy of the Opinion and governmental ruling or guidance, as applicable, and (iii) be accompanied by any documentation received by Registrar from any governmental authority, in each case, related to such determination, and such other documentation reasonably requested by ICANN. Following receipt of such notice, ICANN and Registrar shall discuss the matter in good faith in an effort to reach a mutually acceptable resolution of the matter. Until such time as ICANN's Procedure for Handling Whois Conflicts with Privacy Law is modified to include conflicts relating to the requirements of this Specification and if ICANN agrees with Registrar's determination, ICANN's office of general counsel may temporarily or permanently suspend compliance and enforcement of the affected provisions of this Specification and grant the Wavier Request. Prior to granting any exemption hereunder, ICANN will post its determination on its website for a period of thirty (30) calendar days. Following such modification of ICANN's Procedure for Handling Whois Conflicts with Privacy Law, all Wavier Requests (whether granted or denied) shall be resolved pursuant to such modified procedures.

3. If (i) ICANN has previously waived compliance with the requirements of any requirement of this Data Retention Specification in response to a Waiver Request from a registrar that is located in the same jurisdiction as Registrar and (ii) Registrar is subject to the same applicable law that gave rise to ICANN's agreement to grant such wavier, Registrar may request that ICANN to grant a similar waiver, which request shall be approved by ICANN, unless ICANN provides Registrar with a reasonable justification for not approving such request, in which case Registrar may thereafter make an Wavier Request pursuant to Section 2 of this Data Retention Specification.

4. Any modification of this Data Retention Specification to address violations of applicable law shall only apply during the period of time that the specific provisions of the applicable law giving rise to such violations remain in effect. If the applicable law is repealed or modified (or preempted) in a manner that would no longer prohibit the collection and/or retention of data and information as originally specified in this Data Retention Specification, Registrar agrees that the original version of this Specification will apply to the maximum extent permitted by such modified applicable law.

## REGISTRAR INFORMATION SPECIFICATION

Registrar shall provide to ICANN the information specified below, which shall be maintained in accordance with Section 3.17 of the Agreement. With regard to information identified below, ICANN will hold such information pursuant to the disclosure requirements set forth in Section 3.15 of the Agreement.

**General Information**

1.    Full legal name of Registrar.

2.    Legal form of the Registrar (e.g., LLC, Corporation, Government Body, Intergovernmental Organization, etc.).

3.    The jurisdiction in which the Registrar's business is registered for legal and financial purposes.

4.    The Registrar's business registration number and the name of the authority that issued this number.

5.    Every business name and/or trade name used by the Registrar.

6.    Provide current documentation demonstrating that the Registrar entity is legally established and in good standing. For proof of establishment, provide charter documents or other equivalent document (e.g., membership agreement) of the entity. If the Registrar is a government body or organization, provide a certified copy of the relevant statute, governmental decision or other instrument under which the government body or organization has been established. With respect to an entity other than a government body or organization, where no such certificates or documents are available in the Registrar's jurisdiction, an affidavit drafted and signed by a notary public or a legal practitioner duly qualified in the courts of the Registrar's jurisdiction, declaring that the organization is established and in good standing, must be provided.

7.    Correspondence address for the Registrar.* This address will be used for contractual purposes, and the Registrar must be able to accept notices and service of legal process at this address. No Post Office boxes are allowed.

8.    Primary phone number where the Registrar can be reached for contractual purposes.

9.    Primary Fax number where the Registrar can be reached for contractual purposes.

10.    Primary Email address where the Registrar can be reached for contractual purposes.

11.  If the location or address of Registrar's principal place of business is different from the address provided in 7, provide details including address, phone number, fax number and email address.* Provide ICANN with current documentation demonstrating that the Registrar is legally entitled to do business in the principal place of business.

12.  Any other addresses where the Registrar will be operated or managed, if different from either its principal place of business or correspondence address provided above. (If so, please explain.) Provide ICANN with current documentation demonstrating that the Registrar is legally entitled to do business in each location identified.

13.  Primary contact name:

> Title
> Address
> Phone number
> Fax number
> Email address

14.  URL and Location of Port 43 WHOIS server.

**Ownership, Directors and Officers Information**

15.  Full name, contact information, and position of any persons or entities owning at least 5% of the ownership interest in Registrar's current business entity. For each person listed, please specify such person's percentage ownership.

16.  Full name, contact information, and position of all directors of the Registrar.

17.  Full name, contact information, and position of all officers of the Registrar.* (Officer names and positions must be publicly displayed.)

18.  Full name, contact information, and position of all senior management and other key personnel overseeing the provision of Registrar Services.

19.  For every person or entity mentioned in the answers to questions 15 to 18, indicate if that person or entity:

> a) within the past ten years, has been convicted of a felony or of a misdemeanor related to financial activities, or has been judged by a court to have committed fraud or breach of fiduciary duty, or has been the subject of a judicial determination that is similar or related to any of these;

> b) within the past ten years, has been disciplined by any government or industry regulatory body for conduct involving dishonesty or misuse of funds of others;

c) is currently involved in any judicial or regulatory proceeding that could result in a conviction, judgment, determination, or discipline of the type specified in items 19(a) or 19(b); or

d) is the subject of a disqualification imposed by ICANN.

Provide details if any of the above events in (a)-(d) have occurred.

20. List all Affiliated Registrars, if any, and briefly describe the Affiliation.

21. For any entities listed in item 20, must provide information required in items 1-14 above.

22. List the ultimate parent entity of the Registrar, if applicable.*

**Other**

23. Does the Registrar or any of its Affiliates offer any Privacy Service or Proxy Service (as such terms on defined in the Specification on Privacy and Proxy Registrations)? If yes, list the entities or individuals providing the Privacy Service or Proxy Service.

24. For any entities listed in item 20, provide information required in 1-14 above.

25. Does the Registrar utilize or benefit from the services of Resellers?

26. If yes, provide a list of all such Resellers known to Registrar. The information specified in this item 26 shall be made available to ICANN upon request. At such time as ICANN develops a secure method for the receipt and retention of such information, such information shall thereafter be provided to ICANN in accordance with Section 3.17 of the Agreement.

## ADDITIONAL REGISTRAR OPERATION SPECIFICATION

This Specification may be modified by ICANN from time to time after consultation with the Registrar Stakeholder Group (or its successor), provided that such updates are commercially practical with respect to the registrar industry, taken as a whole.

1. **DNSSEC**

   Registrar must allow its customers to use DNSSEC upon request by relaying orders to add, remove or change public key material (e.g., DNSKEY or DS resource records) on behalf of customers to the Registries that support DNSSEC. Such requests shall be accepted and processed in a secure manner and according to industry best practices. Registrars shall accept any public key algorithm and digest type that is supported by the TLD of interest and appears in the registries posted at: <http://www.iana.org/assignments/dns-sec-alg-numbers/dns-sec-alg-numbers.xml> and <http://www.iana.org/assignments/ds-rr-types/ds-rr-types.xml>. All such requests shall be transmitted to registries using the EPP extensions specified in RFC 5910 or its successors.

2. **IPv6**

   To the extent that Registrar offers registrants the ability to register nameserver addresses, Registrar must allow both IPv4 addresses and IPv6 addresses to be specified.

3. **IDN**

   If the Registrar offers Internationalized Domain Name ("IDN") registrations, all new registrations must comply with RFCs 5890, 5891, 5892, 5893 and their successors. Registrar shall also comply with the IDN Guidelines at http://www.icann.org/en/topics/idn/implementation-guidelines.htm which may be amended, modified, or superseded from time to time. Registrar must use the IDN tables published by the relevant registry.

## *Registrants' Benefits and Responsibilities*

### *Domain Name Registrants' Rights:*

1. Your domain name registration and any privacy/proxy services you may use in conjunction with it must be subject to a Registration Agreement with an ICANN Accredited Registrar.

   • You are entitled to review this Registration Agreement at any time, and download a copy for your records.

2. You are entitled to accurate and accessible information about:

   • The identity of your ICANN Accredited Registrar;
   • The identity of any proxy or privacy service provider affiliated with your Registrar;
   • Your Registrar's terms and conditions, including pricing information, applicable to domain name registrations;
   • The terms and conditions, including pricing information, applicable to any privacy services offered by your Registrar;
   • The customer support services offered by your Registrar and the privacy services provider, and how to access them;
   • How to raise concerns and resolve disputes with your Registrar and any privacy services offered by them; and
   • Instructions that explain your Registrar's processes for registering, managing, transferring, renewing, and restoring your domain name registrations, including through any proxy or privacy services made available by your Registrar.

3. You shall not be subject to false advertising or deceptive practices by your Registrar or though any proxy or privacy services made available by your Registrar. This includes deceptive notices, hidden fees, and any practices that are illegal under the consumer protection law of your residence.

### *Domain Name Registrants' Responsibilities:*

1. You must comply with the terms and conditions posted by your Registrar, including applicable policies from your Registrar, the Registry and ICANN.

2. You must review your Registrar's current Registration Agreement, along with any updates.

3. You will assume sole responsibility for the registration and use of your domain name.

4. You must provide accurate information for publication in directories such as WHOIS, and promptly update this to reflect any changes.

5. You must respond to inquiries from your Registrar within fifteen (15) days, and keep your Registrar account data current. If you choose to have your domain name registration renew automatically, you must also keep your payment information current.



# LOGO LICENSE SPECIFICATION to RAA

## LOGO LICENSE SPECIFICATION

The Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [organization type and jurisdiction] ("Registrar") have entered into a Registrar Accreditation Agreement ("Registrar Accreditation Agreement"), of which this appendix ("Logo License Specification") is a part. Definitions in the Registrar Accreditation Agreement apply in this Logo License Specification.

Registrar wishes to acquire from ICANN, and ICANN wishes to grant to Registrar, a license to use the trademarks listed below the signature block of this Logo License Specification ("Trademarks") in connection with Registrar's role as an ICANN-accredited registrar. Pursuant to and subject to the Registrar Accreditation Agreement, Registrar and ICANN hereby agree as follows:

LICENSE

1. Grant of License. ICANN grants to Registrar a non-exclusive, worldwide right and license to use the Trademarks, during the term of this specification and solely in connection with the provision and marketing of Registrar Services in order to indicate that Registrar is accredited as a registrar of domain names by ICANN. Except as provided in this subsection and Subsection 2.2 of the Registrar Accreditation Agreement, Registrar shall not use the Trademarks, any term, phrase, or design which is confusingly similar to the Trademarks or any portion of the Trademarks in any manner whatsoever.

2. Ownership of Trademarks. Any and all rights in the Trademarks that may be acquired by Registrar shall inure to the benefit of, and are herby assigned to, ICANN. Registrar shall not assert ownership of the Trademarks or any associated goodwill.

3. No Sublicense. Registrar shall not sublicense any of its rights under this specification to any other person or entity (including any of Registrar's resellers) without the prior written approval of ICANN.

REGISTRATION AND ENFORCEMENT

1. Registration. Registration and any other form of protection for the Trademarks shall only be obtained by ICANN in its name and at its expense.

2. Enforcement. Registrar shall promptly notify ICANN of any actual or suspected infringement of the Trademarks by third parties, including Registrar's resellers or affiliates. ICANN shall have the sole discretion to initiate and maintain any legal proceedings against such third parties; Registrar shall not take any such actions without the prior written approval of ICANN; and ICANN shall retain any and all recoveries from such actions.

3. Further Assurances. Registrar agrees to execute such other documents and to take all such actions as ICANN may request to effect the terms of this specification, including providing such materials (for example URLs and samples of any promotional materials bearing the Trademarks), cooperation, and assistance as may be reasonably required to assist ICANN in obtaining, maintaining, and enforcing trademark registration(s) and any other form of protection for the Trademarks.

TERM AND TERMINATION

This Logo License Specification shall be effective from the date it is signed below by both parties until the Expiration Date, unless this specification or the Registrar Accreditation Agreement is earlier terminated. Each party shall have the right to terminate this specification at any time by giving the other party written notice. Upon expiration or termination of this specification, Registrar shall immediately discontinue all use of the Trademarks.

IN WITNESS WHEREOF, the parties have caused this Logo License Specification to be executed by their duly authorized representatives.

ICANN                                    [Registrar Name]

By: _____                  By: _____
                                         Name:
                                         Title:

                                         Dated: _____, 200__

TRADEMARKS:

1. ICANN Accredited Registrar

2.



## COMPLIANCE CERTIFICATE

_____, 20___

Pursuant to Section 3.15 of Registrar Accreditation Agreement (the "Agreement"), dated _____, 20__, by and between the Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [Organization type and jurisdiction] ("Registrar"), the undersigned certifies, in his/her capacity as an officer of the Registrar and not in his/her individual capacity, on behalf of Registrar as follows:

1.      The undersigned is the [Chief Executive Officer/President/Chief Operating Officer/Chief Financial Officer or functional equivalent thereof] of Registrar.

2.      Registrar has in place processes and procedures intended to establish, maintain, review, test, and modify registrar policies and procedures reasonably designed to achieve compliance with the Agreement.

3.      To the best of the undersigned's knowledge and belief, Registrar has performed and complied with all covenants, agreements, obligations and conditions contained in the Agreement that are required to be performed or complied with by it for the calendar year 20__.

The undersigned signs this certificate as of the date indicated under the title.

**[REGISTRAR]**

By: _____
      Name:
      Title:

## Transition Addendum to Registrar Accreditation Agreement

This Transition Addendum (this "Addendum") to the Registrar Accreditation Agreement (the "Agreement") by and between the Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [Organization type and jurisdiction] ("Registrar"), is dated as of _____, 2013.

**WHEREAS**, ICANN and Registrar entered into the Agreement as of the date hereof; and

**WHEREAS**, ICANN acknowledges that implementation by Registrar of certain operational provisions of the Agreement is not possible on the date hereof and will require a reasonable grace period.

**NOW THEREFORE**, the parties agree as follows:

1. ICANN will not enforce the following provisions and specifications of the Agreement until January 1, 2014:  Sections 3.4.1.1, 3.4.1.5, 3.7.10, 3.7.11, 3.12.4, 3.12.7, 3.14, 3.18 and 3.19 of the Agreement; the first sentence of Section 3.7.8 of the Agreement; the WHOIS Accuracy Specification; the Data Retention Specification; and the service level agreements set forth in Section 2.2 of the Registration Data Directory Service (WHOIS) Specification (collectively, the "Transition Provisions").

2. In addition, if immediately prior to the execution of this Addendum Registrar was party to the form registrar accreditation agreement adopted by ICANN in 2009 (the "2009 RAA"), Registrar may use its existing form of registrant registration agreement until January 1, 2014, provided that such agreement complies with Section 3.7.7 of the 2009 RAA.

3. For the calendar year ended December 31, 2013, any certification required pursuant to Section 3.15 shall not require certification as to compliance with the Transition Provisions and may acknowledge the permissible use of the registrant registration agreement under Section 2 hereof.

4. Notwithstanding the foregoing, Registrar agrees to use commercially reasonable efforts to comply with the obligations set forth in the Transition Provisions and transition to a registrant registration agreement that complies with the terms of the Agreement prior to January 1, 2014.

5. Registrar must be fully compliant with the Transition Provisions and Section 3.7.7 of the Agreement as of January 1, 2014, at which date this Addendum shall automatically terminate without action by any party, except as it relates to Section 4 hereof.

6. ICANN and the Registrar Whois Validation Working Group (as defined below) will work together to identify and specify an appropriate set of tools to enable Registrar to complete the across field validation specified in Section 1(e) of the Whois Accuracy Program Specification to the Agreement (the "Across Field Validation").  When such tools are mutually agreed between ICANN and the Registrar Whois Validation Working Group,

ICANN shall provide Registrar written notice of such agreement (which notice shall specify and describe the agreed upon tools). Effective on the one hundred eightieth (180th) calendar day following delivery of such notice by ICANN, Registrar shall comply with the obligations specified in Section 1(e) of the Whois Accuracy Program. Until such time, ICANN will not enforce compliance with such obligations.

For purposes of this Section 6, the Registrar Whois Validation Working Group shall be deemed to have agreed to such Across Field Validation tools when Approval (as defined below) of the then serving members of the group is obtained through a vote of the group (which vote may be conducted through any verifiable means determined by the group, including through electronic means).

The "Registrar Whois Validation Working Group" means that existing working group whose membership has been tasked with identifying and specifying a set of tools to enable registrars to complete the Across Field Validation. The membership of the Registrar Whois Validation Working Group shall be made up of volunteering representatives of ICANN-accredited registrars, and shall initially consist of the members currently serving on the existing working group.

"Approval" is obtained following a vote of the Registrar Whois Validation Working Group, if the votes cast in favor of adoption of the proposed Across Field Validations tools by the then serving members of the group are at least two-thirds of the votes cast by such members, with abstentions or non-votes not being counted as either votes in favor or against adoption of such tools. For purposes of the vote of the group as referenced above, (i) only persons appointed by an ICANN-accredited registrar shall be deemed members of the group and eligible to cast a vote as described above and (ii) no ICANN-accredited registrar nor group of Affiliated Registrars represented in the Registrar Whois Validation Working Group shall have more than one vote.

7. Except as set forth in this Addendum, the Agreement shall be in full force and effect, enforceable by the parties in accordance with its terms.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be executed in duplicate by their duly authorized representatives.

**ICANN**                                    **[Registrar]**

By: _____            By: _____

Name: _____            Name: _____

Title: _____           Title: _____

EXHIBIT C

# Text of Hague Service Convention and Signatories

1. **Information and purchasing instructions for the Practical Handbook on the Operation of the Hague Service Convention.**
   http://www.hcch.net/index_en.php?act=publications.details&pid=2728

2. **Table of countries that participate, with links to the information for each country's Central Authority and other practical information about service in that country.**
   http://www.hcch.net/index_en.php?act=conventions.statusprint&cid=17

3. **Table listing the applicability of certain Convention articles in each country.**
   http://www.hcch.net/upload/applicability14e.pdf

4. **PDF model form for request of service abroad.**
   Fillable: http://www.hcch.net/upload/act_form14e.pdf
   Printable: http://www.hcch.net/upload/form14e2.pdf

5. **Instructions for filling out the model form.**
   http://www.hcch.net/index_en.php?act=publications.details&pid=27&dtid=2

6. **More general info. (i.e. not limited to Hague Service Convention) from the U.S. State Department on service abroad.**
   http://www.travel.state.gov/law/judicial/judicial_680.html

(information above provided by Offices of the AOC)

**14. CONVENTION ON THE SERVICE ABROAD OF JUDICIAL AND EXTRAJUDICIAL DOCUMENTS IN CIVIL OR COMMERCIAL MATTERS**

*(Concluded 15 November 1965)*

The States signatory to the present Convention,

Desiring to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time,

Desiring to improve the organisation of mutual judicial assistance for that purpose by simplifying and expediting the procedure,

Have resolved to conclude a Convention to this effect and have agreed upon the following provisions:

Article 1

The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad.

This Convention shall not apply where the address of the person to be served with the document is not known.

CHAPTER I – JUDICIAL DOCUMENTS

Article 2

Each Contracting State shall designate a Central Authority which will undertake to receive requests for service coming from other Contracting States and to proceed in conformity with the provisions of Articles 3 to 6.

Each State shall organise the Central Authority in conformity with its own law.

Article 3

The authority or judicial officer competent under the law of the State in which the documents originate shall forward to the Central Authority of the State addressed a request conforming to the model annexed to the present Convention, without any requirement of legalisation or other equivalent formality.

The document to be served or a copy thereof shall be annexed to the request. The request and the document shall both be furnished in duplicate.

Article 4

If the Central Authority considers that the request does not comply with the provisions of the present Convention it shall promptly inform the applicant and specify its objections to the request.

Article 5

The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either –

a) by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or

b) by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.

Subject to sub-paragraph (b) of the first paragraph of this Article, the document may always be served by delivery to an addressee who accepts it voluntarily.

If the document is to be served under the first paragraph above, the Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed.

That part of the request, in the form attached to the present Convention, which contains a summary of the document to be served, shall be served with the document.

Article 6

The Central Authority of the State addressed or any authority which it may have designated for that purpose, shall complete a certificate in the form of the model annexed to the present Convention.

The certificate shall state that the document has been served and shall include the method, the place and the date of service and the person to whom the document was delivered. If the document has not been served, the certificate shall set out the reasons which have prevented service.

The applicant may require that a certificate not completed by a Central Authority or by a judicial authority shall be countersigned by one of these authorities.

The certificate shall be forwarded directly to the applicant.

## Article 7

The standard terms in the model annexed to the present Convention shall in all cases be written either in French or in English. They may also be written in the official language, or in one of the official languages, of the State in which the documents originate.

The corresponding blanks shall be completed either in the language of the State addressed or in French or in English.

## Article 8

Each Contracting State shall be free to effect service of judicial documents upon persons abroad, without application of any compulsion, directly through its diplomatic or consular agents.

Any State may declare that it is opposed to such service within its territory, unless the document is to be served upon a national of the State in which the documents originate.

## Article 9

Each Contracting State shall be free, in addition, to use consular channels to forward documents, for the purpose of service, to those authorities of another Contracting State which are designated by the latter for this purpose.

Each Contracting State may, if exceptional circumstances so require, use diplomatic channels for the same purpose.

## Article 10

Provided the State of destination does not object, the present Convention shall not interfere with –

a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

## Article 11

The present Convention shall not prevent two or more Contracting States from agreeing to permit, for the purpose of service of judicial documents, channels of transmission other than those provided for in the preceding Articles and, in particular, direct communication between their respective authorities.

## Article 12

The service of judicial documents coming from a Contracting State shall not give rise to any payment or reimbursement of taxes or costs for the services rendered by the State addressed.

The applicant shall pay or reimburse the costs occasioned by –

a) the employment of a judicial officer or of a person competent under the law of the State of destination,

b) the use of a particular method of service.

## Article 13

Where a request for service complies with the terms of the present Convention, the State addressed may refuse to comply therewith only if it deems that compliance would infringe its sovereignty or security.

It may not refuse to comply solely on the ground that, under its internal law, it claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not permit the action upon which the application is based.

The Central Authority shall, in case of refusal, promptly inform the applicant and state the reasons for the refusal.

## Article 14

Difficulties which may arise in connection with the transmission of judicial documents for service shall be settled through diplomatic channels.

## Article 15

Where a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and the defendant has not appeared, judgment shall not be given until it is established that –

*a)* the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory, or

*b)* the document was actually delivered to the defendant or to his residence by another method provided for by this Convention,

and that in either of these cases the service or the delivery was effected in sufficient time to enable the defendant to defend.

Each Contracting State shall be free to declare that the judge, notwithstanding the provisions of the first paragraph of this Article, may give judgment even if no certificate of service or delivery has been received, if all the following conditions are fulfilled –

*a)* the document was transmitted by one of the methods provided for in this Convention,

*b)* a period of time of not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document,

*c)* no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed.

Notwithstanding the provisions of the preceding paragraphs the judge may order, in case of urgency, any provisional or protective measures.

Article 16

When a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and a judgment has been entered against a defendant who has not appeared, the judge shall have the power to relieve the defendant from the effects of the expiration of the time for appeal from the judgment if the following conditions are fulfilled –

*a)* the defendant, without any fault on his part, did not have knowledge of the document in sufficient time to defend, or knowledge of the judgment in sufficient time to appeal, and

*b)* the defendant has disclosed a *prima facie* defence to the action on the merits.

An application for relief may be filed only within a reasonable time after the defendant has knowledge of the judgment.

Each Contracting State may declare that the application will not be entertained if it is filed after the expiration of a time to be stated in the declaration, but which shall in no case be less than one year following the date of the judgment.

This Article shall not apply to judgments concerning status or capacity of persons.

CHAPTER II – EXTRAJUDICIAL DOCUMENTS

Article 17

Extrajudicial documents emanating from authorities and judicial officers of a Contracting State may be transmitted for the purpose of service in another Contracting State by the methods and under the provisions of the present Convention.

CHAPTER III – GENERAL CLAUSES

Article 18

Each Contracting State may designate other authorities in addition to the Central Authority and shall determine the extent of their competence.

The applicant shall, however, in all cases, have the right to address a request directly to the Central Authority.

Federal States shall be free to designate more than one Central Authority.

Article 19

To the extent that the internal law of a Contracting State permits methods of transmission, other than those provided for in the preceding Articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions.

Article 20

The present Convention shall not prevent an agreement between any two or more Contracting States to dispense with –

*a)* the necessity for duplicate copies of transmitted documents as required by the second paragraph of Article 3,

*b)* the language requirements of the third paragraph of Article 5 and Article 7,

*c)* the provisions of the fourth paragraph of Article 5,

*d)* the provisions of the second paragraph of Article 12.

Article 21

4

Each contracting State shall, at the time of the deposit of its instrument of ratification or accession, or at a later date, inform the Ministry of Foreign Affairs of the Netherlands of the following –
a) the designation of authorities, pursuant to Articles 2 and 18,
b) the designation of the authority competent to complete the certificate pursuant to Article 6,
c) the designation of the authority competent to receive documents transmitted by consular channels, pursuant to Article 9.
Each Contracting State shall similarly inform the Ministry, where appropriate, of –
a) opposition to the use of methods of transmission pursuant to Articles 8 and 10,
b) declarations pursuant to the second paragraph of Article 15 and the third paragraph of Article 16,
c) all modifications of the above designations, oppositions and declarations.

Article 22

Where Parties to the present Convention are also Parties to one or both of the Conventions on civil procedure signed at The Hague on 17th July 1905, and on 1st March 1954, this Convention shall replace as between them Articles 1 to 7 of the earlier Conventions.

Article 23

The present Convention shall not affect the application of Article 23 of the Convention on civil procedure signed at The Hague on 17th July 1905, or of Article 24 of the Convention on civil procedure signed at The Hague on 1st March 1954.
These Articles shall, however, apply only if methods of communication, identical to those provided for in these Conventions, are used.

Article 24

Supplementary agreements between Parties to the Conventions of 1905 and 1954 shall be considered as equally applicable to the present Convention, unless the Parties have otherwise agreed.

Article 25

Without prejudice to the provisions of Articles 22 and 24, the present Convention shall not derogate from Conventions containing provisions on the matters governed by this Convention to which the Contracting States are, or shall become, Parties.

Article 26

The present Convention shall be open for signature by the States represented at the Tenth Session of the Hague Conference on Private International Law.
It shall be ratified, and the instruments of ratification shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

Article 27

The present Convention shall enter into force on the sixtieth day after the deposit of the third instrument of ratification referred to in the second paragraph of Article 26.
The Convention shall enter into force for each signatory State which ratifies subsequently on the sixtieth day after the deposit of its instrument of ratification.

Article 28

Any State not represented at the Tenth Session of the Hague Conference on Private International Law may accede to the present Convention after it has entered into force in accordance with the first paragraph of Article 27. The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Netherlands.
The Convention shall enter into force for such a State in the absence of any objection from a State, which has ratified the Convention before such deposit, notified to the Ministry of Foreign Affairs of the Netherlands within a period of six months after the date on which the said Ministry has notified it of such accession.
In the absence of any such objection, the Convention shall enter into force for the acceding State on the first day of the month following the expiration of the last of the periods referred to in the preceding paragraph.

Article 29

Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is

responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.

At any time thereafter, such extensions shall be notified to the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification referred to in the preceding paragraph.

Article 30

The present Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 27, even for States which have ratified it or acceded to it subsequently.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Netherlands at least six months before the end of the five year period.

It may be limited to certain of the territories to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

Article 31

The Ministry of Foreign Affairs of the Netherlands shall give notice to the States referred to in Article 26, and to the States which have acceded in accordance with Article 28, of the following –

a) the signatures and ratifications referred to in Article 26;

b) the date on which the present Convention enters into force in accordance with the first paragraph of Article 27;

c) the accessions referred to in Article 28 and the dates on which they take effect;

d) the extensions referred to in Article 29 and the dates on which they take effect;

e) the designations, oppositions and declarations referred to in Article 21;

f) the denunciations referred to in the third paragraph of Article 30.

In witness whereof the undersigned, being duly authorised thereto, have signed the present Convention.

Done at The Hague, on the 15th day of November, 1965, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Netherlands, and of which a certified copy shall be sent, through the diplomatic channel, to each of the States represented at the Tenth Session of the Hague Conference on Private International Law.

# SIGNATORIES 14: Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters

Entry into force: 10-II-1969, Last update: 27-I-2011
Number of Contracting States to this Convention: 62

1) S = Signature
2) R/A/Su = Ratification, Accession or Succession
3) Type = R: Ratification;
A: Accession;
A*: Accession giving rise to an acceptance procedure; click on A* for details of acceptances of the accession;
C: Continuation;
Su: Succession;
Den: Denunciation;
4) EIF = Entry into force
5) Ext = Extensions of application
6) Auth = Designation of Authorities
7) Res/D/N = Reservations, declarations or notifications

**Members of the Organisation (click here for the non-Member States)**

| States | S¹ | R/A/Su ² | Type ³ | EIF ⁴ | Ext ⁵ | Auth ⁶ | Res/D/N ⁷ |
|---|---|---|---|---|---|---|---|
| Albania | | 1-XI-2006 | A | 1-VII-2007 | | 3 | |
| Argentina | | 2-II-2001 | A | 1-XII-2001 | | 2 | D,Res5,10,15,16 |
| Australia | | 15-III-2010 | A | 1-XI-2010 | 7 | 5 | D5,8,9,10,15,16,17,29 |
| Belarus | | 6-VI-1997 | A | 1-II-1998 | | 1 | |
| Belgium | 21-I-1966 | 19-XI-1970 | R | 18-I-1971 | | 2 | D8,15,16 |
| Bosnia and Herzegovina | | 16-VI-2008 | A | 1-II-2009 | | 1 | |
| Bulgaria | | 23-XI-1999 | A | 1-VIII-2000 | | 3 | D5,8,10,15,16 |
| Canada | | 26-IX-1988 | A | 1-V-1989 | | 4 | D5,8,10,11,12,15,16,2 |
| China, People's Republic of | | 6-V-1991 | A | 1-I-1992 | | 8 | D,N5,8,10,15,16 |
| Croatia | | 28-II-2006 | A | 1-XI-2006 | | 3 | Res,D5,6,8,9,10,15,16 |
| Cyprus | | 26-X-1982 | A | 1-VI-1983 | | 4 | D8,10,15,16 |
| Czech Republic | | 28-I-1993 | Su | 1-I-1993 | | 4 | D,Res8,10,15,29 |
| Denmark | 7-I- | 2-VIII- | R | 1-X- | | 3 | D10,15,16 |

7

| | Signature | Deposit | | Entry into force | | | Declarations/Reservations |
|---|---|---|---|---|---|---|---|
| | 1969 | 1969 | | 1969 | | | |
| Egypt | 1-III-1966 | 12-XII-1968 | R | 10-II-1969 | 1 | | Res8,10 |
| Estonia | | 2-II-1996 | A | 1-X-1996 | | 1 | D10,15,16 |
| Finland | 15-XI-1965 | 11-IX-1969 | R | 10-XI-1969 | | 2 | D2,9,10 |
| France | 12-I-1967 | 3-VII-1972 | R | 1-IX-1972 | 1 | 3 | D8,15,16 |
| Germany | 15-XI-1965 | 27-IV-1979 | R | 26-VI-1979 | | 3 | D5,8,10,15,16 |
| Greece | 20-VII-1983 | 20-VII-1983 | R | 18-IX-1983 | | 1 | D8,10,15 |
| Hungary | | 13-VII-2004 | A | 1-IV-2005 | | 3 | D2,5,6,8,9,10,15,16 |
| Iceland | | 10-XI-2008 | A | 1-VII-2009 | | 1 | D,Res10,15,16 |
| India | | 23-XI-2006 | A | 1-VIII-2007 | | 1 | D,Res10,15,16 |
| Ireland | 20-X-1989 | 5-IV-1994 | R | 4-VI-1994 | | 3 | D,Res10,15 |
| Israel | 25-XI-1965 | 14-VIII-1972 | R | 13-X-1972 | | 2 | D,Res10,16 |
| Italy | 25-I-1979 | 25-XI-1981 | R | 24-I-1982 | | 3 | D5,12 |
| Japan | 12-III-1970 | 28-V-1970 | R | 27-VII-1970 | | 3 | D10,15 |
| Korea, Republic of | | 13-I-2000 | A | 1-VIII-2000 | | 2 | D,Res8,10,15 |
| Latvia | | 28-III-1995 | A | 1-XI-1995 | | 4 | D5,8,10,15 |
| Lithuania | | 2-VIII-2000 | A | 1-VI-2001 | | 1 | D,Res8,10,15,16 |
| Luxembourg | 27-X-1971 | 9-VII-1975 | R | 7-IX-1975 | | 1 | D,Res5,8,15,16 |
| Mexico | | 2-XI-1999 | A | 1-VI-2000 | | 1 | D5,6,8,10,12,15,16 |
| Monaco | | 1-III-2007 | A | 1-XI-2007 | | 2 | D8,10,15,16 |
| Netherlands | 15-XI-1965 | 3-XI-1975 | R | 2-I-1976 | 1 | 5 | D15,16 |
| Norway | 15-X-1968 | 2-VIII-1969 | R | 1-X-1969 | | 3 | D,Res8,10,15,16 |
| Poland | | 13-II-1996 | A | 1-IX-1996 | | 4 | Res8,10 |
| Portugal | 5-VII-1971 | 27-XII-1973 | R | 25-II-1974 | | 2 | D8,15,16 |
| Romania | | 21-VIII-2003 | A | 1-IV-2004 | | 2 | D8,16 |
| Russian Federation | | 1-V-2001 | A | 1-XII-2001 | | 4 | D,Res2,3,5,6,8,9,10,12,15 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Serbia | | 2-VII-2010 | A | 1-II-2011 | 2 | D5,6,8,10,15,16 |
| Slovakia | | 15-III-1993 | Su | 1-I-1993 | 4 | D8,10,15,29 |
| Slovenia | | 18-IX-2000 | A | 1-VI-2001 | 1 | |
| Spain | 21-X-1976 | 4-VI-1987 | R | 3-VIII-1987 | 3 | D15,16 |
| Sri Lanka | | 31-VIII-2000 | A | 1-VI-2001 | 3 | D7,8,10,15 |
| Sweden | 4-II-1969 | 2-VIII-1969 | R | 1-X-1969 | 2 | D5,10 |
| Switzerland | 21-V-1985 | 2-XI-1994 | R | 1-I-1995 | 3 | D,Res1,5,8,10,15 |
| The former Yugoslav Republic of Macedonia | | 23-XII-2008 | A | 1-IX-2009 | 1 | D,Res5,6,8,9,10,15,16,21 |
| Turkey | 11-VI-1968 | 28-II-1972 | R | 28-IV-1972 | 3 | Res,D8,10,15,16 |
| Ukraine | | 1-II-2001 | A | 1-XII-2001 | 3 | D,Res8,10,15,16 |
| United Kingdom of Great Britain and Northern Ireland | 10-XII-1965 | 17-XI-1967 | R | 10-II-1969 | 14 | 4 | D2,5,10,15,16,18 |
| United States of America | 15-XI-1965 | 24-VIII-1967 | R | 10-II-1969 | 1 | 1 | D2,15,16,29 |
| Venezuela | | 29-X-1993 | A | 1-VII-1994 | 1 | D,Res5,8,10,1516 |

## Non-Member States of the Organisation (click here for the Members)

| States | S[1] | R/A/Su [2] | Type [3] | EIF [4] | Ext [5] | Auth [6] | Res/D/N [7] |
|---|---|---|---|---|---|---|---|
| Antigua and Barbuda | | 1-V-1985 | Su | 1-XI-1981 | | 1 | |
| Bahamas | | 17-VI-1997 | A | 1-II-1998 | | 1 | |
| Barbados | | 10-II-1969 | A | 1-X-1969 | | 1 | |
| Belize | | 8-IX-2009 | A | 1-V-2010 | | | |
| Botswana | | 10-II-1969 | A | 1-IX-1969 | | 3 | D5,10,15 |
| Kuwait | | 8-V-2002 | A | 1-XII-2002 | | 3 | D,Res6,8,9,10,15,16,18 |
| Malawi | | 24-IV-1972 | A | 1-XII-1972 | | 1 | |
| Pakistan | | 7-XII-1988 | A | 1-VIII-1989 | | 3 | D8,15,16 |
| Saint Vincent and the Grenadines | | 6-I-2005 | Su | 27-X-1979 | | 3 | D5,10,15 |
| San Marino | | 15-IV-2002 | A | 1-XI-2002 | | 3 | D8,10,15 |
| Seychelles | | 18-XI-1980 | A | 1-VII-1981 | | 1 | D8,10,15,16 |

# EXHIBIT D



# THE SUPREME PEOPLE'S COURT OF THE PEOPLE'S REPUBLIC OF CHINA



**PRC Laws** Posted: 2003-06-03 14:55:53

- Judicial News
- Grand Justices
- Judicial System
- Laws&Regulations
- PRC Laws
- Focus News
- Home



## CIVIL PROCEDURE LAW OF THE PEOPLE'S REPUBLIC OF CHINA

(Adopted on April 9, 1991)

CONTENTS

PART ONE GENERAL PROVISIONS

CHAPTER I THE AIM, SCOPE OF APPLICATION AND BASIC PRINCIPLES

CHAPTER II JURISDICTION

SECTION 1 JURISDICTION BY LEVEL

SECTION 2 TERRITORIAL JURISDICTION

SECTION 3 REFERRAL AND DESIGNATION OF JURISDICTION

CHAPTER III TRIAL ORGANIZATION

CHAPTER IV WITHDRAWAL

CHAPTER V PARTICIPANTS IN PROCEEDINGS

SECTION 1 PARTIES

SECTION 2 AGENTS AD LITEM

CHAPTER VI EVIDENCE

CHAPTER VII TIME PERIODS AND SERVICE

SECTION 1 TIME PERIODS

SECTION 2 SERVICE

CHAPTER VIII CONCILIATION

CHAPTER IX PROPERTY PRESERVATION AND PRELIMINARY EXECUTION

CHAPTER X COMPULSORY MEASURES AGAINST IMPAIRMENT OF CIVIL ACTIONS

CHAPTER XI LITIGATION COSTS

PART TWO TRIAL PROCEDURE

CHAPTER XII ORDINARY PROCEDURE OF FIRST INSTANCE

SECTION 1 BRINGING A SUIT AND ACCEPTING A CASE

SECTION 2 PREPARATIONS FOR TRIAL

SECTION 3 TRIAL IN COURT

SECTION 4 SUSPENSION AND CONCLUSION OF A LAWSUIT

SECTION 5 JUDGMENT AND ORDER

CHAPTER XIII SUMMARY PROCEDURE

CHAPTER XIV PROCEDURE OF SECOND INSTANCE

CHAPTER XV SPECIAL PROCEDURE

SECTION 1 GENERAL STIPULATIONS

SECTION 2 CASES CONCERNING CREDENTIALS OF VOTERS

SECTION 3 CASES CONCERNING THE PROCLAMATION OF A PERSON AS MISSING OR DEAD

SECTION 4 CASES CONCERNING THE DETERMINATION OF A CITIZEN AS INCOMPETENT OR WITH LIMITED CAPACITY FOR CIVIL CONDUCT

SECTION 5 CASES CONCERNING THE DETERMINATION OF A PROPERTY AS OWNERLESS

CHAPTER XVI PROCEDURE FOR TRIAL SUPERVISION

CHAPTER XVII SUMMARY PROCEDURE FOR RECOVERING A DEBT

CHAPTER XVIII PROCEDURE FOR PUBLIC INVITATION TO ASSERT CLAIMS

CHAPTER XIX PROCEDURE FOR THE BANKRUPTCY REPAYMENT OF ENTERPRISES AS LEGAL PERSONS

PART THREE PROCEDURE OF EXECUTION

CHAPTER XX GENERAL STIPULATIONS

CHAPTER XXI APPLICATION FOR AND REFERRAL OF EXECUTION

CHAPTER XXII EXECUTION MEASURES

CHAPTER XXIII SUSPENSION AND CONCLUSION OF EXECUTION

PART FOUR SPECIAL STIPULATIONS FOR CIVIL PROCEDURES INVOLVING FOREIGN INTERESTS

CHAPTER XXIV GENERAL PRINCIPLES

CHAPTER XXV JURISDICTION

CHAPTER XXVI SERVICE AND TIME PERIODS

CHAPTER XXVII PROPERTY PRESERVATION

CHAPTER XXVIII ARBITRATION

CHAPTER XXIX JUDICIAL ASSISTANCE

PART ONE GENERAL PROVISIONS

CHAPTER I THE AIM, SCOPE OF REGULATION AND BASIS PRINCIPLES

Article 1. The Civil Procedure Law of the People's Republic of China is formulated on the basis of the Constitution and in the light of the experience and actual conditions of our country in trying civil cases.

Article 2. The aim of the Civil Procedure Law of the People's Republic of China is to protect the exercise of the litigation rights of the parties, ensure that the people's courts ascertain facts, distinguish right from wrong, apply the law correctly, try civil cases promptly, affirm the rights and obligations in civil affairs, impose sanctions for civil wrongs, protect the lawful rights and interests of the parties, educate citizens to

voluntarily abide by the law, maintain the social and economic order, and guarantee the smooth progress of the socialist construction.

Article 3. The provisions of this Law shall be applicable to civil lawsuits concerning disputes over the status of property and persons among citizens, legal persons or other organizations respectively and mutually between citizens, legal persons and other organizations.

Article 4. All those who engage in civil lawsuits within the territory of the People's Republic of China must abide by this Law.

Article 5. Foreign nationals, stateless persons, foreign enterprises and organizations that institute or respond to prosecutions in the people's courts shall have the same litigation rights and obligations as citizens, legal persons and other organizations of the People's Republic of China.

Should the courts of a foreign country impose restrictions on the civil litigation rights of the citizens, legal persons and other organizations of the People's Republic of China, the people's courts of the People's Republic of China shall follow the principle of reciprocity regarding the civil litigation rights of the citizens, enterprises and organizations of that foreign country.

Article 6. The people's courts shall exercise the judicial authority with respect to civil cases.

The people's courts shall try civil cases independently in accordance with the law, and shall not be subject to interference by an administrative organ, public organization or individual.

Article 7. In conducting civil proceedings, the people's courts must base themselves on facts and take the law as the criterion.

Article 8. The parties to a civil lawsuit shall have equal litigation rights. The people's courts shall, in conducting civil proceedings, guarantee and faciliate the exercise of litigation rights by the parties, and apply the law equally to the parties.

Article 9. In conducting civil proceedings, the people's courts shall carry out conciliation in accordance with the principles of voluntariness and lawfulness; if conciliation efforts are ineffective, they shall render judgments without delay.

Article 10. In handing civil cases, the people's courts shall, as provided for by law, apply the systems of collegial panel, withdrawal of judicial personnel, public trial, and the system whereby the second hearing is final.

Article 11. Citizens of all nationalities shall have the right to use their native spoken and written languages in civil proceedings.

Where people of a minority nationality live in a concentrated community or where a number of nationalities live together in one area, the people's courts shall conduct hearings and issue legal documents in the spoken and written languages commonly used by the local nationalities.

The people's courts shall provide translations for any participant in the court proceedings who is not familiar with the spoken or written languages commonly used by the local nationalities.

Article 12. In the trial of civil cases by the people's court, the parties shall have the right to engage in argument.

Article 13. The parties to a civil lawsuit shall be entitled, within the scope stipulated by law, to dispose of their rights in civil affairs and their litigation rights.

Article 14. The people's procuratorates shall have the right to exercise legal supervision over the civil proceedings.

Article 15. If the civil rights and interests of the state, a collective or an individual have been infringed, a state organ, public organization, enterprise or institution may support the injured unit or individual to initiate legal action in a people's court.

Article 16. The people's conciliation committees shall be mass organizations to conciliate civil disputes, which are to function under the guidance of the grass-roots people's governments and the basic people's courts.

A people's conciliation committee shall conduct conciliation in accordance with legal provisions and the principle of voluntariness. The parties concerned shall execute the agreement reached in conciliation: those who refuse a conciliation or those for whom a conciliation has failed or those who have retracted from a conciliation agreement may initiate legal proceedings in a people's court.

If a people's conciliation committee violates the law in conciliating civil disputes, a people's court shall make corrections.

Article 17. The people's congresses of the national autonomous areas may formulate adoptive or supplementary provisions in accordance with the principles of the Constitution and this Law and with the specific circumstances of the local nationalities. Such provisions made by an autonomous region shall be submitted to the Standing Committee of the National People's Congress for approval. The provisions made by an autonomous prefecture or autonomous county shall be submitted to the standing committee of the people's congress of the relevant autonomous region or province for approval and to the Standing Committee of the National People's Congress for the record.

CHAPTER II JURISDICTION

SECTION 1 JURISDICTION BY LEVEL

Article 18. The basic people's courts shall have jurisdiction as courts of first instance over civil cases, unless otherwise stipulated in this Law.

Article 19. The intermediate people's courts shall have jurisdiction as courts of first instance over the following civil cases:

(1) major cases involving foreign interests;

(2) cases that have major impact on the area under their jurisdiction; and

(3) cases under the jurisdiction of the intermediate people's courts as determined by the Supreme People's Court.

Article 20. The higher people's courts shall have jurisdiction as courts of first instance over civil cases that have major impact on the areas under their jurisdiction.

Article 21. The Supreme People's Court shall have jurisdiction as the court of first instance over the following civil cases:

(1) cases that have major impact on the whole country; and

(2) cases that the Supreme People's Court deems it should try.

SECTION 2 TERRITORIAL JURISDICTION

Article 22. A civil lawsuit brought against a citizen shall be under the jurisdiction of the people's court in the place where the defendant has his domicile; if the defendant's domicile is different from his habitual residence, the lawsuit shall be under the jurisdiction of the people's court in the place of his habitual residence.

A civil lawsuit brought by a serviceman against a civilian shall be under the jurisdiction of the people's court in the place where the defendant has his domicile.

A civil lawsuit brought against a legal person or any other organization shall be under the jurisdiction of the people's court in the place where the defendant has its domicile.

Where the domiciles or habitual residences of several defendants in the same lawsuit are in the areas under the jurisdiction of two or more people's courts, all of those people's courts shall have jurisdiction over the lawsuit.

Article 23. The civil lawsuits described below shall be under the jurisdiction of the people's court in the place where the plaintiff has his domicile; if the plaintiff's domicile is different from his habitual residence, the lawsuit shall be under the jurisdiction of the people' court in the place of the plaintiff's habitual residence. The relevant lawsuits are:

(1) those brought by civilians against servicemen;

(2) those concerning the status of persons not residing within the territory of the People's Republic of China;

(3) those concerning the status of persons whose whereabouts have been unknown or who have been declared as missing.

(4) those against persons who are undergoing rehabilitation through labour; and

(5) those against persons who are undergoing imprisonment.

Article 24. A lawsuit initiated for a contract dispute shall be under the jurisdiction of the people's court in the place where the defendant has his domicile or where the contract is performed.

Article 25. The parties to a contract may choose through agreement stipulated in the written contract the people's court in the place where the defendant has his domicile, where the contract is performed, where the contract is signed, where the plaintiff has his domicile or where the object of the action is located to have jurisdiction over the case, provided that the provisions of this Law regarding jurisdiction by level and exclusive jurisdiction shall not be violated.

Article 26. A lawsuit initiated for an insurance contract dispute shall be under the jurisdiction of the people's court in the place where the defendant has his domicile or where the insured object is located.

Article 27. A lawsuit initiated for a bill dispute shall be under the jurisdiction of the people's court in the place where the bill is paid or where the defendant has his domicile.

Article 28. A lawsuit initiated for a dispute over railway, highway, water, or air transport or through transport contract shall be under the jurisdiction of the people's court in the place where the transport started or ended or where the defendant has his domicile.

Article 29. A lawsuit initiated for an infringing act shall be under the jurisdiction of the people's court in the place where the infringing act took place or where the defendant has his domicile.

Article 30. A lawsuit concerning claims for damages caused by a railway, highway, water or aviation accident shall be under the jurisdiction of the people's court in the place where the accident took place or where the vehicle or ship first arrived after the accident or where the aircraft first landed after the accident, or where the dependent has his domicile.

Article 31. A lawsuit initiated for damages caused by a ship collision or any other maritime accident shall be under the jurisdiction of the people's court in the place where the collision took place or where the collision ship first docked after the accident or where the ship at fault was detained, or where the defendant has his domicile.

Article 32. A lawsuit initiated for maritime salvage shall be under the jurisdiction of the people's court in the place where the salvage took place or where the salvaged vessel first docked after the disaster.

Article 33. A lawsuit initiated for general average shall be under the jurisdiction of the people's court in the place where the ship first docked after the general average took place or the adjustment thereof was conducted or where the voyage ended.

Article 34. The following cases shall be under the exclusive jurisdiction of the people's courts herein specified:

(1) A lawsuit initiated for real estate shall be under the jurisdiction of the people's court in the place where the estate is located;

(2) A lawsuit concerning harbour operations shall be under the jurisdiction of the people's court in the place where the harbour is located; and

(3) A lawsuit concerning an inheritance shall be under the jurisdiction of the people's court in the place where the decedent had his domicile upon his death, or where the principal part of his estate is located.

Article 35. When two or more people's courts have jurisdiction over a lawsuit, the plaintiff may bring his lawsuit in one of these people's courts; if the plaintiff brings the lawsuit in two or more people's courts that have jurisdiction over the lawsuit, it shall be handled by the people's courts that first files the case.

SECTION 3 REFERRAL AND DESIGNATION OF JURISDICTION

Article 36. If a people's court discovers that a case it has accepted is not under its jurisdiction, it shall refer the case to the people's court that does have jurisdiction over the case. The people's court to which a case has been referred shall accept the case, and if it considers that, according to relevant regulations, the case referred is not under its jurisdiction, it shall report to a superior people's court for the designation of jurisdiction and shall not independently refer it again to another people's court.

Article 37. If a people's court which has jurisdiction over a case is unable to exercise the jurisdiction for special reasons, a superior people's court shall designate another court to exercise the jurisdiction.

In the event of a jurisdictional dispute between various people's courts, it shall be resolved by the disputing parties through consultation; if the dispute cannot be resolved through consultation, it shall be reported to a people's court superior to both disputing parties for the designation of jurisdiction.

Article 38. Should any party hold an objection to the jurisdiction of a case after its acceptance by a people's court, the party shall raise the objection during the term for filing the bill of defence. The people's court shall examine such objection. If the objection is tenable, the people's court shall order that the case be transferred to the people's court that does have jurisdiction over the case; if the objection is untenable, the people's court shall order to turn it down.

Article 39. People's courts at higher levels shall have the authority to try civil cases over which people's courts at lower levels have jurisdiction as courts of first instance; they may also transfer civil cases over which they themselves have jurisdiction as courts of first instance to people's courts at lower levels for trial.

If a people's court at a lower level deems it necessary for a civil case of first instance under its jurisdiction to be tried by a people's court at a higher level, it may request such a people's court to try the case.

CHAPTER III TRIAL ORGANIZATION

Article 40. Civil cases of first instance shall be tried in a people's court by a collegial panel consisting of both judges and assessors or of judges alone. The collegial panel must have an odd number of members.

Civil cases to which summary procedure is applied shall be tried by a single judge alone.

When carrying out their duties as assessors, the assessors shall have equal rights and obligations with the judges.

Article 41. Civil cases of second instance shall be tried in a people's court by a collegial panel of judges. The collegial panel must have an odd number of members.

When retrying a case remanded by a people's court of second instance, the people's court of first instance shall form a new collegial panel in accordance with the procedure of first instance.

If a case for retrial was originally tried at first instance, a new collegial panel shall be formed according to the procedure of first instance; if the case was originally tried at second instance or was removed to a people's court at a higher level for trial, a new collegial panel shall be formed according to the procedure of second instance.

Article 42. The president of the court or the chief judge of a division shall designate a judge to serve as the presiding judge of the collegial panel; if the president or the chief judge participates in trial, he himself shall serve as the presiding judge.

Article 43. When deliberating a case, a collegial panel shall observe the principle that the minority shall defer to the majority. The deliberations shall be recorded in writing, and the transcript shall be signed by the members of the collegial panel. Diverging opinions in the deliberations must be truthfully entered in the transcript.

Article 44. The judicial personnel shall handle the case impartially and in accordance with the law.

The judicial personnel shall not accept a treat or gift of the parties of their agents ad litem.

Any judicial personnel who commits embezzlement, accepts bribes, practices malpractice for personal benefits or perverts the law in making judgment shall be pursued for legal responsibility; if a crime is constituted, the offender shall be investigated for criminal responsibility according to law.

CHAPTER IV WITHDRAWAL

Article 45. A member of the judicial personnel in any of the following circumstances must withdraw, and the parties to the case shall also have the right to request, orally or in writing, that he withdraw.

The relevant circumstances are:

(1) he is a party or a near relative of a party to the case or a near relative of an agent ad litem in the case;

(2) he has a personal interest in the case; or

(3) he has some other relationship with a party to the case that could influence the impartial handling of the case.

The above provisions shall also apply to clerks, interpreters, expert witnesses and inspectors.

Article 46. When a party requests the withdrawal of a member of the judicial personnel, he shall explain the reason for this request and submit the request at the beginning of the proceedings; the request may also be submitted before the end of court debate if the reason for the withdrawal becomes known only after the beginning of the proceedings.

Pending a decision on withdrawal by the people's court, personnel who has been requested to withdraw shall temporarily suspend his participation in the proceedings of the case, but with the exception of cases that require the adoption of emergency measures.

Article 47. The withdrawal of a court president who serves as the presiding judge shall be decided by the judicial committee; the withdrawal of judicial personnel shall be decided by the court president; the withdrawal of other personnel shall be decided by the presiding judge.

Article 48. The decision of a people's court on a request for withdrawal shall be made orally or in writing within three days after the request was made. If a party is not satisfied with the decision, it may apply for reconsideration which could be granted only once. During the period of reconsideration, personnel who has been requested to withdraw shall not suspend his participation in the proceedings. The decision of a people's court on an application for reconsideration shall be made within three days after receiving the application and the person who has made the application for reconsideration shall be notified of the decision.

CHAPTER V PARTICIPANTS IN PROCEEDINGS

SECTION 1 PARTIES

Article 49. Any citizen, legal person or any other organization may become a party to a civil lawsuit.

Legal persons shall be represented by their legal representatives in litigation. Other organizations shall be represented by their principal leading personnel in litigation.

Article 50. The parties shall have the right to appoint agents, request withdrawals, collect and provide evidence, engage in debate, request conciliation, file an appeal and apply for execution.

The parties may consult the materials relating to the court proceedings of the case and copy the materials and other legal documents pertaining to the case. However, materials involving state secrets, trade secrets or the private affairs of individuals shall be exceptions.

The parties must exercise their litigation rights in accordance with the law, observe litigation procedures and carry out legally effective written judgments or orders and conciliation statements.

Article 51. The two parties may reach a compromise on their own.

Article 52. The plaintiff may relinquish or modify his claim. The defendant may confirm or repudiate the claim and shall have the right to file a counterclaim.

Article 53. When one party or both parties consist of two or more persons, the object of action is the same or of the same category and the people's court considers that, subject to the consent of the parties, the lawsuit can be tried together, a joint lawsuit shall be constituted.

If the individuals constituting a party to a joint lawsuit have common rights and obligations with respect to the object of action and the act of litigation of one person is recognized by the others of his party, such act shall be effective for all the other members of his party; if the individuals in one party do not have common rights and obligations with respect to the object of action, then the act of litigation of one person shall have no effect on the others of his party.

Article 54. A joint lawsuit in which one party is numerous may be brought by representatives selected by and from the party. The act of litigation of such representatives shall be effective for all members of the party they represent. However, confirmation, modification or waiver of claims of action or confirmation of the claims of the other party or institution of a compromise by the representatives shall be subject to the approval of the party they represent.

Article 55. With respect to a case in which the object of action is of the same category and one party is numerous and of an uncertain number upon institution of the lawsuit, the people's court may issue a public notice, stating the particulars and claims of the case and informing claimants to file at the people's court within a fixed period of time.

Claimants who have filed at the people's court may select representatives from among themselves to engage in litigation; if such representatives cannot be created through selection, they may be decided by the people's court through negotiation with the claimants who have filed at the court. The act of litigation of such representatives shall be effective for the party they represent. However, modification or waiver of claims of action or confirmation of the claims of the other party or institution of a compromise by the representatives shall be subject to the approval of the party they represent.

The judgments or orders rendered by the people's court shall be effective for all the claimants who have filed at the court. The same judgments or orders shall be binding on the claimants who have not filed at the court but instituted legal proceedings during the limitation of action.

Article 56. If a third party considers that it has an independent claim to the object of action of both parties, it shall have the right to bring an action.

If a third party has no independent claim to the object of action of both parties, however, the outcome of the case will affect its interest legally, it may file a request to participate in the proceedings or the people's court shall notify it to participate. A third party that is to bear civil liability as judged by the people's court shall have the litigation rights of a party.

SECTION 2 AGENTS AD LITEM

Article 57. Any person with no capacity to engage in litigation shall have his guardians as agents ad litem to represent him in a lawsuit. If the agents ad litem try to shift their responsibilities as agents ad litem onto one another, the people's court shall appoint one of them to represent the principal in litigation.

Article 58. Each party or legal representative may appoint one or two persons to act as his agents at litem.

A party's near relative, a lawyer, a person recommended by a relevant public organization or the unit to which a party belongs or any other citizen approved by the people's court may be entrusted as the party's agent ad litem.

Article 59. When a person entrusts another to act on his behalf in litigation, he must submit to the people's court a power of attorney bearing his signature or seal.

The power of attorney must specify the matter and limits of authority entrusted. An agent ad litem must possess special authorization from his principal to confirm, relinquish or modify the claim or to institute a compromise or file a counterclaim or an appeal.

A power of attorney mailed or delivered care of others by a citizen of the People's Republic of China residing abroad must be certified by the Chinese embassy or consulate in that country. If there is no Chinese embassy or consulate in that country, the power of attorney must be certified by an embassy or a consulate of a third state that has diplomatic relations with the People's Republic of China stationed in the country, and then transferred for verification to the embassy or consulate of the People's Republic of China stationed in that third state, or by a local patriotic overseas Chinese organization.

Article 60. A party shall inform the people's court in writing if it changes or revokes the authority of an agent ad litem, and the court shall notify the other party of the change or revocation.

Article 61. a lawyer who serves as an agent ad litem shall have the right to investigate and collect evidence, and may consult materials pertaining to the case in accordance with relevant regulations. However, if such materials involve state secrets, trade secrets or the private affairs of individuals, he must keep the confidential information from the parties concerned and others.

Other agents ad litem shall have the right to investigate and collect evidence and may also consult the materials pertaining to the court proceedings of the case, except those that involve state secrets, trade secrets, or the private affairs of individuals.

Article 62. The parties to a divorce case which has been entrusted to agents ad litem shall also appear in court in person, unless they are incapable of presenting their own case. A party who is truly unable to appear in court due to a special reason shall submit his or hear opinion in writing to the people's court.

CHAPTER VI EVIDENCE

Article 63. Evidence shall be classified as follows:

(1) documentary evidence;

(2) material evidence;

(3) audio-visual reference material;

(4) testimony of witnesses;

(5) statements of the parties;

(6) expert conclusions; and

(7) records of inquests.

Any of the above-mentioned evidence must be verified before it can be taken as a basis for ascertaining a fact.

Article 64. A party shall have the responsibility to provide evidence in support of its own propositions.

With respect to the evidence that the party and its agent ad litem are unable to obtain themselves because of objective reasons or that the people's court considers necessary for the trial of the case, the people's court shall investigate and collect it on its own initiative.

The people's court shall, in accordance with the procedure prescribed by law, collect and examine evidence comprehensively and objectively.

Article 65. The people's court shall have the authority to obtain evidence from the relevant units or individuals, and such units or individuals may not refuse to provide evidence.

The people's court shall verify and determine the validity of documentary evidence provided by relevant units or individuals.

Article 66. Evidence shall be presented in the court and cross- examined by the parties, however, evidence that involves state secrets, trade secrets or the private affairs of individuals shall not be presented in an open court session.

Article 67. The people's court shall take the legal acts, legal facts and documents notarized according to legal procedures as basis for ascertaining facts, except when there is contrary evidence sufficient to invalidate the notarial certification.

Article 68. Any document submitted as evidence shall be the original one. Material evidence shall also be original. If it is truly difficult to present the original document or material, then reproductions, photographs, duplicates or extracts of the original may be submitted.

If a document in a foreign language is submitted as evidence, a Chinese translation must be appended.

Article 69. The people's court shall verify audio-visual materials and determine after examination whether they can be taken as a basis for ascertaining the facts.

Article 70. All units and individuals who have information about a case shall have the obligation to give testimony in court. Responsible persons of relevant units shall encourage the witnesses to give testimony. When it would be truly difficult for a witness to appear in court, he may, with the approval of the people's court, submit a written testimony.

Any person who is unable to express his will properly shall not testify.

Article 71. The people's court shall examine the statements of the parties in connection with the other evidence in the case to determine whether the statements can be taken as a basis for ascertaining the facts.

The refusal of a party to make a statement shall not prevent the people's court from ascertaining the facts of a case on the basis of other evidence.

Article 72. when the people's court deems it necessary to make an evaluation of a specialized problem, it shall refer the problem to an authentication department authorized by law for the evaluation. In the absence of such department, the people's court shall appoint an authentication department to make the evaluation.

The authentication department and the expert witness designated by the department shall have the right to consult the case materials necessary for the evaluation and direct inquiries to the parties and witnesses when circumstances require.

The authentication department and expert witness shall present a written conclusion of the evaluation and affix his seal or signature to it. With respect to an evaluation made by an expert witness, the unit to which the expert witness belong shall certify his status by affixing its seal to the expert conclusion.

Article 73. When inspecting material evidence or a site, the inspector must show his credentials issued by a people's court. He shall request a local grassroots organization or the unit concerned to send persons to participate in the inquest. The party concerned or an adult member of his family shall be present; their refusal to appear on the scene shall not prevent the inquest from proceeding.

Upon notification by the people's court, the relevant units and individuals shall have the obligation to preserve the site and assist in the inquest.

The inspector shall prepare a written record of the circumstances and results of the inquest. The inspector, the party concerned and the requested participants shall affix their signatures or seals to the record.

Article 74. Under circumstances where there is a likelihood that evidence may be destroyed or lost or difficult to obtain later on, the participants in proceedings may apply to the people's court for the evidence to be preserved. The people's court may also on its own initiative take measures to preserve such evidence.

CHAPTER VII TIME PERIODS AND SERVICE

SECTION 1 TIME PERIODS

Article 75. Time periods shall include those prescribed by law and those designated by a people's court.

Time periods shall be calculated by the hour, the day, the month and the year. The hour and day from which a time period begins shall not be counted as within the time period.

If the expiration date of a time period falls on a holiday, then the day immediately following the holiday shall be regarded as the expiration date.

A time period shall not include traveling time. A litigation document that is mailed before a deadline shall not be regarded as overdue.

Article 76. If a party fails to meet a deadline due to force majeure or for other justified reasons, he may apply for an extension of the time limit within 10 days after the obstacle is removed. The requested extension shall be subject to approval by a people's court.

SECTION 2 SERVICE

Article 77. A receipt shall be required for every litigation document that is served and it shall bear the signature or seal of the recipient of the service and the date of receipt.

The date of receipt as signed by the recipient of the service shall be regarded as the date the document is served.

Article 78. Litigation documents shall be served directly on the recipient of the service. If the recipient of the service is a citizen, the documents shall, in the case of his absence, be receipted by an adult member of his family living with him. If the recipient of the service is a legal person or any other organization, the document shall be receipted by the legal representatives of the legal person or the principle leading personnel of any other organization or the personnel of the legal person or any other organization in charge of receiving such documents; If the recipient of the service has an agent ad litem, the documents may be receipted by the agent ad litem. If the recipient of the service has designated an agent to receive his litigation documents and has informed the people's court of it, the documents may be receipted by the agent.

The date of receipt as signed by the adult family member living with the recipient of service, or persons in charge of receiving documents of legal persons or other

organizations, or agents ad litem, or agents designated to receive his documents shall be regarded as the date the document is served.

Article 79. If the recipient of the service of a litigation document or the adult family member living with him refuses to accept a legal document, the person serving the document shall ask representatives from the relevant grassroots organization or the unit to which the recipient of the service belongs to appear on the scene, explain the situation to them, and record on the receipt the particulars of the refusal and the date of it. After the person serving the document and the witnesses have affixed their signatures or seals to the receipt, the document shall be left at the place where the recipient of the service stays and the service shall be considered completed.

Article 80. If direct service of a litigation document proves difficult, service of the document may be entrusted to another people's court, or it may be served by post. If a document is served by post, the date as stated on the receipt shall be regarded as the date the document is served.

Article 81. If the recipient of the service is in the military, the document shall be forwarded to him by the political organ at or above the regimental level in the unit to which he belongs.

Article 82. If the recipient of the service is undergoing imprisonment, the document shall be forwarded to him by the prison or unit of reform through labour where he is serving his term.

If the recipient of the service is undergoing rehabilitation through labour, the document shall be forwarded to him by the unit supervising his rehabilitation through labour.

Article 83. Any organization or unit that receives a litigation document to be forwarded must immediately deliver it to the recipient of the service for a receipt. The date as stated on the receipt shall be regarded as the date the document is served.

Article 84. If the whereabouts of a recipient of the service is unknown, or if a document cannot be served by the other methods mentioned in this section, the document shall be served by public announcement. Sixty days after the date of the public announcement, the document shall be deemed to have been served.

The reasons for service by public announcement and the procedures taken shall be recorded in the case files.

CHAPTER VIII CONCILIATION

Article 85. In handling civil cases, the people's court shall distinguish between right and wrong and conduct conciliation on the basis of the principle of voluntariness of the parties and evident facts.

Article 86. When a people's court conducts a conciliation, a single judge or a collegial panel may preside. Conciliations shall be conducted locally whenever possible.

When a people's court conducts a conciliation, it may employ simplified methods to notify the parties and witnesses to appear in court.

Article 87. When a people's court conducts a conciliation, it may request the assistance of units or individuals concerned. The requested units or individuals shall assist the people's court in conducting the conciliation.

Article 88. A conciliation agreement must be based on voluntariness of both parties, and shall not be reached through compulsion. The content of the conciliation agreement may not contravene the law.

Article 89. When a conciliation agreement is reached, the people's court shall draw up a conciliation statement. A conciliation statement shall clearly set forth the claims of the action, the facts about the case, and the result of the conciliation.

The conciliation statement shall be signed by the judge and the court clerk, sealed by the people's court, and served on both parties.

Once the conciliation statement is receipted and signed by both parties, it shall become legally effective.

Article 90. The people's court need not draw up a conciliation statement for the following cases when an agreement is reached through conciliation:

(1) cases of divorce in which both parties have become reconciled after conciliation;

(2) cases in which adoptive relationship has been maintained through conciliation;

(3) cases in which the claims can be immediately satisfied; and

(4) other cases that do not require conciliation statements.

Any agreement that does not require a conciliation statement shall be entered into the written record and shall become legally effective after being signed or sealed by both parties, the judge and the court clerk.

Article 91. If no agreement is reached through conciliation or if one party retracts from his consent before the conciliation statement is served, the people's court shall render a judgment without delay.

CHAPTER IX PROPERTY PRESERVATION AND PRELIMINARY EXECUTION

Article 92. If it becomes impossible or difficult to execute a judgment because of the acts of one of the parties or for other reasons, the people's court may, at the request of the other party, order that property preservation be adopted. In the absence of such request, the people's court may, when necessary, also order to adopt property preservation measures.

When a people's court has decided to adopt property preservation, it may instruct the applicant to provide a surety; if the applicant fails to do so, his application shall be rejected.

After receiving a party's application, if the case is urgent, the people's court must make an order within 48 hours concerning property preservation; if property preservation is granted by an order, implementation thereof shall begin immediately.

Article 93. Any interested party whose lawful rights and interests, due to urgent circumstances, would suffer unremediable harms without immediately applying for property preservation, may, before filing the lawsuit, apply to the people's court for the adoption of property preservation measures. The applicant shall provide a surety; if the applicant fails to do so, his application shall be rejected.

After receiving a party's application, the people's court must make an order within 48 hours concerning property preservation; if property preservation is granted by an order, the implementation thereof shall begin immediately. If the applicant fails to bring an action within 15 days after the people's court has adopted the preservation measures, the people's court shall cancel the property preservation.

Article 94. Property preservation shall be limited to the scope of the claim or to the property relevant to the case.

Property preservation shall be carried out by sealing up,. distraining, freezing or other methods as prescribed by law.

should the people's court freeze a property, it shall notify the person against whom the application is made.

Property that has already been sealed up or freezed shall not be sealed up or freezed again.

Article 95. If the applicant against whom the application is made provides a surety, the people's court shall cancel the property preservition.

Article 96. If the application is wrongfully made, the applicant shall compensate the person against whom the application is made for any loss incurred from property preservation.

Article 97. The people's court may, at the request of the parties concerned, order preliminary execution in respect to the following cases:

(1) those involving claims for alimony, support for children or elders, pension for the disabled or the family of a decedent, or expenses for medical care;

(2) those involving claims for remuneration for labour; and

(3) those involving urgent circumstances that require preliminary execution.

Article 98. Cases in which preliminary execution is ordered by the people's court shall meet the following conditions:

(1) the relationship of rights and obligations between the parties is definite, and denial of preliminary execution would seriously affect the life or business of the applicant; and

(2) the person against whom the application is made is capable of fulfilling the obligations involved in the preliminary execution.

The people's court may instruct the applicant to provide a surety; if the applicant fails to do so, his application shall be rejected. If the applicant loses the lawsuit, he shall compensate the person against whom the application is made for any loss of property incurred from the preliminary execution.

Article 99. If a party is not satisfied with the order on property preservation or preliminary execution, it may apply for reconsideration which could be granted only one. Implementation of the order shall not be suspended during the time of reconsideration.

CHAPTER X COMPULSORY MEASURES AGAINST IMPAIRMENT OF CIVIL ACTIONS

Article 100. If a defendant is required to appear in court, but, having been served twice with subpoena, still refuses to do so without justified reason, the people's court may summon him to court by a warrant.

Article 101. Participants in proceedings and other persons shall abide by the court rules.

Should any person violate the court rules, the people's court may reprimand him and order him to leave the court, or impose a fine or detention on him.

With respect to any person who seriously disrupts the court procedure by making an uproar in the court or assaulting the courtroom, or insulting, slandering, threatening, or beating the judicial personnel, the people's court shall investigate for criminal responsibility according to law; if the circumstances are minor, a fine or detention may be imposed on the offender.

Article 102. If a participant in the proceedings or any other person commits any of the following acts, the people's court shall, in accordance with the law, investigate for criminal responsibility; if the circumstances are minor and do not constitute a crime, the offender shall be fined or detained:

(1) forging or destroying significant evidence, which would obstruct the trial of a case by the people's court;

(2) using violence, threats or subornation to hinder a witness from giving testimony, or instigating, suborning, or coercing others to commit perjury;

(3) concealing, transferring, selling or destroying property that has been sealed up or distrained, or that has been made an inventory of and has been put under his care according to instruction, or transferring the property that has been freezed;

(4) insulting, slandering, incriminating with false charges, beating up or retaliating against judicial personnel, participants in proceedings, witnesses, interpreters, experts, inspectors, or personnel assisting in execution; or

(5) using violence, threats or other means to hinder judicial personnel from performing their duties; or

(6) refusing to comply with the legally effective judgments or orders of the people's court.

Article 103. With respect to a unit under an obligation to assist in investigation and execution that commits any of the following acts, the people's court may, apart from instructing it to perform its obligation to assist, also impose a fine:

(1) refusing or obstructing, by units concerned, investigations and collection of evidence made by the people's court;

(2) after receiving a notification on assistance in execution from the people's court, refusing by banks, credit cooperatives or other units dealing with savings deposits to assist in inquiring, freezing or transferring relevant deposit.

(3) after receiving a notification on assistance in execution from the people's court, refusing by units concerned to assist in withholding the income of the party subject to execution, handling formalities for transferring relevant certificates and passing on relevant negotiable instrument, certificates, or other property; or

(4) refusing to provide other orbligatory assistance in execution.

With respect to a unit that commits any of the acts specified in the preceding paragraph, the people's court may impose a fine on the principal leading personnel of the unit or the person directly responsible. The people's court may also put forward a proposal on the imposition of disciplinary sanctions to the supervisory organ and organs concerned.

Article 104. A fine on an individual shall be not more than Renminbi, 1, 000 yuan. A fine on a unit shall be not less than Renminbi 1,000 yuan and not more than Renminbi 30,000 yuan.

A detention period shall be not longer than 15 days.

The people's court shall deliver detained persons to a public security organ for custody. The people's court may decide to grant the detained person an early release if he admits and corrects his wrongdoing.

Article 105. Imposition of summons by warrant, fine or detention shall be subject to approval of the president of a people's court. Warrants shall be issued for carrying out summonses by warrant.

Letters of decision shall be issued for fines and detentions. If an offender is not satisfied with the decision, he may apply to a people's court at a higher level for reconsideration that could be granted only once. The execution of the decision shall not be suspended during the time of reconsideration.

Article 106. Decision on the adoption of compulsory measures against impairment of civil actions shall be made by the people's court. Any unit or individual that extorts a debt by illegitimate detention of a person or illegal distrainment of a property shall be *investigated for criminal responsibility according to law, or shall be punished with a detention or fine.

CHAPTER XI LITIGATION COSTS

Article 107. Any party filing a civil lawsuit shall pay a case acceptance fee in accordance with relevant regulations. With respect to cases concerning property, the party shall pay other litigation costs, in addition to case acceptance fee.

Parties that have true difficulty in paying litigation costs may, in accordance with relevant regulations, apply to the people's court for suspension or reduction of or exemption from the payment.

Procedures for the payment of litigation costs shall be formulated separately.

PART TWO TRIAL PROCEDURE

CHAPTER XII ORDINARY PROCEDURE OF FIRST INSTANCE

SECTION 1 BRINGING A SUIT AND ACCEPTING A CASE

Article 108. The following conditions must be met when a suit is brought:

(1) the plaintiff must be an individual, legal person or any other organization that has a direct interest in the case;

(2) there must be a specific defendant;

(3) there must be a concrete claim, a factual basis, and a cause for the suit; and

(4) the suit must be within the scope of acceptance for civil lawsuits of the people's courts and within the specific jurisdiction of the people's court where it is filed.

Article 109. When bringing a suit, a bill of complaint shall be submitted to the people's court, and copies of the bill shall be prepared according to the number of defendants.

If a plaintiff has true difficulty in writing a bill of complaint, he may lodge his complaint orally, and the court shall transcribe it and inform the other party.

Article 110. A bill of complaint shall clearly set forth the following:

(1) the name, sex, age, ethnic status, occupation, work unit and address of each person who is a party to the case or, if a party is a legal person or any. other organization, its name, address and legal representative's or principal leading personnel's name and position;

(2) the claim of the lawsuit and the facts and grounds on which the lawsuit is based; and

(3) any evidence and its source, as well as the names and addresses of witnesses.

Article 111. The people's court must accept the lawsuits filed in conformity with the provisions of Article 109 of this Law. With respect to lawsuits described below, the people's court shall handle them according to their specific circumstances:

(1) With respect to those within the scope of acceptance for administrative lawsuits in accordance with the provisions of the Administrative Procedure Law, the people's court shall notify the plaintiff to institute an administrative lawsuit;

(2) According to legal provisions, if both parties have on voluntary basis reached a written agreement on arbitration concerning contract disputes that they shall apply to an arbitration agency for arbitration, and may not institute legal proceedings in a people's court, the people's court shall notify the plaintiff to apply to an arbitration agency for arbitration;

(3) With respect to disputes which, according to law, should be handled by other organs, the people's court shall notify the plaintiff to apply to the relevant organ for settlement;

(4) With respect to cases that are not under its jurisdiction, the people's court shall notify the plaintiff to bring a lawsuit in the competent people's court;

(5) With respect to cases in which a judgment or order has already taken legal effect, but one party again brings a suit, the people's court shall notify that party to file an appeal instead, with the exception of those cases in which an order is rendered by the people's court allowing the withdrawal of an action;

(6) If cases that are not permitted by law to be filed within a specified period are filed during the same period, they shall not be accepted;

(7) If a divorce suit in which a judgment has been made not granting the divorce, or in which both parties have become reconciled after conciliation, or in which the plaintiff has withdrawn the suit, or any suit concerning adoptive relationship in which a judgment has been made or conciliation conducted to maintain the adoptive relationship is refiled within six months without new developments and reasons, it shall not be accepted, unless the suit is brought by the defendant of the original case.

Article 112. When a people's court receives a bill of complaint or an oral complaint and finds after review that it meets the requirements for acceptance, it shall file the

case within seven days and notify the parties concerned; if the complaint does not meet the requirements for acceptance, the court shall within seven days order that the complaint be rejected. If the complainant has an objection against the order, he may file an appeal.

SECTION 2 PREPARATIONS FOR TRIAL

Article 113. The people's court shall send a copy of the bill of complaint to the defendant within five days from its acceptance of the case, and the defendant shall file a bill of defence within 15 days from his receipt of the copy of the bill of complaint.

If the defendant files a bill of defence, the people's court shall send a copy of the bill of defence to the plaintiff within five days from its receipt. Failure by the defendant to file a bill of defence shall not prevent the case from being heard by the people's court.

Article 114. The People's court shall, in relation to cases whose acceptance has been decided, notify the parties orally or in the notification on case acceptance or in notification on response to prosecution, of their relevant litigation rights and obligations.

Article 115. The parties shall be promptly notified after members of the collegial panel are decided.

Article 116. The judicial personnel must carefully examine the case materials and carry out investigation and collection of necessary evidence.

Article 117. The personnel sent by a people's court to conduct an investigation shall first show their credentials to the person being investigated. The written record of an investigation shall be checked by the person investigated and then signed or sealed by both the investigator and the investigated.

Article 118. A people's court may, when necessary, entrust a people's court in another locality with an investigation.

The entrusting people's court shall clearly set out the matters and requirements of the entrusted investigation. The entrusted people's court may on its own initiative conduct supplementary investigation.

The entrusted people's court shall complete the investigation within 30 days after receiving the rogatory letter. If for some reason it cannot complete the investigation, it shall notify the entrusting people's court in writing within the above-mentioned time limit.

Article 119. If a party who must participate in a joint lawsuit fails to participate in the proceedings, the people's court shall notify it to participate.

SECTION 3 TRIAL IN COURT

Article 120. Civil cases in a people's court shall be heard in public, except for those that involve state secrets or the private affairs of individuals or are otherwise provided by law.

A divorce case or a case involving trade secrets may not be heard in public if a party so requests.

Article 121. In handling civil cases, the people's courts shall, whenever necessary and possible, send out circuit tribunals to hold trials on the spot.

Article 122. The people's court shall notify the parties and other participants in civil case three days before the opening of a court session. If a case is to be heard in public, the names of the parties, the cause of action and the time and location of the court session shall be announced publicly.

Article 123. Before a court session is called to order, the court clerk shall ascertain whether or not the parties and other participants in the case are present and announce the rules of order of the court.

At the beginning of a trial, the presiding judge shall check the parties present, announce the cause of action and the names of the judicial personnel and court clerks, inform the parties of their relevant litigation rights and obligations and ask the parties whether or not they wish to apply for the withdrawal of any court personnel.

Article 124. Courtroom investigation shall be conducted in the following order:

(1) presentation of the statements by the parties;

(2) informing the witnesses of their rights and obligations, giving testimony by the witnesses and reading of the statements of absentee witnesses;

(3) presentation of documentary evidence, material evidence and audio-visual reference material;

(4) reading of the expert conclusions; and

(5) reading of the records of inquests.

Article 125. The parties may present new evidence during a court session.

With the permission of the court, the parties may put questions to witnesses, expert witnesses and inspectors.

The parties may request a new investigation expert evaluation or inquest, subject to the approval of the people's court.

Article 126. Additional claims by the plaintiff, counterclaims by the defendant and third-party claims related to the case may be tried together.

Article 127. Court debates shall be conducted in the following order:

(1) presentation of oral statements by the plaintiff and his agents ad litem;

(2) response by the defendant and his agents ad litem;

(3) presentation of oral statements or defence by the third party and its agents ad litem;

(4) debate between the two sides.

At the end of the court debate, the presiding judge shall ask each side to present his final arguments, with the plaintiff going first, then the defendant, and then the third party.

Article 128. At the end of the court debate, a judgment shall be made according to law. Where conciliation is possible prior to the rendering of a judgment, conciliation effort may be conducted; if conciliation proves to be unsuccessful, a judgment shall be made without delay.

Article 129. If a plaintiff has bee served with a legal subpoena from a people's court and refuses to appear in court without justified reason, or if he walks out during a court session without the permission of the court, the court may consider the plaintiff has applied to withdraw his complaint; if the defendant files a counterclaim, the court may make a judgment by default.

Article 130. If a defendant has been served with a legal subpoena from a people's court and refuses to appear in court without justified reason, or if he walks out during a court session without the permission of the court, the court may make a judgment by default.

Article 131. If a plaintiff applies to withdraw his complaints before judgment is pronounces, the people's court shall make an order regarding whether to grant approval.

If the withdrawal of complaints is disallowed by an order, and the palintiff, after having been served with a subpoena, refuses to appear in court without justified reason, the people's court may make a judgment by default.

Article 132. Under any of the following circumstances, court session for trail may be postponed:

(1) the parties of other participants in the proceedings required to appear in court fail to do so for justified reasons;

(2) a party requests the withdrawal of a member of the judicial personnel only presently;

(3) it is necessary to summon new witnesses to court, collect new evidence, make a new expert evaluation, hold another inquest, or make supplementary investigation; or

(4) other circumstances arise that warrant the postponement.

Article 133. The court clerk shall make a written record of the entire court proceedings, which shall be signed by the judicial personnel and the court clerk.

The court record shall be read out in court, or the parties and other participants in the proceedings may be notified to read the record while in court or within five days. If the parties or other participants in the proceedings consider that there are omissions or errors in the record of their statements, they shall have the right to apply for additions or corrections. If such additions or corrections are not made, the application shall be written into the case file.

The court record shall be signed or sealed by the parties and other participants in the proceedings. Refusal to do so shall be recorded in a note to be attached to the file.

Article 134. The people's court shall publicly pronounce its judgment in all case, whether publicly tried or not.

If a judgment is pronounced in court, the written judgment shall be issued and delivered within ten days; if a judgment is pronounced later on a fixed date, the written judgment shall be issued immediately after the pronouncement.

Upon pronouncement of a judgment, the parties must be informed of their right to file an appeal, the time limit for appeal and the court to which they may appeal.

Upon pronouncement of a divorce judgment, the parties must be informed not to remarry before the judgment takes legal effect.

Article 135. A people's court shall, in handling a case to which ordinary procedure is applied, close it within six months from filing the case. Where an extension of the term is necessary for special circumstances, a six-month extension may be given subject to the approval of the president of the said court. Any further extension shall be reported to the people's court at a higher level for approval.

SECTION 4 SUSPENSION AND CONCLUSION OF A LAWSUIT

Article 136. A lawsuit shall be suspended, if it involves any of the following circumstances:

(1) one of the parties dies and it is necessary to wait for his to make clear whether he would participate in the proceedings;

(2) one of the parties has lost the capacity to engage in litigation and his agent ad litem has not been designated yet;

(3) the legal person or any other organization as one of the parties has terminated, and the person succeeding to its rights and obligations has not been determined yet;

(4) one of the parties is unable to participate in the proceedings for reasons of force majeure;

(5) the current case is dependent on the results of the trial of another case that has not yet been concluded; or

(6) other circumstances arise that warrant the suspension of the lawsuit.

The proceedings shall resume after the causes of the suspension have been eliminated.

Article 137. A lawsuit shall be concluded, if it involves any of the following circumstances:

(1) the plaintiff dies without an heir, or the heir waives his right of litigation;

(2) the defendant dies without estate and without a person who should succeed to his obligations;

(3) one of the parties in a divorce case dies.

(4) one of the parties in a case involving claims for overdue alimony, support for children or elders or a claim for the termination of adoptive relationship dies.

SECTION 5 JUDGMENT AND ORDER

Article 138. A judgment shall clearly set forth the following:

(1) the cause of action, the claims, and the facts of and reasons for the dispute;

(2) the facts and reasons on which the judgment is based and the law is applied;

(3) the result of the judgment and the litigation costs to be borne; and

(4) the time limit for filing an appeal and the appellate court with which the appeal may be filed.

The judgment shall be signed by the judicial personnel and the court clerk, and the seal of the people's court shall be affixed to it.

Article 141. If some of the facts in a case being tried by the people's court are already evident, the court may pass judgment on those facts first.

Article 140. Orders shall be applicable to the following:

(1) rejection of a lawsuit;

(2) objection to the jurisdiction of a court;

(3) rejection of a complaint;

(4) property preservation and preliminary execution;

(5) approval or disapproval of withdrawal of a lawsuit;

(6) suspension or conclusion of a lawsuit;

(7) correction of slips of pen in the judgment;

(8) suspension or termination of execution;

(9) cancellation of or refusal to enforce an arbitration award;

(10) refusal to enforce a document on creditor's rights which has been rendered executory by the notary office;

(11) other matters to be decided by an order.

An appeal may be lodged against an order applied to items (1), (2) and (3) of the preceding paragraph.

A written order shall be signed by the judicial personnel and the court clerk, and the seal of the people's court shall be affixed to it. If an order is issued orally, it shall be entered in the record.

Article 141. All judgments and orders of the Supreme People's Court, as well as judgments and orders that may not be appealed against according to law or have not been appealed against within the prescribed time limit, shall be legally effective.

CHAPTER XIII SUMMARY PROCEDURE

Article 142. When trying simple civil cases in which the facts are evident, relationship of rights and obligations is definite, and disputes are minor, the basic people's courts and the tribunals dispatched by them may apply the summary procedure stipulated in his Chapter.

Article 143. In simple civil cases, the plaintiff may lodge his complaint orally.

The two parties may appear at the same time at a basic people's court or a tribunal dispatched by it to request a solution of their dispute. The basic people's court or the tribunal dispatched by it may try the case immediately or set a date for the trial.

Article 144. In trying a simple civil case, the basic people's court or the tribunal dispatched by it may at any time use simplified methods to summon the parties and witnesses.

Article 145. Simple civil cases shall be tried by a single judge alone and the trial of such cases shall not be restricted by the provisions of Articles 123, 125, and 128 of this Law.

Article 146. The people's court shall, in handling a case to which summary procedure is applied, close it within three months from filing the case.

CHAPTER XIV PROCEDURE OF SECOND INSTANCE

Article 147. If a party refuses to accept a judgment of first instance of a local people's court, he shall have the right to file an appeal with the people's court at the next higher level within 15 days from the date on which the written judgment is served.

If a party refuses to accept an order of first instance of a local people's court, he shall have the right to file an appeal with a people's court at the next higher level within 10 days from the date on which the written order is served.

Article 148. In filing an appeal, an appeal petition shall be submitted. An appeal petition shall include the names of the parties, the names of the legal persons and their legal representatives or names of other organizations and their principal leading personnel; the name of the people's court where the case was originally tried; the case file number and the cause of action; and the claims of the appeal and reasons for it.

Article 149. An appeal petition shall be submitted through the people's court which originally tried the case, and copies of the petition shall be prepared according to the number of people in the other party or the representatives thereof.

If a party appeals directly to a people's court of second instance, the court shall within five days transfer the appeal petition to the people's court which originally tried the case.

Article 150. Within five days after receiving an appeal petition, the people's court which originally tried the case shall serve copies of the appeal petition on the other party. After receiving the copies of the appeal petition, the other party shall submit its defence within 15 days. The people's court shall, within five days from receiving the defence, serve copies of the defence on the appellant. Failure by the other party to submit a defence shall not prevent the case from being tried by the people's court.

After receiving the appeal petition and the defence, the people's court which originally tried the case shall, within five days, deliver them together with the entire case file and evidence to the people's court of second instance.

Article 151. With respect to an appealed case, the people's court of second instance shall review the relevant facts and the application of the law.

Article 152. When handling an appealed case, the people's court of second instance shall form a collegial panel and conduct a hearing. Having verified the facts of the case by consulting the files, making necessary investigations and questioning the parties, if the collegial panel considers that it is not necessary to hold a hearing, it may make a judgment or order without a hearing.

A people's court of second instance may try an appealed case in its own court or in the place where the case originated or where the people's court which originally tried the case is located.

Article 153. After hearing an appealed case, the people's court of second instance shall handle it respectively according to the conditions set forth below:

(1) If the facts were clearly ascertained and the law was correctly applied in the original judgment, the appeal shall be rejected by judgment and the original judgment shall be sustained;

(2) If the law was incorrectly applied in the original judgment, the judgment shall be amended according to law;

(3) If in the original judgment the facts were incorrectly ascertained or were not clearly ascertained and the evidence was inconclusive, the judgment shall be rescinded and the case remanded by an order to the original people's court for retrial, or the people's court of second instance may amend the judgment after investigating and clarifying the facts; or

(4) If in the original judgment a violation of the prescribed procedure may have affected the correctness of the judgment, the judgment shall be rescinded and the case remanded by an order to the original people's court for retrial.

The parties may appeal against the judgment or order rendered in a retrial of their case.

Article 154. A people's court of second instance shall use orders in all cases of appeal against the orders made by the people's court of first instance.

Article 155. In handling an appealed case, a people's court of second instance may conduct conciliation. If an agreement is reached through conciliation, a conciliation statement shall be made and signed by the judicial personnel and the court clerk, and the seal of the people's court shall be affixed to it. After the conciliation statement has been served, the judgment of the people's court which originally tried the case shall be considered rescinded.

Article 156. If an appellant requests to withdraw his appeal before a people's court of second instance pronounces its judgment, the court shall give an order with regard to approving or disapproving the request.

Article 157. When a people's court of second instance handles an appealed case, it shall apply the ordinary procedure for trials of first instance, unless otherwise stipulated in this Chapter.

Article 158. The judgments and orders of a people's court of second instance shall be final.

Article 159. In trying an appealed case against a judgment, the people's court shall make a final judgment within three months after the case was filed as one of second instance. Any extension of the term necessitated by special circumstances shall be subject to the approval of the president of the said court.

In trying an appealed case against an order, the people's court shall make a final order within 30 days after the case was filed as one of second instance.

CHAPTER XV SPECIAL PROCEDURE

SECTION 1 GENERAL STIPULATIONS

Article 160. When a people's court handles cases concerning the credentials of voters, the proclamation of a person as missing or dead, the determination of a citizen as incompetent or with limited capacity for civil conduct and the determination of a property as ownerless, the provisions of this Chapter shall apply. For matters not covered in this Chapter, the relevant provisions of this Law and other laws shall apply.

Article 161. With respect to a case tried in accordance with the procedure stipulated in this Chapter, the judgment of first instance shall be final. A collegial panel of

judges shall be formed for the trial of any case involving the credentials of voters or any major, difficult or complicated case; other cases shall be tried by a single judge alone.

Article 162. If a people's court, while trying a case in accordance with the procedure stipulated in this Chapter, discovers that the case involves a dispute over rights and interests in civil affairs, it shall make an order to terminate the special procedure and inform the interested parties to bring another suit.

Article 163. The people's court shall, in trying cases to which special procedure is applied, close them within one month from filing the case or within one month from expiration of the term set forth in the public notice. Any extension of the term necessitated by special circumstances shall be subject to the approval of the president of the said court, however, except cases concerning the credentials of voters.

## SECTION 2 CASES CONCERNING THE CREDENTIALS OF VOTERS

Article 164. If citizens refuse to accept an election committee's decision on an appeal concerning the credentials of voters, they may, five days before the election day, bring a suit in the basic people's court located in their electoral district.

Article 165. After a people's court has accepted a case concerning the credentials of voters, it must close the case before the election day.

The prosecutor, a representative of the election committee and other citizens concerned must participate in the proceedings.

The written judgment of the people's court shall be served on the election committee and the prosecutor before the election day, and other citizens concerned shall be notified of the judgment.

## SECTION 3 CASES CONCERNING THE PROCLAMATION OF A PERSON AS MISSING OR DEAD

Article 166. With respect to a citizen whose whereabouts have been unknown for two years, if the interested party applies for proclaiming the person as missing, the application shall be filed with the basic people's court in the locality where the missing person has his domicile.

The application shall clearly state the facts and time of the disappearance as well as the action requested, and documentary evidence from a public security organ or other relevant organs concerning the disappearance of the citizen shall be appended.

Article 167. With respect to a citizen whose whereabouts have been unknown for four years or whose whereabouts have been unknown for two years after an accident in which he was involved, or whose whereabouts have been unknown after an accident in which he was involved and, upon verification by the relevant authorities, the said citizen is unable to survive, if the interested party applies for proclaiming such person as dead, the application shall be filed with the basic people's court in the locality where the missing person has his domicile.

The application shall clearly state the facts and time of the disappearance as well as the action requested, and documentary evidence from a public security organ or other relevant organs concerning the disappearance of this citizen shall be appended.

Article 168. After accepting a case concerning a proclamation of a person as missing or dead, the people's court shall issue a public search notice for the person whose whereabouts have been unknown. The time limit of the notice on the proclamation of a person as missing shall be three months, and the time limit of the notice on the proclamation of a person as dead shall be one year. Where a citizen's whereabouts have been unknown after an accident in which he was involved and, upon verification by the relevant authorities, the said citizen is unable to survive, the time limit of the notice on the proclamation of such person as dead shall be three months.

On the expiration of the time limit of the public notice, the people's court shall, depending on whether the facts about the missing or death of the person have been confirmed, make a judgment proclaiming the person as missing or dead or make a judgment to reject the application.

Article 169. Should a person who has been proclaimed as missing or dead by a people's court reappear, the people's court shall, upon the application of that person or an interested party, make a new judgment and annul the previous one.

SECTION 4 CASES CONCERNING THE DETERMINATION OF A CITIZEN AS INCOMPETENT OR WITH LIMITED CAPACITY FOR CIVIL CONDUCT

Article 170. An application for determining a citizen as incompetent or with limited capacity for civil conduct shall be filed by the citizen's near relatives or any other interested party with the basic people's court in the locality where the citizen has his domicile.

The application shall clearly state the facts and grounds on which the citizen's incompetence or limited capacity for civil conduct is claimed.

Article 171. After accepting such an application, the people's court shall, when necessary, have an expert evaluation on the citizen whose incompetence or limited capacity for civil conduct is claimed; if the applicant has already provided an evaluation conclusion, the people's court shall examine the conclusion.

Article 172. When the people's court handles a case for determining a citizen as incompetent or with limited capacity for civil conduct, a near relative of the citizen shall be the agent ad litem, however, except the applicant. If the near relatives shift the responsibility onto one another, the people's court shall appoint one of them as an agent ad litem for the citizen. If the citizen's state of health permits, the people's court shall also question the citizen.

If the people's court is convinced, after trial, that the application is based on facts, it shall make a judgment determining the citizen as incompetent or with limited capacity for civil conduct; if the court finds that the application is not based on facts, it shall make a judgment to reject it.

Article 173. If, upon the application of a person who has been determined as incompetent or with limited capacity for civil conduct or of his guardian, the people's court verifies that the causes of that person's incompetence or limited capacity for civil conduct has been eliminated, it shall make a new judgment and annul the previous one.

SECTION 5 CASES CONCERNING THE DETERMINATION OF A PROPERTY AS OWNERLESS

Article 174. An application for determining a property as ownerless shall be filed by a citizen, legal person or any other organization with the basic people's court in the place where the property is located.

The application shall clearly state the type and quantity of the property and the grounds on which the application for determining the property as ownerless is filed.

Article 175. The people's court shall, after accepting such an application and upon examination and verification, issue a public notice for the claim of the property. If no one claims the property within one year from the issue of the public notice, the people's court shall make a judgment determining the property as ownerless and turn it over to the state or the collective concerned.

Article 176. If, after a property has been determined by a judgment as ownerless, the owner of the property or his heir appears and claims the property, the people's court shall, after examination and verification, make a new judgment and annul the previous one.

CHAPTER XVI PROCEDURE FOR TRIAL SUPERVISION

Article 177. If the president of a people's court at any level finds some definite error in a legally effective judgment or order of his court and deems it necessary to have

the case retried, he shall refer it to the judicial committee for discussion and decision.

If the Supreme People's Court finds some definite error in a legally effective judgment or order of a local people's court at any level, or if a people's court at a higher level finds some definite error in a legally effective judgment or order of a people's court at a lower level, it shall have the power to bring the case up for trial itself or direct the people's court at a lower level to conduct a retrial.

Article 178. If a party considers that a legally effective judgment or order has some error, he may apply to the people's court which originally tried the case or to a people's court at the next higher level for retrial; however, execution of the judgment or order shall not be suspended.

Article 179. If an application made by a party involves any of the following circumstances, the people's court shall retry the case:

(1) the new evidence is conclusive enough to repudiate the original judgment or order;

(2) the main evidence on which the facts were ascertained in the original judgment or order was insufficient;

(3) there was error in the application of the law in the original judgment or order;

(4) a violation of the legal procedure by a people's court may have affected the correctness of the judgment or order in the case;

(5) the judicial personnel committed embezzlement, accepted bribes, practised malpractice for personal benefits and twisted the law in trial of the case.

The people's court shall reject the application that does not meet any of the conditions specified in the preceding paragraph.

Article 180. With respect to a legally effective conciliation statement, if evidence provided by a party proves that the conciliation violates the principle of voluntariness and the content of the conciliation statement is in violation of the law, he may apply for a retrial. The people's court shall, upon examination and verification, retry the case.

Article 181. with respect to a legally effective judgment on dissolution of marriage, no party shall apply for a retrial.

Article 182. Any application for a retrial by a party shall be made within two years after the judgment or order becomes legally effective.

Article 183. When a decision is made to retry a case in accordance with the procedure for trial supervision, the execution of the original judgment shall be ordered to be suspended. The order shall be signed by the president of the court, and the seal of the people's court shall be affixed to it.

Article 184. With respect to a case to be retried by a people's court in accordance with the procedure for trial supervision, if the legally effective judgment or order was made by a court of first instance, it shall be handled in accordance with the procedure of first instance, and the parties may appeal against the new judgment or order; if the legally effective judgment or order was made by a court of second instance, it shall be handled in accordance with the procedure of second instance, and the new judgment or order shall be legally effective; if it is a case which was brought up for trial by a people's court at a higher level, it shall be handled in accordance with the procedure of second instance, and the new judgment or order shall be legally effective.

The people's court shall, in retrying a case, form a new collegial pannel.

Article 185. If the Supreme People's Procuratorate discovers that a legally effective judgment or order made by a people's court at any level, or if a people's procuratorate at a higher level discovers that a legally effective judgment or order made by a people's court at a lower level, involves any of the following circumstances, the Supreme People's Procuratorate or the people's procuratorate

at a higher level shall respectively lodge a protest in accordance with the procedure for trial supervision:

(1) the main evidence ascertaining the facts in the previous judgment or order was insufficient;

(2) there was error in the application of the law in the previous judgment or order;

(3) a violation of the legal procedure may have affected the correctness of the judgment or order; or

(4) the judicial personnel committed embezzlement, accepted bribes, practiced malpractice for personal benefits and twisted the law in trail of the case.

If a local people's procuratorate at any level discovers that a legally effective judgment or order made by a people's court at the corresponding level involves any of the circumstances specified in the preceding paragraph, it shall refer the matter to the people's procuratorate at a higher level for a protest to be lodged by the latter in accordance with the procedure for trial supervision.

Article 186. Cases protested by the people's procuratorate shall be retried by the people's court.

Article 187. When the people's procuratorate decides to lodge a protest against a judgment or order made by a people's court, it shall produce a written protest.

Article 188. The people's court shall, in retrying a case protested by the people's procuratorate, notify the people's procuratorate to send personnel to the court.

CHAPTER XVII SUMMARY PROCEDURE FOR RECOVERING A DEBT

Article 189. When a creditor requests payment of money or negotiable instrument from a debtor, if the following requirements are met, he may apply to the basic people's court that has jurisdiction for a payment warrant. The relevant requirements are:

(1) the creditor and the debtor are not involved in other obligation disputes; and

(2) the payment warrant can be served on the debtor.

The application shall clearly state the requested amount of money or quantity of negotiable instrument and the facts and evidence on the basis of which the request is made.

Article 190. After a creditor has submitted his application, the people's court shall within five days inform the creditor whether it has accepted his application.

Article 191. After accepting the application, the people's court shall, upon examination of the facts and evidence provided by the creditor, if the relationship of the creditor's rights and the debtor's obligations is definite and legitimate, issue a payment warrant to the debtor within 15 days from accepting the application.

If the application is untenable, the people's court shall render an order to reject it.

The debtor shall, within 15 days from the receipt of the payment warrant, clear off his debts or submit a written objection to the people's court.

If the debtor has neither submitted an objection nor complied with the payment warrant within the time limit specified in the preceding paragraph, the applicant may apply to the people's court for execution.

Article 192. The people's court shall, on receiving the written objection submitted by the debtor, make an order to conclude the summary procedure for recovering a debt and the payment warrant shall be invalidated automatically, the creditor may then institute a lawsuit.

CHAPTER XVIII PROCEDURE FOR PUBLIC INVITATION TO ASSERT CLAIMS

Article 193. Any holder of a bill which may be endorsed over according to regulations may, if the bill is stolen, lost, or missing, apply for public invitation to assert claims to the basic people's court in the place where the bill is to be paid.

The provisions of this Chapter shall apply to other matters to which, according to legal provisions, public invitation to assert claims may be applicable.

Anyone who applies for public invitation to assert claims shall submit to the people's court an application which shall clearly states the main contents of the bill such as the face amount, the issuer, the holder, the endorser, and the grounds and facts on which the application is made.

Article 194. The people's court shall, upon deciding to accept the application, notify the payor to suspend the payment, and within 3 days issue a public notice to invite the interested parties to assert claims. The time limit of the public notice shall be at the discretion of the people's court, however, it shall not be less than two months.

Article 195. The payor shall, on receiving the notification on suspension of payment issued by the people's court, suspend its payment till the conclusion of the procedure for public invitation to assert claims.

Within the time limit of the public notice, any act relating to the transfer of the rights in the bill shall be of no force.

Article 196. The interested parties shall apply to the people's court for asserting claims within the time limit of the public notice. After receiving an application of the interested party for asserting claims, the people's court shall make an order to conclude the procedure for public invitation to assert claims and notify the applicant and the payor.

The applicant or the claimant may institute a lawsuit in the people's court.

Article 197. If no one asserts claims, the people's court shall make a judgment on the basis of the application to declare the bill null and void. The judgment shall be announced in a public notice, and the payor of the bill shall be notified of the judgment. As of the date of the public notice, the applicant shall be entitled to claim payment from the payor.

Article 198. If an interested party for justified reasons was unable to apply to the people's court for asserting claims before the judgment was made, he may, within one years from the day he knew or should have known of the public notice of the judgment, institute a lawsuit in the people's court which made the judgment.

CHAPTER XIX PROCEDURE FOR BANKRUPTCY OF ENTERPRISES AS LEGAL PERSONS

Article 199. If an enterprise as legal person is in serious losses and unable to repay the debts that are due, the creditors may apply to a people's court for declaring the debtor's bankruptcy repayment, the debtor may also file at a people's court to declare bankruptcy repayment.

Article 200. After rendering an order to declare bankruptcy repayment, the people's court shall notify the debtors and the known creditors within ten days and make a public announcement.

Creditors who have been notified shall, within one month after receiving the notice, and creditors who have not been notified shall, within three months after the date of the announcement, report their claims to the people's court Creditors who do not report their claims during these periods shall be deemed to have abandoned their claims.

Article 201. The people's court may set up a liquidation team composed of relevant state organs and personnel. The liquidation team shall be responsible for the keeping, putting into order, appraisal, disposition and distribution of the bankruptcy property. The liquidation team may carry out necessary civil actions in accordance with the law.

The liquidation team shall be responsible to, and report on its work to, the people's court.

Article 202. Enterprises as legal persons and the creditors may institute a compromise. After they have reached a settlement agreement which has been recognized by the people's court, the people's court shall make a public

announcement and suspend the bankruptcy repayment proceedings. The settlement agreement shall have legal effect from the date of the public announcement.

Article 203. With respect to property that already constitutes security for such obligatory rights as loan from a bank and for other surety, the bank and other creditors shall have priority in receiving repayment with respect to such security or other surety. If the value of the security and other surety exceeds the amount of debts that they secure, the exceeding portion shall be the bankruptcy repayment property.

Article 204. After the prior deduction of bankruptcy expenses from the bankruptcy property, repayment shall be made in the following order:

(1) wages of staff and workers and labour insurance expenses that are owed by the bankrupt enterprise;

(2) taxes that are owed by the bankrupt enterprise; and

(3) bankruptcy claims.

Where the bankruptcy property is insufficient to repay all the repayment needs within a single order of priority, it shall be distributed on a pro-rata basis.

Article 205. The bankruptcy repayment of an enterprise as legal person shall be under the jurisdiction of the people's court in the place where the enterprise as legal person is located.

Article 206. With respect to the procedure for bankruptcy repayment of enterprises owned by the whole people, the provisions of the Law of the People's Republic of China on Enterprise Bankruptcy shall apply.

With respect to enterprises without legal personality, individual business, leaseholding farm households and individual partnership, the provisions of this Chapter shall not apply.

PART THREE PROCEDURE OF EXECUTION

CHAPTER XX GENERAL STIPULATIONS

Article 207. Legally effective judgments or orders in civil cases, as well as the parts of judgments or orders that relate to property in criminal cases, shall be executed by the people's court that tried the case in the first instance.

Other legal documents which are to be executed by a people's court as prescribed by law shall be executed by the people's court in the place where the person subject to execution has his domicile or where the property subject to execution is located.

Article 208. If in the course of execution a person who is not involved in the case raises an objection with respect to the object of the execution, the execution officer shall review the objection in accordance with the procedure as prescribed by law. If the objection is untenable, it shall be rejected; if the objection is tenable, it shall be submitted to the president of the court for an approval of the suspension of execution. If any definite error is found in the judgment or order, it shall be dealt with in accordance with the procedure for trial supervision.

Article 209. The execution shall be carried out by the execution officer.

In carrying out a compulsory execution measure, the execution officer shall show his credentials. After the execution is completed, the execution officer shall make a record of the particulars of the execution, and have it signed or sealed by the persons concerned on the scene.

The basic people's court and the intermediate people's court may, in the light of needs, establish executive organs, whose functions shall be defined by the Supreme People's Court.

Article 210. If a person or property subject to execution is in another locality, the people's court in that locality may be entrusted with enforcement of the execution.

The entrusted people's court shall begin the execution within 15 days after receiving a letter of entrustment and shall not refuse to do so. After the execution has been completed, the entrusted people's court shall promptly inform the entrusting people's court, by letter, of the result of the execution. If the execution has not been completed within one month, the entrusted people's court shall also inform the entrusting people's court, by letter, of the particulars of the execution.

If the entrusted people's court fails to enforce the execution within 15 days after receiving the letter of entrustment, the entrusting people's court may request the people's court at a higher level of the entrusted people's court to instruct the entrusted people's court to enforce the execution.

Article 211. If in the course of execution the two parties reconcile themselves and reach a compromise on their own initiative, the execution officer shall make a record of the terms of the compromise, and both parties shall affix their signatures or seals to it.

If one party fails to fulfill the conciliation agreement, the people's court may, at the request of the other party, resume the execution of the legal document which is formerly effective.

Article 212. In the course of execution, if the person subject to execution provides surety, the people's court may, with the consent of the person who has applied for execution, decide to suspend the execution and to defer the time limit for execution. If the person subject to execution fails again to enforce the execution within the new time limit, the people's court shall have the power to execute the guaranteed property of the person subject to execution or the property of the guarantor.

Article 213. If the citizen subject to execution dies, his debts shall be paid off from his estate; if a legal person or any other organization as the party subject to execution terminates, the party that succeeds to its rights and obligations shall fulfill the obligations.

Article 214. After the execution has been enforced in accordance with a judgment or order or other legal documents, if definite error has been found in such judgment, order or legal document and therefore it has been revoked by the people's court, the people's court shall, with respect to the property which has been executed, render an order that persons who have obtained the property should return it. In the event of refusal to return the property, compulsory execution shall be enforced.

Article 215. The provisions of this Part shall be applicable to the execution of conciliation statements as drawn up by the people's court.

Article 216. The parties must comply with legally effective judgments or orders in civil cases. If a party refuses to comply, the other party may apply to the people's court for execution, or the judge may refer the matter to the execution officer for execution.

The parties must comply with the conciliation statements and other legal documents that are to be executed by the people's court. If a party refuses to comply, the other party may apply to the people's court for execution.

Article 217. If a party fails to comply with a legally effective award of an arbitration agency established according to law, the other party may apply for execution to the people's court which has jurisdiction over the case. The people's court so applied to shall execute the said award.

Should the party against whom the application is made provide evidence which proves that the arbitration award involves any of the following circumstances, the people's court shall, after examination and verification by a collegial panel, order to cancel the arbitration award:

(1) the parties have not stipulated clauses on arbitration in the contracts, or have not subsequently reached a written agreement on arbitration;

(2) matters decided exceed the scope of the arbitration agreement or the limits of authority of the arbitration agency;

(3) the composition of the arbitration division or the procedure for arbitration is not in conformity with the legal procedure.

(4) the main evidence for ascertaining the facts is insufficient;

(5) there is errors in the application of the law; or

(6) the arbitrators committed acts of malpractice for personal benefits and perverted the law in the arbitration of the case;

If the people's court determines that the execution of the arbitration award would contradict the social and public interest, it shall order to cancel the award.

The above-mentioned order shall be served on both parties and the arbitration agency.

In the event that an arbitration award is canceled by an order of the people's court, the parties may, in accordance with the written agreement on arbitration reached between the two parties, apply to the arbitration agency for arbitration anew and may also bring a lawsuit in the people's court.

Article 218. If a party fails to comply with a document of creditor's rights that has been rendered executory according to law by a notary office, the other party may apply to the people's court which has jurisdiction over the case for execution. The people's court so applied to shall execute such document.

If the people's court finds some definite error in the notarized document of creditor's rights, it shall order to disallow the execution and serve the order on both parties as well as the notary office.

Article 219. The time limit for the submission of an application for execution shall be one year if one or both of the parties are citizens; it shall be six months if both parties are legal persons or other organizations.

The above-mentioned time limit shall be calculated from the last day of the period specified by the legal document for its performance. If the legal document specifies that it shall be performed in stages, the time limit shall be calculated from the last day of the period specified for each stage of performance.

Article 220. The execution officer shall, after receiving the application for execution or the writ of referral of execution, send a notification on execution to the person subject to execution, instructing him to perform the execution within the specified time limit. If the person fails to perform the execution within the time limit, compulsory execution shall be enforced.

CHAPTER XXII EXECUTION MEASURES

Article 221. If the person subject to execution fails to fulfill the obligations specified in the legal document as instructed by the notice on execution, the people's court shall have the power to make inquiries to banks, credit cooperatives or other units that deal with savings deposits about the savings deposits of the person subject to execution, and shall have the power to freeze and transfer the savings deposits of the person subject to execution, however, the injury, freezing or transfer of the deposits shall not exceed the scope within which the person subject to execution should fulfill his obligations.

The people's court shall, in deciding to freeze or transfer a deposit, pass an order and issue a notice on assistance in execution. Banks, credit cooperatives or other units that deal with savings deposits must comply with the notice.

Article 222. If the person subject to execution fails to fulfill the obligations specified in the legal documents as instructed by the notice on execution, the people's court shall have the power to withhold or withdraw the income of the person subject to execution within the scope of the obligation that the person subject to execution should fulfill, however, it shall leave the necessary living expenses for the person and his dependent family members.

The people's court shall, when withholding or withdrawing the income, pass an order and issue a notice on assistance in execution. The unit in which the person

subject to execution works, banks, credit cooperatives or other units that deal with savings deposits must comply with the notice.

Article 223. If the person subject to execution fails to fulfill the obligation specified in the legal document as instructed by the notice on execution, the people's court shall have the power to seal up, distrain, freeze, or sell off the property of the person subject to execution at reduced or the current price within the scope of the obligations that the person subject to execution should fulfill, however, it shall leave the articles of daily necessity for the person and his dependent family members.

The people's court shall render an order regarding the adoption of the measures specified in the preceding paragraph.

Article 224. When the people's court seals up or distrains a property, if the person subject to execution is a citizen, it shall notify the person and an adult member of his family to appear on the scene; if the person subject to execution is a legal person or any other organization, it shall notify its legal representatives or principal leading personnel to appear on the scene. Their refusal to appear in the scene shall not stop the execution. If the person subject to execution is a citizen, his unit or the grass-roots organization in the place where his property is located shall send people to participate.

An inventory of the sealed-up or distrained property must be made by the execution officer and, after the inventory has been signed or sealed by the persons on the scene, a copy of it shall be given to the person subject to execution or, if the person subject to execution is a citizen, it may also be given to an adult member of his family.

Article 225. The execution officer may assign the responsibility of safekeeping the sealed-up property to the person subject to execution, and the person shall be held responsible for any losses incurred due to his fault.

Article 226. After a property has been sealed up or distrained, the execution officer shall instruct the person subject to execution to fulfill, within the prescribed time limit, the obligations specified in the legal document. If the person fails to fulfill his obligations within the prescribed time limit, the people's court may, in accordance with relevant regulations, entrust the relevant units with the selling of the sealed-up or distrained property at reduced or the current price. Articles which are prohibited from free trading by the state shall be delivered to and purchased by the relevant units at the price set down by the state.

Article 227. If the person subject to execution fails to fulfill the obligations specified in the legal document and conceals his property, the people's court shall have the power to issue a search warrant and carry out a search on the person subject to execution and in his domicile or in the place where the property is concealed.

The adoption of the measures mentioned in the preceding paragraph shall be subject to a search warrant signed by the president of the people's court.

Article 228. The property or negotiable instrument specified for delivery in the legal document shall be delivered in the presence of both parties summoned by the execution officer to the recipient, who shall sign a receipt.

Any unit concerned that holds the property or negotiable instrument at issue shall pass it on in accordance with the notice on assistance in execution of the people's court, and the recipient shall sign a receipt.

If any citizen concerned holds the property or negotiable instrument at issue, the people's court shall notify him to relinquish them. If he refuses to do so, compulsory execution shall be enforced.

Article 229. Compulsory eviction from a building or a plot of land shall require a public notice signed and issued by the president of a people's court, instructing the person subject to execution to perform it within a designated period of time. If the person fails to do so within the given time, compulsory execution shall be enforced by the execution officer.

When a compulsory execution is being enforced, if the person subject to execution is a citizen, the person or an adult member of his family shall be notified to be present; if the person subject to execution is a legal person or any other organization, its legal representatives or principal leading personnel shall be notified to be present; their refusal to be present shall not stop the execution. If the person subject to execution is a citizen, his work unit or the grass-roots organization in the locality of the building or the plot of land at issue shall send people to participate. The execution officer shall make a record of the particulars of the compulsory execution, and the people on the scene shall affix their signatures or seals to the record.

The people's court shall assign personnel to transport the property involved in a compulsory eviction from a building to a designated location and deliver it to the person subject to execution or to an adult member of his family; if any loss is incurred due to the person's refusal to accept the property, he shall be held responsible for it.

Article 230. In the course of execution, if some formalities for certificates transfer need to be gone through, the people's court may issue a notice on assistance in execution to relevant units, which must comply with the notice.

Article 231. If the person subject to execution fails to fulfill the performance required of him by a judgment or order or any other legal document as instructed by the notice on execution, the people's court may enforce compulsory execution or entrust the performance to a relevant unit or other persons, and the person subject to execution shall bear the expenses thus incurred.

Article 232. If the person subject to execution fails to fulfill his obligations in respect to payment of money within the time limit specified by a judgment or order or any other legal document, he shall pay a multiplied interest on the debt for the period of deferred fulfillment. If the person subject to execution fails to fulfill his other obligations within the time limit specified by a judgment or order or any other legal document, he shall pay a surcharge for the deferred fulfillment.

Article 233. After the adoption of the execution measures stipulated in Article 222, 223 and 224 of this Law, if the person subject to execution is still unable to repay its debts, it shall continue to fulfill his obligations. Once the creditor discovers that the person subject to execution has any other property, the creditor may at any time apply to the people's court for execution.

CHAPTER XXIII SUSPENSION AND CONCLUSION OF EXECUTION

Article 234. Under any of the following circumstances, the people's court shall order suspension of an execution:

(1) the applicant indicates that the execution may be postponed;

(2) a person not involved in the case raises a justified objection to the object of the execution;

(3) a citizen as one of the parties dies and it is necessary to wait for an heir to inherit the rights of the deceased or to succeed to his obligations;

(4) a legal person or any other organization as one of the parties terminates, and the person succeeding to its rights and obligations has not been determined; or

(5) other circumstances occur under which the people's court deems the execution should be suspended.

Execution shall be resumed when the circumstances which caused the suspension of execution have disappeared.

Article 235. Under any of the following circumstances, the people's court shall order conclusion of an execution:

(1) the applicant has withdrawn his application;

(2) the legal document on which the execution is based has been repealed;

(3) the citizen subject to execution dies and there is no estate to be executed and no one to succeed to his obligations;

(4) the person entitled to claim alimony or support for children or elders dies;

(5) the citizen subject to execution is too badly off to repay his debts, has no source of income and loses his ability to work as well; or

(6) other circumstances occur under which the people's court deems the execution should be concluded.

Article 236. An order to suspend or conclude an execution shall become effective immediately after being served on the parties concerned.

PART FOUR SPECIAL STIPULATIONS FOR CIVIL PROCEDURES INVOLVING FOREIGN INTERESTS

CHAPTER XXIV GENERAL PRINCIPLES

Article 237. The provisions of this Part shall be applicable to any civil lawsuit involving foreign interests within the territory of the People's Republic of China. Where it is not covered by the provisions of this Part, other relevant provisions of this Law shall apply.

Article 238. If an international treaty concluded or acceded to by the People's Republic of China contains provisions differing from those found in this Law, the provisions of the international treaty shall apply, unless the provisions are the ones on which China has announced reservations.

Article 239. Any civil lawsuits brought against a foreign national, a foreign organization or an international organization that enjoys diplomatic privileges and immunities shall be dealt with in accordance with the relevant laws of the People's Republic of China and with the international treaties concluded or acceded to by the People's Republic of China.

Article 240. In conducting trials of civil cases involving foreign interests, the people's court shall use the spoken and written languages commonly used in the People's Republic of China. Translation may be provided at the request of the parties concerned, and the expenses shall be borne by them.

Article 241. When foreign nationals, stateless persons or foreign enter prises or organizations need to appoint lawyers as agents ad litem to institute or respond to prosecutions in the people's court, they must appoint lawyers of the People's Republic of China.

Article 242. Any power of attorney mailed or forwarded from outside the territory of the People's Republic of China by a foreign national, stateless person or a foreign enterprise or organization that has no domicile in the People's Republic of China to appoint a lawyer or any other person of the People's Republic of China as an agent ad litem must be authenticated by a notarial office in the country where that person or enterprise or organization has domicile and confirmed by the Chinese embassy or consulate stationed in that country or must go through the notarial formalities stipulated in the relevant bilateral treaties between China and that country before it becomes effective.

CHAPTER XXV JURISDICTION

Article 243. A lawsuit brought against a defendant who has no domicile in the People's Republic of China concerning a contract dispute or other disputes over property rights and interests, if the contract is signed or performed within the territory of the People's Republic of China, or the object of the action is within the territory of the People's Republic of China, or the defendant has distrainable property within the territory of the People's Republic of China, or the defendant has its representative agency, branch or business agent within the territory of the People's Republic of China, may be under the jurisdiction of the people's court in the place where the contract is signed or performed, or where the object of the action is located, or where the defendant's distrainable property is located, or where

the infringing act takes place, or where the representative agency, branch or business agent is located.

Article 244. Parties to a dispute over a contract involving foreign interests or over property rights and interests involving foreign interests may, through written agreement, choose the people's court in the place which has actual connections with the dispute as the jurisdictional court. If a people's court of the People's Republic of China is chosen as the jurisdictional court, the stipulations on jurisdiction by level and exclusive jurisdiction in this Law shall not be contravened.

Article 245. If the defendant in a civil lawsuit involving foreign interests raises no objection to the jurisdiction of a people's court, responds to the prosecution and replies to his defence, he shall be deemed to have admitted that this people's court has jurisdiction over the case.

Article 246. Lawsuits initiated for disputes arising from the performance of contracts for Chinese-foreign equity joint ventures, or Chinese-foreign contractual joint ventures, or Chinese-foreign cooperative exploration and development of the natural resources in the People's Republic of China shall be under the jurisdiction of the people's courts of the People's Republic of China.

CHAPTER XXVI SERVICE AND TIME PERIODS

Article 247. A people's court may serve litigation document to a party who has no domicile within the territory of the People's Republic of China by the following methods:

(1) it may serve by the method specified in the international treaties concluded or acceded to by both the People's Republic of China and the country where the recipient of service resides;

(2) it may serve through diplomatic channels;

(3) it may entrust the service to the embassy or consulate of the People's Republic of China stationed in the country where the recipient of service resides,

(4) it may serve through the agent ad litem who is empowered by the recipient of service to receive the service for it;

(5) it may serve through the party's representative agency within the territory of the People's Republic of China, or the branch or business agent empowered to receive the service for it;

(6) it may serve by post if the law of the country where the recipient of service resides so permits; in the event that no receipt is returned sixty days after the date on which the document was posted, but various circumstances justify the assumption that it has been served, the service shall be deemed completed upon the expiration of the time limit; and

(7) it may serve by public notice, if none of the above-mentioned methods can be employed. The service shall be considered completed three months after the date on which the public notice was issued.

Article 248. If a defendant has no domicile in the People's Republic of China, the people's court shall serve a copy of the bill of complaint on the defendant and notify him to forward his bill of defence within 30 days after he receives the copy of the bill of complaint. Any extension of the term requested by the defendant shall be at the discretion of the people's court.

Article 249. If any party who has no domicile in the People's Republic of China is dissatisfied with a judgment or order made by a people's court of first instance, he shall have the right to file an appeal within 30 days from the date the written judgment or order is served. The appellee shall forward his bill of defence within 30 days after he has received a copy of the appeal petition. If a party is unable to file an appeal or forward a bill of defence within the period of time prescribed by law, and therefore requests an extension of the period, the people's court shall decide to approve or disapprove it.

Article 250. The time period for handling a civil case involving foreign interests by the people's court shall not be limited by the provisions of Article 138 and 163 of this Law.

CHAPTER XXVII PROPERTY PRESERVATION

Article 251. The parties may, in accordance with the provisions of Article 93 of this Law, apply to the people's court for property preservation.

The interested parties may, in accordance with the provisions of Article 94 of this Law, apply to the people's court for property preservation before a lawsuit is brought.

Article 252. After a people's court has ordered to grant property preservation before litigation, the applicant shall bring a lawsuit within 30 days. If he fails to bring a lawsuit within the time limit, the people's court shall cancel the property preservation.

Article 253. After the people's court has ordered to grant property preservation, if a surety is provided by the person against when the application is made, the people's court shall cancel the property preservation.

Article 254. If an application is wrongfully made, the applicant shall compensate the person against whom the application is made for losses incurred by the property preservation.

Article 255. If a property preserved by a people's court needs to be kept under surveillance, it shall notify the unit concerned to be responsible for the surveillance, and the person against whom the application is made shall bear the expenses thus incurred.

Article 256. An order to cancel the preservation issued by a people's court shall be carried out by an execution officer.

CHAPTER XXVIII ARBITRATION

Article 257. With respect to contract disputes arise from the foreign economic, trade, transport or maritime activities of China, if the parties have stipulated clauses on arbitration in the contract or have subsequently reached a written agreement on arbitration, they shall submit such disputes for arbitration to the foreign affairs arbitration agency of China, and they shall not bring a suit in a people's court.

If the parties have not stipulated clauses on arbitration in the contract or have not subsequently reached a written agreement on arbitration, they may file a lawsuit in the people's court.

Article 258. If any party has applied for the adoption of property preservation measures, the foreign affairs arbitration agency of the People's Republic of China shall submit for an order the party's application to the intermediate people's court in the place where the person against whom the application is filed has his domicile or where the said person's property is located.

Article 259. If one party fails to comply with the award made by the foreign affairs arbitration agency of the People's Republic of China, the other party may apply for execution to the intermediate people's court in the place where the person against whom the application is made has his domicile or where the property of the said person is located.

Article 260. If the person against whom the application is made provides evidence which proves that the arbitration award made by the foreign affairs arbitration agency of the People's Republic of China involves any of the following circumstances, the people's court shall, after examination and verification by a collegial panel, order to disallow the execution of the award:

(1) the parties have not stipulated clauses on arbitration in the contract or have not subsequently reached a written agreement on arbitration;

(2) the person against whom the application is made is not duly notified to appoint the arbitrator or to proceed with the arbitration, or the said person fails to state its

opinions due to reasons for which he is not held responsible;

(3) the composition of the arbitration division or the procedure for arbitration is not in conformity with rules of arbitration; or

(4) matters decided exceed the scope of the arbitration agreement or the limits of authority of the arbitration agency.

If the people's court determines that the execution of the award at issue is against the social and public interest, it shall order to disallow the execution of the arbitration award.

Article 261. If the execution of an arbitration award is disallowed, the parties may, in accordance with the written agreement on arbitration concluded between them, apply to the arbitration agency for arbitration anew, or may file a lawsuit in a people's court.

CHAPTER XXIX JUDICIAL ASSISTANCE

Article 262. In accordance with the international treaties concluded or acceded to by the People's Republic of China or on the principle of reciprocity, the people's courts of China and foreign courts may request each other's assistance in the service of legal documents, in investigation and collection of evidence or in other litigation actions.

If any matter requested by a foreign court for assistance would impair the sovereignty, security or social and public interest of the People's Republic of China, the people's court shall refuse to carry it out.

Article 263. The request for and providing of judicial assistance shall be conducted through channels stipulated in the international treaties concluded or acceded to by the People's Republic of China or through diplomatic; channels.

Any foreign embassy or consulate stationed in the People's Republic of China may serve documents and carry out investigation and collection of evidence with respect to its nationals, provided that the laws of the People's Republic of China shall not be violated and no compulsory measures shall be adopted.

Except for the circumstances prescribed in the preceding paragraph, no foreign organization or individual may, without the consent of the competent authorities of the People's Republic of China, serve documents or carry out investigation and collection of evidence within the territory of the People's Republic of China.

Article 264. The letter of request for judicial assistance and its annexes submitted by a foreign court to a people's court shall be appended with a Chinese translation or a text in other languages specified in the relevant international treaties.

The letter of request and its annexes submitted to a foreign court by a people's court for judicial assistance shall be appended with a translation in the language of the country or a text in other languages specified in the relevant international treaties.

Article 265. The judicial assistance provided by the people's courts shall be carried out in accordance with the procedure stipulated by the law of the People's Republic of China. If a special method is requested by a foreign court, the judicial assistance may also by carried out in such method as requested, provided that the requested special method shall not contradict the law of the People's Republic of China.

Article 266. If a party applies for execution of a legally effective judgment or order made by a people's court and the party subject to execution or its property is not within the territory of the People's Republic of China, it may directly apply for recognition and enforcement to the foreign court which has jurisdiction over the case, or the people's court may, in accordance with the relevant provisions of the international treaties concluded or acceded to by China, or on the principle of reciprocity, request recognition and enforcement by a foreign court.

If a party applies for execution of a legally effective arbitration award made by a foreign affairs arbitration agency of the People's Republic of China and the party subject to execution or its property is not within the territory of the People's

Republic of China, it may directly apply for recognition and enforcement to the foreign court which has jurisdiction over the case.

Article 267. If a legally effective judgment or order made by a foreign court requires recognition and enforcement by a people's court of the People's Republic of China, the party concerned may directly apply to the intermediate people's court of the People's Republic of China which has jurisdiction over the case for recognition and enforcement, or the foreign court may, in accordance with the provisions of the international treaties concluded or acceded to by the People's Republic of China or on the principle of reciprocity, request recognition and enforcement by a people's court.

Article 268. If a people's court of the People's Republic of China, after its review in accordance with the international treaties concluded or acceded to by the People's Republic of China or on the principle of reciprocity, considers that the legally effective judgment or order of a foreign court which requires recognition and enforcement does not contradict the basic principles of the law of the People's Republic of China nor violates the state and social, public interest of China, it shall render an order on the recognition of its force.

Where an execution is necessary, a writ of execution shall be issued and enforced in accordance with the relevant provisions of this Law; If it contradicts the basic principles of the law of the People's Republic of China or the state and social, public interest of China, the people's court shall refuse its recognition and enforcement.

Article 269. If an award made by a foreign arbitration agency requires the recognition and enforcement by a people's court of the People's Republic of China, the party concerned shall directly apply to the intermediate people's court in the place where the party subject to execution has its domicile or where its property is located. The people's court shall deal with the matter in accordance with the relevant provisions of the international treaties concluded or acceded to by the People's Republic of China or on the principle of reciprocity.

Article 270. This Law shall come into force as of the date of promulgation, and the Civil Procedure Law of the People's Republic of china (for Trial Implementation) shall be annulled as of the same date.

COPYRIGHT 2002-2009 ALL RIGHTS RESERVED

# EXHIBIT E



**filmora**                Products ˅    Effects Store    Support ˅    Get Creative    Downloads ˅    Q   🛒

🛒 My Cart|  Sign In  |  Sign Up

Effects Store > Free > Summer Collection

## Summer Collection - Sunny effects for summery videos

♡ 64    ⬇ 89022



### Overview:

Brighten up your videos and make summer last forever!

ⓘ Note: Requires Filmora V7.3 or higher

### In This Pack:

| | | |
|---|---|---|
| ♫ Music Tracks | | 4 |
| ▣ Elements | | 27 |
| ▣ Overlays | | 2 |
| T Titles | | 8 |
| ⁍ Transitions | | 16 |

( Download )

    

Heidi's Summer    Make Memories    Dive Into Summer    Fun in the Sun

# EXHIBIT F



**filmora**

Products ∨   Effects Store   Support ∨   Get Creative   Downloads ∨

🛒 My Cart | Sign In | Sign Up

Effects Store > Free > Halloween Collection

## Halloween Collection - Spooky effects for eerie videos

♡ 43   ⬇ 52885





Walking Dead Title        Sci-fi Symbol 5        Negative        Black Vignette



---

### Overview:

Fun trick-or-treat video for the kiddies? You can do that. Bloodcurdling horror flick? You can do that too!

ⓘ Note: Requires Filmora V7.3 or higher

### In This Pack:

| | | |
|---|---|---|
| ♫ Music tracks | 12 |
| ▣ Overlays | 21 |
| T Titles | 13 |
| ◉ Filters | 9 |

( Download )



FASHION

# EXHIBIT G



IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Bulgari, S.p.A.

,

Plaintiff(s),

Case No. 15 C 5148

v.                                               Judge Sharon Johnson Coleman

The Partnerships and Unincorporated
Associations Identified on Schedule "A",

Defendant(s).

## ORDER

Motion hearing held. Plaintiff's motion for temporary restraining order including a Temporary
Injunction, a Temporary Transfer of the Defendant Domain Names, a Temporary Asset restraint,
Expedited Discovery, and Service of Process by Email and/or Electronic Publication [8] is
granted. Plaintiff's motion for leave to file excess pages [9] is granted. Plaintiff's motion to seal
document [10] is granted. Enter Temporary Restraining Order filed under seal. Status hearing
set to 6/30/2015 at 9:00 a.m.

(T: 0:03)

Date: 6/17/2015                      /s/ Sharon Johnson Coleman
                                     Sharon Johnson Coleman
                                     United States District Court Judge

2015 JUN 18 AM 11:29

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

Michael Kors, L.L.C.,                          )
                                               )
          Plaintiff,                           )
                                               )
     v.                                        )    No. 13 C 8612
                                               )
The Partnerships and Unincorporated            )
Associations identified on Schedule "A",       )    Judge Rebecca R. Pallmeyer
                                               )
                                               )
          Defendant.                           )

## ORDER

Motion hearing held on 12/5/2013. Plaintiff Michael Kors, L.L.C.'s *Ex Parte* motion for entry of a (1) Temporary Restraining Order; (2) Domain Name Transfer Order, (3) Asset Restraining Order, (4) Expedited Discovery Order, and (5) service of process by email and electronic publication order [6] granted. Plaintiff's motion to exceed page limitation [7] granted. Plaintiff Michael Kors, L.L.C.'s motion for leave to file under seal [8] granted. Schedule A attached to the Complaint and Exhibits 7 and 8 to the Declaration of Lilly Stone shall remain under seal until further order of the Court. Michael Kors shall deposit with the Court Ten Thousand Dollars ($10,000.00) as security. This Temporary Restraining Order shall remain in effect for (14) fourteen days.

ENTER:

Dated: December 5, 2013

REBECCA R. PALLMEYER
United States District Judge

(T:00:01)

R.S. DISTRICT COURT
CLERK

2013 DEC -5 PM 4:13

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Calvin Klein Trademark Trust, et al. | ) | |
| | ) | Case No: 13 C 8186 |
| v. | ) | |
| | ) | Judge: Matthew F. Kenn*elly* |
| The Partnerships and Unincorporated | ) | |
| Associations Identified on Schedule "A" | ) | |

## <u>ORDER</u>

    Motion hearing held on 11/19/2013.   Plaintiffs' motion for temporary restraining order [6], Plaintiffs' motion for leave to file excess pages [7] and Plaintiffs' motion to seal [8] are all granted. Separate orders to follow.  The Clerk is directed to seal this case in its entirety.  Status hearing set for 12/2/2013 at 9:30 a.m.

Date: 11/19/2013                 /s/ Judge Matthew F. Kennelly

(00:8)

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1**
**Eastern Division**

Manolo Blahnik International Limited

Plaintiff,

v.                                                                  Case No.:
                                                                    1:13–cv–07810
                                                                    Honorable Virginia M.
                                                                    Kendall

The Partnerships and Unincorporated Associations
Identified on Schedule "A"

Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Tuesday, November 12, 2013:

    MINUTE entry before Honorable Virginia M. Kendall: Motion for temporary restraining order [6] is granted. The temporary restraining order shall remain in effect for fourteen (14) days. Motion for leave to file under seal [8] is granted. Motion for leave to file in excess pages [7] is granted.Advised in open court notice(tsa, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NBA Properties, Inc., et al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 13 C 7181 |
| | ) | |
| The Partnerships and Unincorporated | ) | |
| Associations Identified on Schedule "A", | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Motion hearing held on 10/9/2013. Plaintiffs' *Ex Parte* motion for entry of a (1) Temporary Restraining Order, (2) Domain Name transfer Order, (3) Asset Restraining Order, (4) expedited discovery order, and (5) service of process by mail and electronic publication order [6] granted. Plaintiffs' motion to exceed page limitation [7] granted. Plaintiffs' motion for leave to file under seal [8] granted as follows: Schedule A attached to the Complaint, and WHOIS information for the Defendant domain Names and printouts of linked websites and marketplace accounts (Exhibits 1 and 2 to the Declaration of Lisa Uriguen Armstrong). Plaintiffs shall deposit with the Court Ten Thousand Dollars ($10,000,00) as security. The Temporary Restraining Order shall remain in effect for (14) fourteen days.

Status hearing set for 10/23/2013 at 9:00 AM.

ENTER:

Dated: October 9, 2013

REBECCA R. PALLMEYER
United States District Judge

(T:00:04)

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Beats Electronics, LLC | ) | |
| Plaintiff | ) | Case No: 13 C 6724 |
| | ) | |
| v. | ) | |
| | ) | Judge: Samuel Der-Yeghiayan |
| The Partnerships and | ) | |
| Unincorporated Associations | ) | |
| Identified on Schedule "A" | ) | |
| Defendant | ) | |
| | ) | |

## ORDER

Motion hearing held. Plaintiff's motion for leave to file brief in excess of 15 ages [7] is granted. Plaintiff's motion for leave to file Schedule A attached to the complaint under seal and the WHOIS information [8] is granted. Plaintiff's motion for TRO [6] is granted. Preliminary injunction hearing set for 10/23/13 at 9:30 a.m.

Date: September 25, 2013

/s/ Samuel Der-Yeghiayan
Samuel Der-Yeghiayan
U.S. District Court Judge

/VK

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Lululemon Athletica | ) | Case No: 13 C 6297 |
| | ) | |
| v. | ) | |
| | ) | Judge: Thomas M. Durkin |
| | ) | |
| The Partnerships, et al | ) | |
| | ) | |

**ORDER**

(:5)

Motion hearing held. Plaintiff's ex-parte motion for entry of temporary restraining order, domain name transfer order, asset restraining order, expedited discovery order and service of process by email and motion for leave to file under seal and motion to exceed page limits are granted. [6,7,8] Enter Sealed Temporary Restraining Order. Lululemon shall deposit with the Court Ten Thousand dollars ($10,000), either cash or surety bond, as security, which amount was determined adequate for the payment of such damages as any person may be entitled to recover as a result of a wrongful restraint hereunder. A status hearing is set for 9/24/13 at 9:00 a.m.

*Thomas M Durkin*

Date: 9/10/13

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1
### Eastern Division

Chrome Hearts LLC

Plaintiff,

v.

Case No.:
1:13–cv–04784
Honorable Amy J.
St. Eve

The Partnerships and Unincorporated Associations
Identified on Schedule "A", et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, July 10, 2013:

MINUTE entry before Honorable Amy J. St. Eve: Motion hearing held on 7/10/2013. Plaintiff's ex parte motion for entry of a (1) temporary restraining order, (2) domain name transfer order,(3) asset restraining order, (4) expedited discovery order and (5) service of process by email and electronic publication order [6] is granted. Status hearing set for 7/22/2013 at 08:30 AM.Mailed notice(kef, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1
### Eastern Division

Luxottica USA LLC

Plaintiff,

v.

Case No.:
1:13–cv–04429
Honorable Gary
Feinerman

Partnerships and Unincorporated Associations Identified
on Schedule "A", The, et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, June 20, 2013:

MINUTE entry before Honorable John Z. Lee: For the reasons stated on the record, Plaintiff's ex parte motion for entry of a (1) temporary restraining order, (2) domain name transfer order, (3) asset restraining order, (4) expedited discovery order, and (5) service of process by email and electronic publication order [6] is granted. Plaintiff's motion to exceed page limitations [7] is granted. Plaintiff's motion for leave to file under seal [8] is granted. Mailed notice(ca, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert Dow, Jr. | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 12 C 9864 | **DATE** | 12/14/2012 |
| **CASE TITLE** | Oakley Inc. Vs. Does 1- 100 | | |

**DOCKET ENTRY TEXT**

MOTION by Plaintiff Oakley, Inc. for temporary restraining order , MOTION by Plaintiff Oakley, Inc. for Entry of a Domain Name Transfer Order, Asset Restraining Order, Expedited Discovery Order, and Service of Process by Email and Electronic Publication Order [6] is granted. MOTION by Plaintiff Oakley, Inc. for leave to file excess pages [7] is granted. **MOTION by Plaintiff Oakley, Inc. to seal documents [8] is granted**. The following documents are ordered sealed: (1) Schedule A attached to the Complaint, which includes a list of the Defendant Domain Names, domain name registration information and marketplace accounts; and (2) WHOIS information for the Defendant Domain Names and printouts of linked websites and marketplace accounts (Exhibits 1 and 2 to the Declaration of Adrian Punderson).

00:5

U.S. DISTRICT COURT
CLERK
2012 DEC 14 PM 1:57

| | Courtroom Deputy Initials: | TBK |
|---|---|---|

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sharon J. Coleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 12 C 9894 | **DATE** | 12/18/2012 |
| **CASE TITLE** | True Religion Apparel, Inc. Vs. Does 1-100 | | |

### DOCKET ENTRY TEXT

Motion hearing held. Plaintiffs' motions for temporary restraining order [6], for leave to file excess pages [7], and to seal document [8] are granted. Draft order shall be entered within 24 hours of this hearing. Status hearing set to 2/4/2013 at 9:00 a.m.

Docketing to mail notices.

00:04

| | Courtroom Deputy Initials: | rh |
|---|---|---|



Order Form (01/2005) Case: 1:12-cv-09066 Document #: 17 Filed: 11/15/12 Page 1 of 1 PageID #:426

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 12 C 9066 | **DATE** | 11/15/2012 |
| **CASE TITLE** | TORY BURCH LLC, et al. Vs. DOES 1 - 100, et al. | | |

## DOCKET ENTRY TEXT

Motion hearing held. Plaintiffs' Ex Parte motion for entry of a (1) temporary restraining order, (2) domain name transfer order, (3) asset restraining order, (4) expedited discovery order and (5) service of process by email and electronic publication order [6] is granted. Plaintiffs' motion to exceed page limitation [7] is granted. Plaintiffs' motion for leave to file under seal [8] is granted. Schedule A to the complaint and exhibits 15 and 16 to the Declaration of Tiffany Walden shall remain sealed until further order of court. Plaintiffs shall deposit with the Clerk of the Court $10,000.00 as security. Status hearing set for 11/29/2012 at 9:30 am. Enter Sealed Order.

■ [ For further detail see separate order(s).]

Notices mailed by Judicial staff.

00:19

| | Courtroom Deputy Initials: | JHC |
|---|---|---|

12C8963 COACH, INC., et al. Vs. DOES 1 - 100, et al.

Page 1 of 1

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 12 C 8963 | **DATE** | 11/15/2012 |
| **CASE TITLE** | COACH, INC., et al. Vs. DOES 1 - 100, et al. | | |

**DOCKET ENTRY TEXT**

Motion hearing held. Plaintiffs' Ex Parte motion for entry of a (1) temporary restraining order, (2) domain name transfer order, (3) asset restraining order, (4) expedited discovery order and (5) service of process by email and electronic publication order [11] is granted. Plaintiffs' motion to exceed page limitation [12] is granted. Plaintiffs' motion for leave to file under seal [13] is granted. Schedule A to the complaint and exhibits 2 and 3 to the Declaration of Ethan Lau shall remain sealed until further order of court. Plaintiffs shall deposit with the Clerk of the Court $10,000.00 as security. Status hearing set for 11/29/2012 at 9:30 am. Enter Sealed Order.

■ [ For further detail see separate order(s).]

Notices mailed by Judicial staff.

00:19

| | Courtroom Deputy Initials: | JHC |
|---|---|---|

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sharon J. Coleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 12 C 1973 | **DATE** | 4/4/2012 |
| **CASE TITLE** | Deckers Outdoor Corporation vs. Does 1-1,281 d/b/a the aliases identified on Schedule A | | |

**DOCKET ENTRY TEXT**

Enter Sealed Order. This temporary restraining order without notice is entered at 4:45 p.m on April 4, 2012 and shall remain in effect for (14) fourteen days.

■ [ For further detail see separate order(s).]

Docketing to mail notices.

| | Courtroom Deputy Initials: | KG |
|---|---|---|